Rebekah Kaufman (CA Bar No. 213222)
Robert Petraglia (CA Bar No. 264849)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone: (415) 268-7000
Facsimile: (415) 268-7522
RKaufman@mofo.com
RPetraglia@mofo.com

MARC J. ZWILLINGER (*pro hac vice*)
Marc@zwillgen.com
JACOB SOMMER (*pro hac vice*)
Jake@zwillgen.com
ZWILLGEN PPLC
1705 N. Street, NW
Washington, D.C. 20036
Telephone: (202) 706-5202
Facsimile: (202) 706-5298

Attorneys for Defendant YAHOO! INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE YAHOO MAIL LITIGATION | Case No.   5:13-cv-4980 LHK<br><br>**STATEMENT OF RECENT DECISION**<br><br>L.R. 7-3(d)(2) |

Pursuant to Local Rule 7-3(d)(2), defendant Yahoo Inc. submits a copy of this Court's recent decision in *Perkins et al. v. LinkedIn Corp.*, Case No. 13-CV-04303-LHK, 2014 U.S. Dist. LEXIS 81042 (N.D. Cal. June 12, 2014), for consideration in connection with Yahoo's pending motion to dismiss the complaint in this action. A copy of the decision is attached. The opinion addresses several issues raised by the motion to dismiss, including whether Yahoo acquires users' consent to "intercept" or "access" their emails as required by the Wiretap Act (18 U.S.C. § 2511) and the Stored Communications Act (18 U.S.C. § 2701). *See* Case No. 13-CV-04303-LHK, 2014 U.S. Dist. LEXIS 81042 at *41-50.

DATED: July 1, 2014

MORRISON & FOERSTER LLP
Rebekah Kaufman
Robert Petraglia

By: /s/ Robert Petraglia

*Attorneys for Defendant YAHOO! INC.*

1

2

3

4

5

6

7  UNITED STATES DISTRICT COURT

8  NORTHERN DISTRICT OF CALIFORNIA

9  SAN JOSE DIVISION

| | | |
|---|---|---|
| PAUL PERKINS, et. al., | ) | Case No.: 13-CV-04303-LHK |
| Plaintiffs, | ) ) | ORDER GRANTING IN PART AND |
| v. | ) ) | DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE |
| LINKEDIN CORPORATION, | ) ) | TO AMEND |
| Defendant. | ) ) ) | |

Paul Perkins, Pennie Sempell, Ann Brandwein, Erin Eggers, Clare Connaughton, Jake Kushner, Natalie Richstone, Nicole Crosby, and Leslie Wall, on behalf of themselves and a putative class ("Plaintiffs"), bring the instant action against LinkedIn Corporation ("Defendant" or "LinkedIn"). *See* ECF No. 7. The gravamen of Plaintiffs' complaint is that Defendant, the operator of a popular social networking website, violated several state and federal laws by harvesting email addresses from the contact lists of email accounts associated with Plaintiffs' LinkedIn accounts and by sending repeated invitations to join LinkedIn to the harvested email addresses. *See id.* ¶ 2. Defendant filed a Motion to Dismiss the operative complaint, the First Amended Complaint ("FAC"). *See* ECF No. 17. The Motion is fully briefed, *see* ECF Nos. 24, 30, and the Court held a hearing on the Motion, *see* ECF No. 44 ("Tr."). Having considered the briefing, applicable law, and the oral arguments presented at the hearing, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion. The Court also grants Plaintiffs leave to amend the FAC to cure deficiencies identified in this Order.

1

United States District Court
For the Northern District of California

## I.    BACKGROUND

### A.    Factual Allegations

LinkedIn is a social networking website geared toward professional networking with more than 200 million users. ECF No. 7 ¶¶ 22–23. Users, who maintain resume-like profiles, utilize LinkedIn to view each other's profiles and to exchange messages. This case centers around one portion of the process that a user must complete to sign up for a LinkedIn account. Specifically, Plaintiffs, nine LinkedIn users who seek to represent a nationwide class of LinkedIn users, allege that during the sign-up process, Defendant harvests the email addresses of Plaintiffs' contacts. The Court begins by describing the sign-up process that is challenged. The Court then turns to the internal policies that LinkedIn allegedly violates through this sign-up process and user complaints about the process. The Court then concludes this section with a description of the harm that the challenged process allegedly inflicts on Plaintiffs.

When a new member signs up for LinkedIn, the website prompts her to provide her first name, last name, email address, and a password. *Id.*, Fig. 1 (which is below). Below the prompts for this information is a button titled "Join LinkedIn," adjacent to which is an asterisk. *Id.* The asterisk points to a line at the bottom of a page that states that "[b]y joining LinkedIn, you agree to LinkedIn's User Agreement, Privacy Policy, and Cookie Policy." *Id.* ¶ 26.



**Figure 1**

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

After a user clicks the "Join LinkedIn" button, she is directed to a second page, which states "let's start creating your professional profile." *Id.*, Fig. 2 (which is below). This page asks the user to provide LinkedIn with her country of residence, ZIP code, employment status, job title, and industry. *Id.* Below these fields is a button titled "Create my profile." *Id.*



**Figure 2**

A user who clicks the "Create my profile" button is directed to a page that states "Grow your network on LinkedIn." *Id.,* Fig. 3 (which is below). On this page, the user is told to "Get started by adding your email address," under which the field for "Your email" is pre-populated with the user's email address, which the user already provided to LinkedIn on the first screen, which is Figure 1. *Id.* ¶ 30. The "Grow your network on LinkedIn" page has a button for "Continue" under the pre-populated email field. *Id.*, Fig. 3 (which is below). Under the "Continue" button is a statement that reads "We will not store your password or email anyone without your permission." *Id.* Further, under that statement is an option to "Skip this step." *Id.*



**Figure 3**

A user who clicks "Continue" and who used an email address from Google's Gmail system is led to a screen from Google Accounts.[1] *See id.,* Fig. 4 (which is below). This page states that "Linkedin.com is asking for some information from your Google Account" and then lists the user's email address. *Id.* The page then contains two bullet points. The first bullet point states "Email address" and contains the email address of the user. *Id.* The second bullet point states "Google Contacts." *Id.* The user then has the option of choosing between "Allow" and "No thanks," and the buttons for each are equally sized and are equally prominent. *Id.*

---

[1] The putative class covers LinkedIn users who used any email address, not just Gmail. *See* ECF No. 7 ¶ 75. However, the FAC contains only the disclosures that Gmail users received. *See id.*, Fig. 4. Furthermore, the FAC does not state what email service each of the named Plaintiffs used. *See id.* ¶¶ 13–21. At the hearing, however, Plaintiffs' counsel represented that all of the named Plaintiffs used a Gmail account to sign up for LinkedIn. Tr. 18:13–16.

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND

**Figure 4**

A user who chooses "Allow" then proceeds to a screen titled "Connect with people you know on LinkedIn."[2] *See* ECF No. 18-2, Ex. F (which is labeled as Figure 5 below). This page contains a list of the users' contacts who are already on LinkedIn titled "people you know on LinkedIn." *Id.* LinkedIn provides this list by matching the users' contacts' email addresses, which LinkedIn has collected from Google, against LinkedIn's own membership database, which contains email addresses that LinkedIn users utilized to register for LinkedIn accounts. The page contains images and job titles of email contacts of the user who have a LinkedIn account, with check boxes next to their names. *Id.* The boxes are all checked by default. *Id.* The user can then choose between two options: "Add Connection(s)" or "Skip this step." *Id.*

---

[2] A screen shot of this page does not appear in the FAC. However, Defendant requests judicial notice of a screenshot of this page, which the Court grants for the reasons stated in *infra* Section III.

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND

1
2
3
4
5
6
7
8
9
10

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Figure 5**

After the page containing contacts who already have a LinkedIn account, the user is directed to a page titled "Why not invite some people?"[3] *Id.*, Fig. 5 (which is labeled as Figure 6 below). Below the heading on this page is the following statement: "Stay in touch with your contacts who aren't on LinkedIn yet. Invite them to connect with you." *Id.* Below that statement is a list of the user's email contacts (names and email addresses) who are not already registered on LinkedIn. *Id.* There is a checkbox next to each, and the "Select All" box is checked by default. *Id.* While only the first ten appear, there is a scroll bar, indicating that additional entries lay below. *Id.* Furthermore, next to the "Select All" box is a statement of the total number of contacts selected. *Id.* The screenshot in the FAC, for example, states "1132 Selected." *Id.* At the bottom of the page, the user could choose between "Add to Network" or "Skip this step." *Id.*

---

[3] In the FAC, Plaintiffs allege that signing up in the first instance is not the only way that users are led to this page. Rather, existing LinkedIn users are greeted on the LinkedIn homepage by a link that states "See Who You Already Know on LinkedIn." ECF No. 7 ¶ 42. Under that title is a screen that allows the user to input her email address. Like new registrants, this field is pre-populated with the email address affiliated with the user's LinkedIn account. If the user clicks the "Continue" button under the email address, she is directed to the "Why not invite some people?" page. *See id.* ¶ 44.

6

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND

**Figure 6**

If a user chooses the "Add to Network" option, LinkedIn sends an email to all of the email addresses affiliated with the checked boxes. *Id.* ¶ 44. The emails, to which Plaintiffs refer in the FAC as "endorsement emails," come from the user's name via LinkedIn and contain the following text: "I'd like to add you to my professional network." *Id.*, Fig. 7 (which is below).[4] This text is followed by a signature line that contains the LinkedIn user's name. *Id.* Below this is a button that says "Accept." *Id.* If one week after receiving an endorsement email, the recipient has not joined LinkedIn, LinkedIn sends a follow-up email with the same message. *Id.* ¶ 46. If after a second week, the recipient of the endorsement email still has not joined LinkedIn, LinkedIn sends a third email with the same message. *Id.* In the FAC, Plaintiffs alleged that "[e]ach of the reminder emails contain the LinkedIn member's name and likeness so as to give the recipient the impression that the LinkedIn member is endorsing LinkedIn and asking the recipient to join LinkedIn's social network." *Id.* ¶ 41. However, at the hearing on the instant Motion, Plaintiffs clarified that only users' names—not likenesses—appeared in the endorsement emails. Tr. 26:13–14.

---

[4] The parties confirmed after the hearing on the instant Motion that Figure 7 of the FAC contains an accurate version of the endorsement email. *See* ECF No. 42.

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND



**Figure 7**

Plaintiffs allege that once this process has been set into motion, it is nearly impossible to stop LinkedIn from sending the reminder endorsement emails. Specifically, Plaintiffs allege that "[t]he only way a LinkedIn user can stop the two follow-up endorsement emails (assuming the user found out about the initial emails in the first place) from going out to the email addresses harvested from that user's external email account is for the user to individually open up each invitation from within his or her LinkedIn account (which LinkedIn has intentionally made difficult to find within the user's account) and click a button that allows the user to withdraw that single invitation." *Id.* ¶ 50. Plaintiffs allege that there is no mechanism by which users can withdraw all endorsement emails at once. *Id.* Accordingly, Plaintiffs allege that it would take hours to prevent LinkedIn from sending the repeated endorsement emails to the hundreds or thousands of contacts a user may have. *Id.* Plaintiffs further allege that LinkedIn does not take prompt remedial action when users contact LinkedIn regarding stopping the endorsement emails. *Id.*

Plaintiffs allege that Defendant's harvesting of email addresses and sending of endorsement emails is contrary to several of Defendant's own policies. More specifically, in the FAC, Plaintiffs point to the following LinkedIn statements, to which Plaintiffs contend the harvesting and emailing practices are contrary:

- LinkedIn's statement on the screen on which it seeks a user's email address to trigger the identification of existing contacts on LinkedIn or invitation of further contacts: "We will not store your password or email anyone without your permission." *Id.* ¶¶ 47, 48; *see also id.*, Fig. 3.

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND

United States District Court
For the Northern District of California

- LinkedIn's statements in blog posts that "we are committed to putting our members first. This means being open about how we use and protect the data that you entrust with us as a LinkedIn member"; "Ensuring more privacy and control over your personal data remains our highest priority"; and "Ensuring you more clarity and consistency and control over your personal data continues to be our highest priority." *Id.* ¶ 47.

- A LinkedIn blog post titled "How to Report Abusive Behavior on LinkedIn," in which LinkedIn states that examples of abusive behavior in violation of LinkedIn's terms of service include "examples such as not using a real name/person as the profile owner, falsifying info, creating fake profiles, trying to use someone else's account, massively inviting people they don't know, and using the data in a way not authorized or intended by LinkedIn's Terms of Service. This behavior, though infrequent, strikes at the very root of a trusted professional network. We take these violations very seriously and will not tolerate this behavior." *Id.*[5]

- Two sentences from LinkedIn's Privacy Policy: (1) "You decide how much or how little you wish to communicate to individuals or groups" and (2) "We do not rent, sell, or otherwise provide your personally identifiable information to third parties without your consent unless compelled by law." *Id.* ¶ 48.

Plaintiffs also point to a number of postings by users on LinkedIn's Help Center pages complaining about the harvesting and endorsement email processes to contend that LinkedIn knew about flaws in its process but nevertheless took no action. *See id.* ¶¶ 31, 33, 36, 41, 49, 50, 58. In an extended message thread on LinkedIn's Help Center, one user described LinkedIn's process as "deceptive, misleading and purposely vague," while another stated that she was "extremely upset at the repercussions" of LinkedIn's "hacking." *Id.* ¶ 31. Another user on that message board thread states "LinkedIn should stop the spammy practices of sending out invitations to people's address book without their explicit request to do so." *Id.* ¶ 41. Yet another user states: "at this point I'm finding LinkedIn more of a problem in terms of hurting my reputation rather than helping it. What's more the invitations are NOT people in my address book. They are people I don't know. I find this entire issue extremely unprofessional on LI's part. You would think with all these members with the same problem LI would respond with a fix." *Id.* ¶ 50.

In the FAC, Plaintiffs set forth a number of theories regarding how LinkedIn's sign up process allegedly injures Plaintiffs. First, Plaintiffs allege the endorsement emails are valuable to LinkedIn. Specifically, Plaintiffs note that attracting new members to LinkedIn is integral to

---

[5] Plaintiffs selectively quote this blog post in the FAC, but the Court takes judicial notice of the entire document, which is available at http://blog.linkedin.com/2009/03/27/how-to-report-abusive-behavior-on-linkedin/, because the document has been incorporated by reference into the FAC. *See infra* Section II.C.

9

LinkedIn's business model (as LinkedIn actively advertises its size), and that endorsement emails are a critical component of attracting these new members. *Id.* ¶¶ 51–54. Plaintiffs quote Reid Hoffman, the co-founder and Chairman of LinkedIn, who stated "it's the connection with the individual that I think leads to the growth rate." *Id.* ¶ 35. Plaintiffs suggest that in the absence of the endorsement email program, LinkedIn would have to pay for email addresses to advertise and promote LinkedIn's services. *Id.* ¶ 57. Second, Plaintiffs note that LinkedIn charges its users $10 to send a LinkedIn message (known as InMail) to LinkedIn users to whom the sender is not connected. *Id.* ¶ 55. Plaintiffs rely on this to suggest that "[t]he email addresses that LinkedIn takes from its users and uses to promote its service (using the name of the LinkedIn user) have value to a user." *Id.* Third, Plaintiffs note that the increased membership that results from the endorsement emails further benefits LinkedIn by expanding the market to which LinkedIn can advertise its Premium Membership program, which costs $39.95 to $49.95 per month. *Id.* ¶ 56.

### B.      Procedural History

Plaintiffs filed a class action complaint on September 17, 2013. *See* ECF No. 1. On October 2, 2013, Plaintiffs amended their complaint and filed the FAC that is the subject of the instant Motion. *See* ECF No. 7. The FAC contains five causes of action: (1) violation of California's common law right of publicity; (2) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200; (3) violation of the Stored Communications Act ("SCA"), 18 U.S.C. § 2701; (4) violation of the Wiretap Act, 18 U.S.C. § 2511; and (5) violation of California's Comprehensive Data Access and Fraud Act ("Section 502"), Cal. Penal Code § 502. *See id.*

On December 6, 2013, Defendant filed a Motion to Dismiss and an accompanying Request for Judicial Notice. *See* ECF Nos. 17–18. On January 13, 2014, Plaintiffs filed an Opposition and an accompanying Request for Judicial Notice. *See* ECF Nos. 24–25. On January 31, 2014, Defendant filed a Reply. *See* ECF No. 30. The Court held a hearing on April 10, 2014. *See* Tr.

While the instant Motion to Dismiss was pending, the parties had a discovery dispute regarding taking the deposition of Mr. Hoffman, LinkedIn co-founder and Chairman. Specifically, the parties vigorously disputed in their Requests for Judicial Notice, whether certain quotes of Mr.

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND

1    Hoffman in the FAC and in the Opposition to the instant Motion had been taken out of context.

2    Accordingly, Plaintiffs sought a deposition of Mr. Hoffman. The parties submitted a Discovery

3    Dispute Joint Report to Magistrate Judge Lloyd wherein LinkedIn sought a protective order under

4    the apex doctrine (which requires a showing of particular knowledge and exhaustion of alternative

5    means before officials of the highest level of corporate management can be deposed under some

6    circumstances) to prevent the deposition of Mr. Hoffman. *See* ECF No. 34. Judge Lloyd ordered

7    the parties to further meet and confer because Judge Lloyd found that the parties' discussion

8    described in the Joint Report was inadequate. *See* ECF No. 35. After this further meet and confer,

9    the parties reached a stipulation. *See* ECF No. 36. Pursuant to the stipulation, LinkedIn agreed not

10   to dispute the authenticity or accuracy of the quotes of Mr. Hoffman in the FAC and the Opposition

11   to the instant Motion for the purposes of the instant Motion, and Plaintiffs agreed to withdraw the

12   deposition notice for Mr. Hoffman. *Id.* The parties reserved their rights with respect to any future

13   challenges to the accuracy of Mr. Hoffman's quotations and any future deposition of Mr. Hoffman.

14   *See id.*

15   **II.    LEGAL STANDARDS**

16          **A.    Motion to Dismiss under Rule 12(b)(1)**

17          A defendant may move to dismiss an action for lack of subject matter jurisdiction pursuant

18   to Federal Rule of Civil Procedure 12(b)(1). A motion to dismiss for lack of subject matter

19   jurisdiction will be granted if the Complaint on its face fails to allege facts sufficient to establish

20   subject matter jurisdiction. *See Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th

21   Cir. 2003). In considering a Rule 12(b)(1) motion, the Court "is not restricted to the face of the

22   pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual

23   disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560

24   (9th Cir. 1988). If the plaintiff lacks standing under Article III of the U.S. Constitution, then the

25   Court lacks subject matter jurisdiction, and the case must be dismissed. *See Steel Co. v. Citizens for

26   a Better Env't*, 523 U.S. 83, 101–02 (1998). Once a party has moved to dismiss for lack of subject

27   matter jurisdiction under Rule 12(b)(1), the opposing party bears the burden of establishing the

28

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE
TO AMEND

Court's jurisdiction, *see Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010), by putting forth "the manner and degree of evidence required" by whatever stage of the litigation the case has reached, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *see also Barnum Timber Co. v. Envtl. Prot. Agency*, 633 F.3d 894, 899 (9th Cir. 2011) (at the motion to dismiss stage, Article III standing is adequately demonstrated through allegations of "specific facts plausibly explaining" why the standing requirements are met).

### B.      Motion to Dismiss under Rule 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the non-moving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

However, a court need not accept as true allegations contradicted by judicially noticeable facts, *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and a "court may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment, *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995). A court is also not required to "'assume the truth of legal conclusions merely because they are cast in the form of factual allegations.'" *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (quoting *W. Min. Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *accord Iqbal*, 556 U.S. at 678. Furthermore, "a plaintiff may plead herself out of court" if she "plead[s] facts which establish that

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND

**United States District Court**
For the Northern District of California

1    [s]he cannot prevail on h[er] . . . claim." *Weisbuch v. Cnty. of L.A.*, 119 F.3d 778, 783 n.1 (9th Cir.

2    1997) (internal quotation marks and citation omitted).

3        **C.      Request for Judicial Notice**

4            The Court generally may not look beyond the four corners of a complaint in ruling on a

5    Rule 12(b)(6) motion, with the exception of documents incorporated into the complaint by

6    reference, and any relevant matters subject to judicial notice. *See Swartz v. KPMG LLP*, 476 F.3d

7    756, 763 (9th Cir. 2007); *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001). Under

8    the doctrine of incorporation by reference, the Court may consider on a Rule 12(b)(6) motion not

9    only documents attached to the complaint, but also documents whose contents are alleged in the

10   complaint, provided the complaint "necessarily relies" on the documents or contents thereof, the

11   document's authenticity is uncontested, and the document's relevance is uncontested. *Coto

12   Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010); *see Lee*, 250 F.3d at 688–89. The

13   purpose of this rule is to "prevent plaintiffs from surviving a Rule 12(b)(6) motion by deliberately

14   omitting documents upon which their claims are based." *Swartz*, 476 F.3d at 763 (internal

15   quotation marks omitted).

16           The Court also may take judicial notice of matters that are either (1) generally known

17   within the trial court's territorial jurisdiction or (2) capable of accurate and ready determination by

18   resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). Proper

19   subjects of judicial notice when ruling on a motion to dismiss include legislative history reports,

20   *see Anderson v. Holder*, 673 F.3d 1089, 1094, n.1 (9th Cir. 2012); court documents already in the

21   public record and documents filed in other courts, *see Holder v. Holder*, 305 F.3d 854, 866 (9th

22   Cir. 2002); and publically accessible websites, *see Caldwell v. Caldwell*, No. 05-4166, 2006 WL

23   618511, at *4 (N.D. Cal. Mar. 13, 2006); *Wible v. Aetna Life Ins. Co.*, 375 F. Supp. 2d 956, 965–66

24   (C.D. Cal. 2005).

25       **D.      Leave to Amend**

26           If the Court determines that the complaint should be dismissed, it must then decide whether

27   to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend

28

13

United States District Court
For the Northern District of California

1   "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule

2   15 . . . [is] to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez*

3   *v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and citation

4   omitted). Nonetheless, a court "may exercise its discretion to deny leave to amend due to 'undue

5   delay, bad faith or dilatory motive on part of the movant, repeated failure to cure deficiencies by

6   amendments previously allowed, undue prejudice to the opposing party . . ., [and] futility of

7   amendment.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892–93 (9th Cir. 2010)

8   (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (alterations in original).

9   **III.   REQUESTS FOR JUDICIAL NOTICE**

10           In connection with the instant Motion to Dismiss, Defendant requests that the Court take

11  judicial notice of the following documents: (1) the full text of an interview with LinkedIn founder

12  and Chief Executive Officer Reid Hoffman, which was excerpted in the FAC; (2) the LinkedIn

13  profiles of the named Plaintiffs; (3) LinkedIn's description of its "InMail" feature; (4) Google's

14  description of the Google Contacts feature; (5) LinkedIn's description of its "Invitation Reminders"

15  feature; and (6) a screen shot of "Connect with people you know on LinkedIn." ECF No. 18. In

16  connection with their Opposition to the instant Motion to Dismiss, Plaintiffs request that the Court

17  take judicial notice of the following documents: (1) an interview with Mr. Hoffman; (2) Google's

18  description of its Google Contacts API version 3.0; (3) Google's description of its "Default

19  contacts groups"; and (4) a New York Times Bits blog article about the instant litigation. ECF No.

20  25.

21           The Court rules as follows on the requests for judicial notice[6]:

22  • The Court GRANTS the requests (made by both parties) for judicial notice of the two
       interviews with Mr. Hoffman. The parties do not dispute the accuracy of the quotations of Mr.

23     Hoffman. Accordingly, judicial notice is appropriate under Fed. R. Evid. 201(b). *See*
       Tr. 5:9–14.

24  • The Court GRANTS LinkedIn's request for judicial notice of the LinkedIn profiles of the
       named Plaintiffs. The FAC refers to these pages, and Plaintiffs cite and rely on these

25

26  _____

    [6] In addition, Plaintiffs attach two judicial documents (an order and a complaint) to their Request
27  for Judicial Notice, though they do not explicitly request judicial notice of these documents. *See*
    ECF No. 25-2, Exs. E–F. The Court takes judicial notice of these documents. *See Disabled Rights*
28  *Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 866 n.1 (9th Cir. 2004) (holding that
    "undisputed matters of public record" are proper subjects for judicial notice).

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE
TO AMEND

documents in Opposition to the instant Motion. *See* ECF No. 7 ¶¶ 13–21; ECF No. 24 at 4 n.2.

- The Court GRANTS LinkedIn's request for judicial notice of LinkedIn's description of its InMail feature. The FAC discusses the InMail feature and quotes LinkedIn pages describing the feature. ECF No. 7 ¶¶ 8, 9, 55. Furthermore, Plaintiffs do not oppose the request or contend that the document is inaccurate. *See* Fed. R. Evid. 201(b).

- The Court GRANTS LinkedIn's request for judicial notice of Google's description of the Google Contacts feature. Plaintiffs have cited and relied on this document in their Opposition to the instant Motion and do not oppose LinkedIn's request or otherwise contend that the document is inaccurate. *See* ECF No. 24 at 32; Fed. R. Evid. 201(b).

- The Court GRANTS LinkedIn's request for judicial notice of LinkedIn's Help Page, which contains a description of the "Invitation Reminders" feature. Plaintiffs do not oppose this request or otherwise contend that the document is inaccurate. *See* Fed. R. Evid. 201(b). Further, the document is cited in the FAC. *See* ECF No. 7 ¶ 8.

- The Court GRANTS LinkedIn's request for judicial notice of the screen shot of the "Connect with people you know on LinkedIn." Plaintiffs do not oppose this request or otherwise contend that the document is inaccurate. *See* Fed. R. Evid. 201(b). Moreover, this screen appears between two screens cited in the FAC. *See* ECF No. 7, Figs. 4 & 5. The Court therefore finds judicial notice appropriate. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (noting that judicial notice of the context of webpages is appropriate because "[j]ust as a reader must absorb a printed statement in the context of the media in which it appears, a computer user necessarily views web pages in the context of the links through which the user accessed those pages").

- The Court GRANTS Plaintiffs' request for judicial notice of Google's description of its Google Contacts API version 3.0. LinkedIn does not oppose this request or otherwise contend that the document is inaccurate. *See* Fed. R. Evid. 201(b). In fact, LinkedIn cites and relies on this document in its Reply in support of the instant Motion. ECF No. 30 at 6, 18 n.10.

- The Court GRANTS Plaintiffs' request for judicial notice of Google's description of its "Default contacts groups." LinkedIn does not oppose this request or otherwise contend that the document is inaccurate. Accordingly, judicial notice is appropriate under Fed. R. Evid. 201(b).

- The Court DENIES Plaintiffs' request for judicial notice of a New York Times Bits blog article about the instant litigation. This document is not cited or referenced in the FAC. Furthermore, LinkedIn disputes the accuracy of the contents of the article. ECF No. 30 at 3 n.1. Therefore, the article does not contain statements "whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

## IV.   MOTION TO DISMISS

Defendant moves to dismiss the FAC on several bases. First, Defendant contends that all of Plaintiffs' claims fail because consent is a defense to all of Plaintiffs' causes of action and that an objectively reasonable person who clicked through the various screens after viewing the disclosures on LinkedIn would have consented to LinkedIn's allegedly wrongful conduct. ECF No. 17 at 10–15. Second, Defendant contends that Plaintiffs have failed to allege adequate injury for the purposes of Article III standing to pursue their right of publicity, UCL, and Section 502 claims.

15

*Id.* at 15–21. Third, Defendant contends that for various reasons, Plaintiffs have failed to state a claim with respect to each of Plaintiffs' five causes of action. *See id.* at 21–33.

The Court begins by noting that Plaintiffs have actually challenged two separate processes in LinkedIn's sign-up process. First, Plaintiffs challenge LinkedIn's harvesting and collecting email addresses from the users' contact lists. Second, Plaintiffs challenge LinkedIn's *use* of these email addresses in sending out the endorsement emails with users' names. The analytical distinction between the two challenges is important because the various causes of action challenge only one of the two processes. Specifically, the SCA, the Wiretap Act, and the Section 502 causes of action relate only to the *collection* of emails. ECF No. 7 ¶¶ 110–38. Meanwhile, the common law right of publicity relates to the second step, LinkedIn's *use* of users' names and likenesses in the endorsement emails. *See id.* ¶¶ 88–109. The UCL cause of action relates to both. Tr. 4:13–16.

The Court begins, as it must, by addressing Article III standing. Because the Court finds, for the reasons stated below that Plaintiffs adequately allege Article III standing to pursue the right of publicity, UCL, and Section 502 claims (the only causes of action for which standing has been challenged), the Court denies Defendants' Motion as it relates to standing. The Court then turns to the merits of the various causes of action. For the reasons stated below, on the merits, the Court denies LinkedIn's Motion as it relates to the common law right of publicity cause of action with respect to LinkedIn's sending of two reminder endorsement emails and the derivative UCL unlawful prong cause of action. The Court grants the remainder of Defendant's Motion.

### A.    Article III Standing

A federal court must ask whether a plaintiff has suffered sufficient injury to satisfy the "case or controversy" requirement of Article III of the U.S. Constitution. *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013) ("'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). To satisfy Article III standing, a plaintiff must allege: (1) an injury-in-fact that is concrete and particularized, as well as actual or imminent; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that the injury is redressable by a favorable ruling.

16

*Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2752 (2010); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). "The party invoking federal jurisdiction bears the burden of establishing these elements . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

In a class action, named plaintiffs representing a class "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Gratz v. Bollinger*, 539 U.S. 244, 289 (2003) (internal quotation marks and citations omitted). "[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974).

In the instant case, LinkedIn challenges Plaintiffs' Article III standing to pursue common law right of publicity, UCL, and Section 502 causes of action because LinkedIn contends that Plaintiffs have not suffered any injury. Specifically, LinkedIn contends that Plaintiffs have no coherent theory that they suffered economic harm, and that in fact, the challenged portion of the sign-up process is designed to benefit LinkedIn users, not injure them. *See* ECF No. 17 at 15–21. In their Opposition, Plaintiffs contend that Plaintiffs have standing because their names and likenesses have been misappropriated. ECF No. 24 at 19–20. Further, Plaintiffs contend that LinkedIn values the endorsement emails, because these emails help grow LinkedIn's membership base, prevent LinkedIn from having to pay member acquisition costs, and help LinkedIn sell premium memberships. *Id.* at 20–23.

Before turning to the question of whether Plaintiffs have standing to assert their right of publicity, UCL, and Section 502 claims, the Court begins by noting that LinkedIn has not challenged Plaintiffs' standing to assert claims under the Wiretap Act or the SCA. The Court nonetheless notes that Plaintiffs have standing to assert these claims. Under Ninth Circuit precedent, the injury required by Article III may exist by virtue of "statutes creating legal rights, the invasion of which creates standing." *See Edwards v. First Am. Fin. Corp.*, 610 F.3d 514, 517

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND

(9th Cir. 2010) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).  In such cases, the "standing question . . . is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Id.* (quoting *Warth*, 422 U.S. at 500). In *Edwards*, the Ninth Circuit held that the Real Estate Settlement Procedures Act conferred standing to a homeowner who sought to challenge the kickback relationship between the title insurer and title agency despite the fact that the homeowner suffered no independent injury, through, for example, overpayment. *Id.* The Ninth Circuit recently extended the holding of *Edwards* to the Wiretap Act and the SCA. *See In re: Zynga Privacy Litig.*, No. 11-18044, 2014 WL 1814029, at *5 n.5 (9th Cir. May 8, 2014). The Ninth Circuit's decision is in accord with the decisions of the courts in this District that have held that alleged colorable violations of the Wiretap Act and the SCA alone suffice, under *Edwards*, to establish Article III standing without any independent showing of injury. *See In re Google, Inc. Privacy Policy Litig.*, No. 12-1382, 2012 WL 6738343, at *5 (N.D. Cal. Dec. 28, 2012) (Wiretap Act); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1055 (N.D. Cal. 2012) (Wiretap Act and SCA); *Gaos v. Google Inc.*, No. 10-4809, 2012 WL 1094646, at *3 (N.D. Cal. Mar. 29, 2012) (SCA); *In re Facebook Privacy Litigation*, 791 F. Supp. 2d 705, 712 (N.D. Cal. 2011) (Wiretap Act).

The Court now turns to the causes of action for which standing has been challenged: the common law right of publicity, UCL, and Section 502 causes of action. This Court has previously considered the standing of a social networking website's users to raise claims that the social networking website utilized the users' names and likenesses for marketing purposes in *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785 (N.D. Cal. 2011). In *Fraley*, this Court found standing where a putative class of users alleged that Facebook's "Sponsored Stories" feature invaded the users' privacy rights. "Sponsored Stories" were advertisements that appeared on users' Facebook pages. The Sponsored Stories, which were generated based on users' Facebook posts, likes, and check-ins, contained a Facebook friend's name, profile picture, and an assertion that the friend "likes" an advertiser. *Id.* at 791. This Court concluded that plaintiffs in *Fraley* had standing. Specifically, this Court in *Fraley* found that plaintiffs had articulated a coherent theory of economic injury because

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  plaintiffs had alleged that "their individual, personalized endorsement of products, services, and

2  brands to their friends and acquaintances has concrete, provable value in the economy at large,

3  which can be measured by the additional profit Facebook earns from selling Sponsored Stories

4  compared to its sale of regular advertisements." *Id.* at 799. The Court then noted that Facebook

5  officers and consultants had suggested that advertisements that contain endorsements from a

6  familiar or trusted source had specific increased value. Therefore, the Court accepted plaintiffs'

7  assertion that "they have a tangible property interest in their personal endorsement of Facebook

8  advertisers' products to their Facebook Friends, and that Facebook has been unlawfully profiting

9  from the nonconsensual exploitation of Plaintiffs' statutory right of publicity." *Id.* The Court in

10  *Fraley* found particularly persuasive the complaint's quotation of Facebook CEO Mark

11  Zuckerberg, who stated "[a] trusted referral influences people more than the best broadcast

12  message. A trusted referral is the Holy Grail of advertising" and of Facebook COO Sheryl

13  Sandberg, who stated "[m]arketers have always known that the best recommendation comes from a

14  friend . . . . This, in many ways, is the Holy Grail of advertising." *Id.* The Court concluded that

15  plaintiffs had standing because they had "identified a direct, linear relationship between the value

16  of their endorsement of third-party products, companies, and brands to their Facebook friends, and

17  the alleged commercial profit gained by Facebook." *Id.* at 800.

18       In *Fraley*, this Court distinguished *Cohen v. Facebook, Inc.*, 798 F. Supp. 2d 1090 (N.D.

19  Cal. 2011) ("*Cohen I*"), and *Cohen v. Facebook, Inc.*, No. 10-5282, 2011 WL 5117164 (N.D. Cal.

20  Oct. 27, 2011) ("*Cohen II*"), cases that "appear[ed] highly similar" to *Fraley*. In the *Cohen* cases,

21  Judge Seeborg dismissed a misrepresentation cause of action due to plaintiffs' failure to show

22  harm. *Cohen*, which did not address Article III standing, considered Facebook's promotion of its

23  Friend Finder service. The Friend Finder service allowed users to input their email addresses into a

24  system, which "searches contact information in those [email] accounts, compares it to the

25  Facebook user database, and presents the user with a list of other Facebook users he or she already

26  knows, but who are not among his or her Facebook 'friends.'" *Cohen I*, 798 F. Supp. 2d at 1092.

27  The challenged conduct in *Cohen* was Facebook's promotion of the Friend Finder service.

28

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE
TO AMEND

1   Specifically, Facebook promoted the Friend Finder service by placing on Facebook users'

2   homepages a notification of which of each user's friends had used the Friend Finder service and

3   encouraging other users who had not used the Friend Finder service to "[g]ive it a try!" *Id.* The

4   plaintiffs in *Cohen* were Facebook users who utilized Friend Finder. These users were concerned

5   that Facebook had "used their names and profile pictures to promote the Friend Finder service

6   without their knowledge or consent" by placing the notification that these users had utilized the

7   Friend Finder service on the Facebook homepages of these users' friends who had not used the

8   Friend Finder service. *Id.*

9       In *Cohen I*, Judge Seeborg concluded that "Plaintiffs have not shown how the mere

10   disclosure to their Facebook friends that they have employed the Friend Finder service (even

11   assuming some of them did not) causes them any cognizable harm, regardless of the extent to

12   which that disclosure could also be seen as an implied endorsement by them of the service." *Id.* at

13   1097. In *Cohen II*, Judge Seeborg rejected plaintiffs' contention that "Facebook's use of plaintiffs'

14   names and likeness can be seen as serving a commercial purpose, undertaken with at least the

15   intent of achieving growth in Facebook's user base, thereby ultimately resulting in monetary gain

16   for Facebook." *Cohen II*, 2011 WL 5117164, at *2. The *Cohen II* Court found that the mere use of

17   plaintiffs' likenesses was insufficient to create the requisite injury and noted that "this is not a

18   situation where the defendant is alleged to have publicized the plaintiffs' names or likenesses to

19   any audience or in any context where they did not already appear—rather, the names and

20   likenesses were merely displayed on the pages of other users who were already plaintiffs'

21   Facebook 'friends' and who would regularly see, or at least have access to, those names and

22   likenesses in the ordinary course of using their Facebook accounts." *Id.* at *3.

23       Judge Seeborg recently interpreted *Cohen* and *Fraley* in *C.M.D. v. Facebook, Inc.*, No. 12-

24   1216, 2014 WL 1266291 (N.D. Cal. March 26, 2014). In *C.M.D.*, minor Facebook users filed suit

25   against Facebook alleging that Facebook violated the minor's rights by using the minor's name and

26   likeness in "Sponsored Stories" (as in *Fraley*) and in Social Ads, a program that allowed

27   advertisers to pair a statement that a user "likes" the advertiser with an advertisement paid for by

28

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE
TO AMEND

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    the advertiser. *Id.* at *1. The Court held that the minor had Article III standing because the case

2    was closer to *Fraley* than it was to *Cohen*. The *C.M.D.* Court relied on the fact that "plaintiffs have

3    alleged that their names and likenesses are used to endorse third-party products, companies, and

4    brands, with a resulting inference that those endorsements have 'concrete, measurable, and

5    provable value in the economy at large.'" *Id.* at *2.

6         The Court finds that this case is no different than *Fraley*. The Court's decision in *Fraley*

7    was premised on the fact that endorsements or invitations from friends or acquaintances are more

8    valuable than generic advertisements that do not contain the recommendation of a familiar or

9    trusted source. It is this measure of personalization of an endorsement that routinely has a concrete

10   and provable value, as this Court recognized in *Fraley* and as Judge Seeborg concluded in *C.M.D.*

11   In *Fraley*, Facebook allegedly sold personalized advertisements at a higher rate by

12   misappropriating the names and likenesses of its users. This redounded to a measurable economic

13   benefit for Facebook, which was able to charge more for the personalized advertisements, at the

14   expense of plaintiffs in that case who were not compensated. Similarly, here, LinkedIn is alleged to

15   have misappropriated Plaintiffs' names to promote LinkedIn and to grow LinkedIn's membership,

16   which is indisputably economically valuable to LinkedIn. Tr. 14:14–15 ("As a general matter, your

17   honor, it is of benefit to LinkedIn to have more members and a broader network."); *see also* Tr.

18   15:1–4. Just as the quotations from Mark Zuckerberg and Sheryl Sandberg in *Fraley* suggested the

19   value of personalized (as opposed to generic) endorsements, here, the FAC quotes LinkedIn

20   documents that highlight the importance of viral marketing to grow LinkedIn's membership. ECF

21   No. 7 ¶¶ 7, 51, 54. For example, the FAC alleges that LinkedIn's 2012 10-K states that "our

22   member base has grown virally based on members inviting other members to join our network"

23   and that "our member base has grown virally . . . we have been able to build our brand with

24   relatively low marketing costs." *Id.* ¶¶ 51, 54. One of the principal reasons such viral marketing is

25   superior to other forms of marketing is the source: viral marketing comes from a friend or contact

26   with whom the recipient is familiar and trusts as opposed to an unfamiliar or untrusted source.

27

28

21

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE
TO AMEND

To contend that Plaintiffs lack standing, LinkedIn relies heavily on *Cohen*. Specifically, LinkedIn contends that Plaintiffs' sole theory of injury is that LinkedIn grew its membership base through the endorsement emails, and that the growth in membership base is an insufficient theory of commercial value under *Cohen*. This Court is not persuaded by *Cohen.* As Mark Zuckerberg and Sheryl Sandberg have stated, the best recommendation comes from a friend and is the "Holy Grail" of advertising. *Fraley*, 830 F. Supp. 2d at 799. Facebook's use of users' names and likenesses to promote Facebook's Friend Finder service is undertaken with the intent to grow Facebook's user base and ultimately result in commercial advantage to Facebook. Facebook profits from this at the expense of its users. Similarly, in the instant case, LinkedIn's use of users' names to promote LinkedIn's services is undertaken with the intent to grow LinkedIn's user base and ultimately result in commercial advantage to LinkedIn. Similarly, LinkedIn profits from this at the expense of its users.

The Court notes that this type of injury, using an individual's name for personalized marketing purposes, is precisely the type of harm that California's common law right of publicity is geared toward preventing. The California Court of Appeal has recognized that the "first step toward selling a product or service is to attract the consumers' attention" and that a defendant may "gain[] a commercial advantage" by appropriating an individual's name or likeness to accomplish this goal. *See Eastwood v. Superior Court*, 149 Cal. App. 3d 409, 420 (1983); *see also Lugosi v. Universal Pictures*, 25 Cal.3d 813, 823 (1979) ("[T]he so-called right of publicity means in essence that the reaction of the public to name and likeness, which may be fortuitous or which may be managed or planned, endows the name and likeness of the person involved with commercially exploitable opportunities. The protection of name and likeness from unwarranted intrusion or exploitation is the heart of the law of privacy.").

In sum, the Court finds that individuals' names have economic value where those names are used to endorse or advertise a product to the individuals' friends and contacts. This is so because an advertisement bearing the imprimatur of a trusted or familiar source, such as a friend or

22

acquaintance, has concrete value in the marketplace. Here, Plaintiffs allege that their names were misappropriated by LinkedIn to create personalized endorsements.

For all the above reasons, the Court finds that Plaintiffs have adequately alleged Article III standing with respect to all of their causes of action. Accordingly, the Court denies LinkedIn's Motion to Dismiss on standing grounds.

### B.    SCA and Wiretap Act

The Court now turns to the merits of Plaintiffs' causes of action. The Court first addresses two causes of action related to the collection of email addresses: the SCA and the Wiretap Act. LinkedIn moves to dismiss both the SCA and the Wiretap Act causes of action on the basis that Plaintiffs have consented to LinkedIn's allegedly unlawful conduct. That is, LinkedIn contends that Plaintiffs have consented to LinkedIn's collection of email addresses from users' contact lists. The Court begins by providing some background on the statutes and then applies the consent standard in the two statutes to the allegations in the FAC.

Enacted in 1986 as Section II of the Electronic Communications Protection Act ("ECPA"), the SCA creates criminal and civil liability for certain unauthorized access to stored communications and records. *See Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 874 (9th Cir. 2002). The SCA creates a private right of action against anyone who "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701(a); *see id.* § 2707 (creating a private right of action). The SCA exempts from its coverage conduct "authorized . . . by the person or entity providing a wire or electronic communication service," *id.* § 2701(c)(1), or "by a user of that service with respect to a communication of or intended for that user," *id.* § 2701(c)(2). While there is relatively scant authority on the definition of "authorized" under the SCA, the Ninth Circuit has analogized authorization under the SCA to consent that defeats a common law trespass claim. *Theofel v. Farey-Jones*, 359 F.3d 1066, 1072 (9th Cir. 2004). The Restatement (Second) of Torts, which the

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND

1   Ninth Circuit cited for this proposition, describes the consent exception as follows: "If words or

2   conduct are reasonably understood by another to be intended as consent, they constitute apparent

3   consent and are as effective as consent in fact." Restatement (Second) of Torts § 892.

4        The Wiretap Act, which was enacted as Title III of ECPA, generally prohibits the

5   "interception" of "wire, oral, or electronic communications." 18 U.S.C. § 2511(1). More

6   specifically, the Wiretap Act provides a private right of action against any person who

7   "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or

8   endeavor to intercept, any wire, oral, or electronic communication," 18 U.S.C. § 2511(1)(a), or

9   who "intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic

10  communication, knowing or having reason to know that the information was obtained through the

11  interception of a wire, oral, or electronic communication in violation of [the Wiretap Act],"

12  *id.* § 2511(1)(d). *See id.* § 2520 (providing a private right of action). Under 18 U.S.C. § 2511(2)(d),

13  however, it is not unlawful "to intercept a wire, oral, or electronic communication . . . where one of

14  the parties to the communication has given prior consent to such interception." Consent to an

15  interception can be explicit or implied, but any consent must be actual. *See U.S. v. Van Poyck*, 77

16  F.3d 285, 292 (9th Cir. 1996); *U.S. v. Amen*, 831 F.2d 373, 378 (2d Cir. 1987); *U.S. v. Corona–*

17  *Chavez*, 328 F.3d 974, 978 (8th Cir. 2003). "[G]enerally, consent must be express, but consent may

18  be implied where there are surrounding circumstances indicating that the defendant knowingly

19  agreed to the surveillance." *U.S. v. Staves*, 383 F.3d 977, 981 (9th Cir. 2004) (internal quotation

20  marks omitted). "In the [the Wiretap Act] milieu as in other settings, consent inheres where a

21  person's behavior manifests acquiescence or a comparable voluntary diminution of his or her

22  otherwise protected rights." *Griggs-Ryan v. Smith*, 904 F.2d 112, 116 (1st Cir. 1990).

23       There may be subtle differences between the consent exception to Wiretap Act liability and

24  the authorization exception to SCA liability. However, the parties conceded, and the Court finds

25  that for the purposes of the instant Motion, the question under both is essentially the same: Would a

26  reasonable user who viewed the LinkedIn's disclosures have understood that LinkedIn was

27  collecting email addresses from the user's external email account such that the user's acquiescence

28

24

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE
TO AMEND

demonstrates that she consented to or authorized the collection? Tr. 31:19–32. The FAC, as pleaded, suggests that the answer to this question is yes. When a user enters her Gmail address into Figure 3 above and clicks "Continue," she receives a notification that says "Linkedin.com is asking for some information from your Google account [email address]" and then has a bullet point that states "Google Contacts." ECF No. 7, Fig. 4. At this point a user can choose between "Allow" or "No thanks." *Id.* It is only if, after viewing the disclosure that Linkedin.com is seeking a user's Google Contacts from her Google account, the user indicates "Allow" that a user's contacts' email addresses are imported from Google Contacts to LinkedIn. Importantly, this disclosure is presented immediately prior to the moment at which LinkedIn is alleged to have engaged in wrongful conduct. It was not, as is often the case, a disclosure buried in a Terms of Service or Privacy Policy that may never be viewed or if viewed at all on a wholly separate page disconnected from the processes that led to the alleged wrongful conduct. *See In re Google Inc. Gmail Litig.* ("*Gmail*"), No. 13-2430, 2013 WL 5423918, at *12–14 (N.D. Cal. Sept. 26, 2013). Even more significantly, perhaps, is the fact that alongside the disclosure is an express opt out opportunity in the form of the "No thanks" button. The opportunity to opt-out of the harvesting process that leads to the allegedly wrongful conduct while still utilizing LinkedIn further distinguishes this case from cases like *Gmail*, where users who sought to use Gmail could not opt out of the allegedly unlawful conduct. In light of the clarity of the disclosure, the proximity of the disclosure to the wrongful conduct, and the ability to opt out, the Court finds that the FAC, as pleaded, suggests that Plaintiffs have consented to or authorized the collection of email addresses.

The Court is not persuaded by Plaintiffs' contentions to the contrary. Plaintiffs contend that LinkedIn's disclosure that LinkedIn would access thousands of a users' contacts' email addresses is unclear. Relatedly, Plaintiffs posit that a reasonable user would not understand that the contacts that LinkedIn accesses include everyone to whom a user has sent an email. The Court finds that the allegations in the FAC fatally undermine these contentions for two reasons. First, the initial disclosure explicitly states that LinkedIn was trying to access the user's "Google Contacts." ECF No. 7, Fig. 4. There are no allegations in the FAC regarding what any of the named Plaintiffs

25

1   understood "Google Contacts" to encompass. Had the Plaintiffs looked to Google's page regarding

2   Contacts, they would have encountered Google's statement that "[e]mail addresses are

3   automatically added to your Contacts list each time you use the Reply, Reply to all, or Forward

4   functions to send mail to addresses that don't already exist in your Contacts list." ECF No. 18, Ex.

5   D. This statement suggests that "Google Contacts" encompasses all those to whom a user has

6   replied or forwarded an email. Second, to the extent that the "Google Contacts" page was not

7   viewed or was insufficiently explicit, Plaintiffs manifested consent subsequent to their initial

8   decision to allow LinkedIn to access their Google Contacts. Specifically, the LinkedIn page that

9   asks users to "Stay in touch with your contacts who aren't on LinkedIn yet. Invite them to connect

10  with you" explicitly selects all of the users' contacts and states the number of contacts that have

11  been selected. ECF No. 7, Fig. 5. The example of this page in the FAC depicted above in Figure 6,

12  for example, states "1132 Selected" next to "Select All." *Id.* None of the named Plaintiffs at this

13  point chose to "Skip this step" despite having the opportunity to do so. The fact that Plaintiffs were

14  explicitly alerted to the fact that thousands of contacts had been selected but nevertheless chose to

15  proceed further undermines Plaintiffs' contention that they did not know that they were consenting

16  to LinkedIn's collection of thousands of email addresses.

17        Plaintiffs further contend that LinkedIn's statements do not disclose the fact that LinkedIn

18  stores the email addresses in perpetuity. However, Plaintiffs have cited no case—and the Court

19  could find none—to suggest that the duration of maintaining intercepted data is relevant to the

20  issue of consent under the SCA or the Wiretap Act. Rather, under the SCA and the Wiretap Act,

21  the violation occurs at the moment of interception of communications in transit or accessing stored

22  communications. Accordingly, the Court finds that whether LinkedIn disclosed the duration for

23  which it would store email addresses is not relevant to the issue of consent.

24        Plaintiffs also contend that the "thousands" of complaints regarding LinkedIn's processes

25  by users posted to the LinkedIn website suggest that there is no consent. As a threshold matter, the

26  Court notes that the FAC does not cite thousands of user complaints. Rather, the FAC contains

27  citation to a handful of users' grievances regarding LinkedIn's processes. More importantly,

28

United States District Court
For the Northern District of California

26

1    however, the test for express consent or authorization for both the SCA and the Wiretap Act for the

2    purposes of a motion to dismiss is an objective test. That is, the question at the motion to dismiss

3    phase is whether plaintiffs have plausibly alleged that a reasonable user who undertook LinkedIn's

4    process has not consented to the collection of email addresses. Individualized subjective

5    experiences of users, while potentially relevant, do not by themselves undermine the Court's

6    finding that a reasonable user who clicked "Allow" consented to the collection of email addresses.

7            Plaintiffs' final contention is that the collection of email addresses is contrary to LinkedIn's

8    clear policy disclosures. Specifically, Plaintiffs point to the following statements of LinkedIn:

9    "grow your network"; "get started by adding your email address"; "we will not store your

10   password or email anyone without your permission"; and "LinkedIn.com is asking for some

11   information from your Google Contacts." ECF No. 24 at 12. The Court is not persuaded that

12   LinkedIn's collection of emails is contrary to any of these statements, because nothing in any of

13   these statements suggests that LinkedIn would not collect email addresses of users who clicked

14   "Allow." Further, Plaintiffs misstate LinkedIn's disclosure in their Opposition. Specifically, while

15   Plaintiffs' Opposition suggests that LinkedIn's disclosure states that "LinkedIn.com is asking for

16   some information from your Google Contacts," the screenshot of that page in the FAC actually

17   states "LinkedIn.com is asking for some information from your Google Account" and then contains

18   a bullet point that states "Google Contacts." ECF No. 7, Fig. 4. While the disclosure as modified by

19   Plaintiffs is misleading as it suggests that LinkedIn is only seeking "some information from

20   [users'] Google Contacts," the actual disclosure is not, as it may suggest that LinkedIn is seeking

21   *all* of the users' Google Contacts. Moreover, even if this disclosure is not completely clear, Figure

22   5, which discloses 218 people the user knows who have LinkedIn accounts and Figure 6, which

23   discloses 1132 people the user knows who do not have LinkedIn accounts, notify the user that all

24   the users' Google Contacts have been harvested.

25           Therefore, the Court finds that the consent and authorization defense applies to Plaintiffs'

26   Wiretap Act and SCA causes of action, and grants LinkedIn's Motion as to these claims.

27

28

United States District Court
For the Northern District of California

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE
TO AMEND

C.      **Common Law Right of Publicity**

Plaintiffs' next cause of action, the common law right of publicity cause of action, challenges LinkedIn's use of users' names in the endorsement emails. Plaintiffs must allege four elements to state a claim for violation of California's common law right to publicity: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 692 (9th Cir. 1998). "California law has not imposed any requirement that the unauthorized use or publication of a person's name or picture be suggestive of an endorsement or association with the injured person." *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 414 (9th Cir. 1996). In addition to challenging Plaintiffs' standing to bring this claim, LinkedIn contends that Plaintiffs have consented and that therefore Plaintiffs cannot allege the third element, lack of consent. Because consent is the only element of the merits of the common law right of publicity cause of action that Defendant challenges, *see* ECF No. 17 at 21, the Court's analysis below focuses exclusively on this element.

"Consent to use a name or likeness need not be express or in writing, but it may be implied from the consenting party's conduct and the circumstances of the case." *Jones v. Corbis Corp.*, 815 F. Supp. 2d 1108, 1113 (C.D. Cal. 2011) *aff'd*, 489 F. App'x 155 (9th Cir. 2012). The Ninth Circuit has held that for purposes of a common law right to publicity cause of action, "[c]onsent . . . is to be determined objectively from the perspective of a reasonable person." *Jones v. Corbis Corp.*, 489 F. App'x 155, 156 (9th Cir. 2012).

The Court agrees with LinkedIn that based on LinkedIn's disclosures, a reasonable user would have understood that her name would be used in invitations to join LinkedIn that would be sent to her contacts who were not already LinkedIn users with regard to the first endorsement email. Specifically, before the endorsement emails are sent, LinkedIn users must review a LinkedIn page that bears the title "Why not invite some people?" and that states "Stay in touch with your contacts who aren't on LinkedIn yet. Invite them to connect with you." ECF No. 7, Fig. 5. The

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND

United States District Court
For the Northern District of California

1    Court finds that these disclosures, which were contained on a page that allowed users to deselect

2    some or all of the recipients or to "Skip this step" altogether, combined with the fact that Plaintiffs

3    explicitly chose "Add to Network," suggests that Plaintiffs have consented to the dissemination of

4    endorsement emails to their contacts who are not LinkedIn members. The disclosure explicitly

5    states that LinkedIn intends to send an invitation to the email addresses that remain selected. In

6    fact, Plaintiffs do not challenge the specific format or content of the invitation email. Tr. 33:9–20

7    (The Court: "Let me ask you, with regard to Figure 7, is there -- do you have an objection or

8    concern about the format or the consent if it was rephrased a different way? Would that alleviate

9    your concerns if it . . . somehow said . . . "Matt Wiley has joined LinkedIn and invites you to join

10   him on LinkedIn," or if [it] had any different phraseology . . . ?" Plaintiffs' Counsel: "I don't

11   believe that would cure the problem, your honor, because LinkedIn is using the identities of people

12   to solicit their friends to join LinkedIn . . . .").

13        The Court is not persuaded by Plaintiffs' contention that the disclosures were not clear

14   enough to alert Plaintiffs that the emails sent to their contacts would contain an endorsement of

15   LinkedIn. The actual email that is ultimately sent to the contacts states "I'd like to add you to my

16   professional network" with the name of the LinkedIn user below. *See* ECF No. 7, Fig. 7. The Court

17   finds that a reasonable user who saw the disclosure "Invite [contacts] to connect with you" has

18   consented to this language in the email. The email contains the message that LinkedIn discloses to

19   users: an invitation from the user to the users' contacts to connect with the user on LinkedIn.

20   Plaintiffs attempt to slice the disclosures too thin in arguing for a distinction between invitations,

21   which LinkedIn clearly discloses, and endorsements, which Plaintiffs contend are contained in the

22   email. The Court finds that Plaintiffs have consented to LinkedIn's sending of emails inviting

23   Plaintiffs' contacts to join Plaintiffs' LinkedIn networks. In this instance, an invitation and

24   endorsement are synonymous. Thus, the Court uses the terms "invitation emails" and "endorsement

25   emails" interchangeably.

26        Plaintiffs' contention that LinkedIn is not clear about the volume of endorsement emails

27   that are being sent because LinkedIn only states that it is inviting "contacts" is also unpersuasive.

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE
TO AMEND

*See* ECF No. 24 at 14. Plaintiffs contend that this masks the fact LinkedIn sends emails to every address the user has contacted. Relatedly, Plaintiffs contend that the disclosure page is deceptive since only the first ten email addresses that will receive the endorsement emails are listed and the remaining email addresses are hidden beneath a scroll bar. *See id.* The Court is not persuaded. As discussed above, the disclosure page contains an explicit disclosure of the number of recipients of the endorsement emails (in the FAC's example "1132 Selected") and allows users to unselect either all or individual email addresses. *See* ECF No. 7, Fig. 5. The Court finds that explicitly listing the number on the top of the page is sufficient to alert a reasonable person to the volume of endorsement emails being sent. Despite this number appearing at the top of the webpage, Plaintiffs chose to "Add to Network" rather than skipping the step. Importantly, before the endorsement emails were sent to a user's email contacts, the user had three separate occasions to opt out of the entire process. *See* ECF No. 7, Figs. 3, 4, 5.

Although the Court concludes that Plaintiffs have consented to LinkedIn's initial endorsement email, the Court finds that Plaintiffs have plausibly alleged that they did not consent to the second and third reminder endorsement emails. While the Court has found that "Invite [your contacts] to connect with you" discloses that LinkedIn intends to send an endorsement email to the user's contacts, the same cannot be said of the two reminder endorsement emails. Nothing in LinkedIn's disclosures alerts users to the possibility that their contacts will receive not just one invitation, but three. In fact, by stating a mere three screens before the disclosure regarding the first invitation that "We will not . . . email anyone without your permission," LinkedIn may have actively led users astray. *See* ECF No. 7, Fig. 3. Specifically, it is entirely plausible that a reasonable user would have thought that by agreeing to LinkedIn's invitation of the user's contacts to connect, the user authorized LinkedIn to send only *one* invitation and that further emails would require further authorizations. Accordingly, the Court finds that consent does not defeat Plaintiffs' common law right of publicity claims as it relates to the second and third endorsement emails at the pleading stage.

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND

1    LinkedIn contends that Plaintiffs suffer no independent injury from the second and third

2    emails because "the reminder emails are no different in form and content than connection

3    invitations." ECF No. 30 at 13; Tr. 29:15–17 ("There's certainly nothing that Plaintiffs have

4    pointed to that suggest that somehow the additional two reminder e-mails causes any additional

5    harm."). The Court is not persuaded by LinkedIn's contention. It is plausible that Plaintiffs suffer

6    additional harm from the second and third endorsement emails. One of Plaintiffs' key allegations

7    throughout the FAC is that the endorsement emails have a deleterious effect on users' reputations

8    by making the users' contacts believe that the user is sending the contact multiple endorsement

9    emails. *See, e.g.*, ECF No. 7 ¶ 50. This theory demonstrates the additional harm that users suffer

10   from the second and third endorsement emails that they would not have suffered from the first

11   endorsement email. Specifically, the second and third endorsement emails could injure users'

12   reputations by allowing contacts to think that the users are the types of people who spam their

13   contacts or are unable to take the hint that their contacts do not want to join their LinkedIn

14   network. The reputational harm is magnified by the fact that the only people who receive the

15   second endorsement email are the user's contacts who chose not to register for LinkedIn upon

16   receipt of the first email. Moreover, the only individuals who receive the third endorsement email

17   are the user's contacts who chose not to register for LinkedIn upon receipt of the first and second

18   emails. Therefore, individuals who receive second and third email invitations to join LinkedIn after

19   declining one or two previous email invitations to join LinkedIn from the same sender may become

20   annoyed at the sender, which could be professionally or personally harmful. This is further

21   exacerbated by the breadth of the recipients of the endorsement emails, which includes all those to

22   whom the LinkedIn user has sent an email using the reply, reply to all, or forward functions. ECF

23   No. 18, Ex. D. This type of reputational harm—incurred additionally and independently of the first

24   endorsement email—is precisely the harm against which the common law right to publicity seeks

25   to protect. *See Lugosi*, 603 P.2d at 431. Accordingly, the Court finds that Plaintiffs have plausibly

26   alleged that they suffer additional harm from the second and third endorsement emails.

27

28

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE
TO AMEND

**United States District Court**
For the Northern District of California

1   In sum, although LinkedIn's sign-up process could and should be clearer, the Court

2   concludes that Plaintiffs' allegations that they did not consent to the first endorsement email are

3   insufficient because LinkedIn's sign-up process discloses that LinkedIn will send such an

4   endorsement email. Accordingly, the Court grants Defendant's Motion as it relates to Plaintiffs'

5   common law right of publicity action for the first endorsement email. However, the Court finds

6   that Plaintiffs have adequately pleaded lack of consent to the sending of the second and third

7   endorsement emails and that it is plausible that these subsequent emails created independent harm.

8   Defendants have raised no other arguments as to why the common law right of publicity cause of

9   action should be dismissed. Accordingly, the Court denies Defendant's Motion as it relates to the

10  common law right of publicity cause of action with regard to the second and third endorsement

11  emails.

12      **D.      Section 502**

13      Section 502 of the California Penal Code is California's Comprehensive Computer Data

14  Access and Fraud Act. The Act prohibits certain computer-based conduct such as "[k]nowingly and

15  without permission access[ing] or caus[ing] to be accessed any computer, computer system, or

16  computer network." Cal. Penal Code § 502(c)(7). LinkedIn moves to dismiss Plaintiffs' Section

17  502 cause of action on two bases. First, LinkedIn contends that Plaintiffs authorized LinkedIn's

18  access to Plaintiffs' email contacts. Second, LinkedIn contends that Plaintiffs have not alleged that

19  LinkedIn breached any technical or code-based barrier, which is fatal to Plaintiffs' Section 502

20  claims. The Court agrees with LinkedIn's second contention and therefore need not reach

21  LinkedIn's first contention.

22      The parties agree that there is a violation of the subsections of Section 502, which requires

23  action "without authorization," only where defendants circumvent technical or code based barriers

24  in place to restrict or bar a user's access. ECF No. 17 at 30–31; ECF No. 24 at 32. As this Court

25  has previously noted, "individuals may only be subjected to liability for acting 'without

26  permission' under Section 502 if they access or use a computer, computer network, or website in a

27  manner that overcomes technical or code-based barriers." *In re iPhone Application Litig.*, No. 11-

28

32

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE
TO AMEND

2250, 2011 WL 4403963, at *12 (N.D. Cal. Sept. 20, 2011) (internal quotation marks and

alterations omitted). This is in accord with the interpretation of this provision by several other

courts in this district. *See In re Google Android Consumer Privacy Litig.*, No. 11-2264, 2013 WL

1283236, at *11 (N.D. Cal. Mar. 26, 2013) ("Courts within this District have interpreted 'without

permission' to require that a defendant access a network in a manner that circumvents technical or

code based barriers in place to restrict or bar a user's access." (internal quotation marks omitted));

*In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705, 715 (N.D. Cal. 2011) ("Individuals may only

be subjected to liability for acting 'without permission' under Section 502 if they access or use a

computer, computer network, or website in a manner that overcomes technical or code-based

barriers." (internal quotation marks and alterations omitted)); *Facebook, Inc. v. Power Ventures,*

*Inc.*, No. 08-5780, 2010 WL 3291750, at *11 (N.D. Cal. July 20, 2010) (concluding after detailed

statutory analysis that "accessing or using a computer, computer network, or website in a manner

that overcomes technical or code-based barriers is 'without permission,' and may subject a user to

liability under Section 502").

   The dispute here centers on whether the FAC sufficiently alleges that LinkedIn has

breached a technical or code-based barrier. Plaintiffs' theory that once a user provides LinkedIn

with her email address, LinkedIn "tunnel[s] through any open email program on a user's desktop."

ECF No. 7 ¶ 43.[7] "Even if a user has never provided a password to LinkedIn, LinkedIn will use an

open connection to an email service to download a user's data." *Id.* In essence, Plaintiffs' theory is

that when a putative LinkedIn user has her Gmail account open in a separate tab or window or has

not logged out of Gmail after using the service and subsequently begins the LinkedIn sign-up

process, she is not re-asked for her Gmail password before she gets to the Google Accounts screen.

Tr. 36:21–37:16. The moment that troubles Plaintiffs occurs when the user clicks "Continue" after

her email is pre-prepopulated. "When you click the button 'Continue,' what it does is it checks to

---

[7] Defendants, in a footnote, move to strike the hacking and tunneling allegations under Rule 12(f),
which empowers courts to strike any "redundant, immaterial, impertinent, or scandalous matter,"
Fed. R. Civ. P. 12(f). *See* ECF No. 17 at 31–32 n.9. The Court declines to strike these allegations,
as these allegations (though not ultimately meritorious) are highly relevant to Plaintiffs' Section
502 cause of action.

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE
TO AMEND

see whether there's an open e-mail account on your computer that matches the address that's pre-

populated in there, and then if so, it queries that account and doesn't ask for the password because

it knows that you're already logged in to that account." Tr. 38:17–22. There is no allegation that at

this step of the process LinkedIn has accessed Plaintiffs' Google Contacts. The sole concern is that

LinkedIn has accessed the Google Accounts without re-prompting for a password. Tr. 39:2–10.

> More succinctly, Plaintiffs allege that LinkedIn breaches a code-based barrier by not

seeking the Plaintiffs' Google Accounts password between these two screens:



> The Court concludes that these allegations do not suggest that LinkedIn has circumvented a

technical or code-based barrier. Rather, Plaintiffs allege only that LinkedIn merely skips the step of

requiring users to input the passwords associated with their Google Accounts when a user is

already logged in to their email account on a different tab or browser window or when the user has

not logged out of her email account. As a threshold matter, it is not clear *whose* technical or code-

based barriers Plaintiffs allege LinkedIn circumvents. Moreover, to the extent that Plaintiffs rely on

Google's code-based barrier in placing the Google Contacts page behind a password, the FAC is

not clear as to how *LinkedIn* overcomes those barriers. Rather, the FAC and Plaintiff's counsel's

statements suggest that Plaintiffs overcame this barrier by providing a Google password in a

different tab or window or by not logging out of their Google accounts. In the absence of additional

specificity regarding what technical or code-based barriers were in place and as to who overcame

those barriers and how, the Court finds Plaintiffs' allegations insufficient to allege a Section 502

violation.

> Moreover, Plaintiffs suffer no harm from this allegedly wrongful conduct. Importantly, at

the moment when LinkedIn skips the step of requesting users' passwords, LinkedIn is still unable

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE
TO AMEND

United States District Court
For the Northern District of California

to access the list of email addresses of contacts of the users' Google accounts. Rather, the collection of emails only occurs after the above screen and after a user has explicitly authorized the collection. The Court finds that Plaintiffs must plead some injury emanating from LinkedIn's alleged Section 502 violations to survive the Motion to Dismiss. *See* Cal. Penal Code § 502(e)(1) (noting that only an individual "who suffers damage or loss by reason of a violation" may bring a private action). The Court grants LinkedIn's Motion to Dismiss Plaintiffs' Section 502 claims on the basis that Plaintiffs have not adequately alleged that Defendant breaches a technical or code-based barrier or that Plaintiffs have suffered any tangible harm from the alleged Section 502 violations.

### E.     UCL

The UCL broadly prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. When the "unfair competition" underlying a plaintiff's UCL claim consists of a defendant's misrepresentation, a plaintiff must have actually relied on the misrepresentation, and suffered economic injury as a result of that reliance, to state a claim for relief. *See In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009). California courts have extended this actual reliance requirement to claims brought under the UCL's unlawful prong to the extent "the predicate unlawful conduct is based on misrepresentations." *Durell*, 183 Cal. App. 4th 1350, 1355 (2010); *accord Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 326 (2011). Moreover, in *Kwikset Corp. v. Superior Court*, the California Supreme Court suggested that the actual reliance requirement applies whenever the underlying misconduct in a UCL action is fraudulent conduct. *See* 51 Cal. 4th at 326. In line with this authority, this Court has concluded "that the actual reliance requirement also applies to claims under the UCL's unfair prong to the extent such claims are based on fraudulent conduct." *See Kane v. Chobani, Inc.*, No. 12-2425, 2013 WL 5289253, at *6 (N.D. Cal. Sept. 19, 2013). Accordingly, this Court has consistently required allegations of actual reliance and injury at the pleading stage for claims under all three prongs of the UCL where such claims are premised on misrepresentations. *See Kane v. Chobani, Inc.*, No. 12-2425, 2014 WL 657300, at *5 (N.D. Cal. Feb. 20, 2014).

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND

United States District Court
For the Northern District of California

This showing of actual reliance under the UCL requires a plaintiff to allege that "the defendant's misrepresentation or nondisclosure was an immediate cause of the plaintiff's injury-producing conduct." *Tobacco II*, 46 Cal. 4th at 326 (internal quotation marks omitted). "A plaintiff may establish that the defendant's misrepresentation is an immediate cause of the plaintiff's conduct by showing that in its absence the plaintiff in all reasonable probability would not have engaged in the injury-producing conduct." *Id.* (internal quotation marks omitted). While a plaintiff need not demonstrate that the defendant's misrepresentations were "the sole or even the predominant or decisive factor influencing his conduct," the misrepresentations must have "played a substantial part" in the plaintiff's decision making. *Id.*

To make the reliance showing, this Court has consistently held that plaintiffs in misrepresentation cases must allege that they actually read the challenged representations. *See, e.g., Bruton v. Gerber Prods. Co.,* No. 12-2412, 2014 WL 172111, at *9 (N.D. Cal. Jan. 15, 2014) (holding that a plaintiff may not "assert claims based on statements she did not view"); *In re iPhone Application Litig.*, — F. Supp. 2d —,11-2250, 2013 WL 6212591, at *8 (N.D. Cal. Nov. 25, 2013) ("Plaintiffs must have seen the misrepresentations and taken some action based on what they saw—that is, Plaintiffs must have actually relied on the misrepresentations to have been harmed by them."); *see also In re LinkedIn User Privacy Litig.*, 932 F. Supp. 2d 1089, 1093 (N.D. Cal. 2013) (dismissing case because "Plaintiffs do not even allege that they actually read the alleged misrepresentation"). In the FAC, Plaintiffs have not alleged that they read any of LinkedIn's purported misrepresentations. Contrary to Plaintiffs' counsel's contention at the hearing, Tr. 35:20–25, none of the paragraphs describing the named Plaintiffs' interaction with LinkedIn suggests that these Plaintiffs actually read the alleged misrepresentations. ECF No. 7 ¶¶ 13–21. Rather, these paragraphs only suggest that named Plaintiffs registered for LinkedIn and that endorsement emails were sent to their email contacts without their authorization. Furthermore, the fact that some of the alleged misrepresentations appeared on screens that all users had to click through to register do not by themselves establish that any of the Plaintiffs actually read or relied on the misrepresentations in the absence of allegations that Plaintiffs read these statements.

36

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND

United States District Court
For the Northern District of California

1    Accordingly, the misrepresentation-based UCL claims fail, and the Court grants Defendant's

2    Motion as to these claims.

3         However, Plaintiffs also allege a UCL cause of action under the unlawful prong, which is

4    derivative of their common law publicity cause of action. *See CRST Van Expedited, Inc. v. Werner*

5    *Enterprises, Inc.*, 479 F.3d 1099, 1107 (9th Cir. 2007) (noting that a UCL unlawful prong cause of

6    action can be premised on the invasion of a common law right). It follows from the Court's denial

7    of Defendant's Motion as to Plaintiffs' common law right of publicity claim that Defendant's

8    Motion as to Plaintiffs' unlawful prong UCL claim also fails. Defendant moved to dismiss the

9    unlawful prong claim only on the basis that there is no underlying unlawful conduct and that

10   Plaintiffs lack standing to sue. ECF No. 17 at 24–25. Because both of these contentions were

11   rejected above, the Court denies Defendant's Motion as to the unlawful prong claim to the extent

12   that the claim is premised on LinkedIn's invasion of Plaintiffs' common law right of publicity

13   when LinkedIn sends the second and third endorsement emails.

14   **V.       MOTION TO STRIKE**

15        In the alternative to the Motion to Dismiss, Defendant seeks to strike Plaintiffs' class

16   allegations. *See* ECF No. 7 at 33–35. Specifically, Defendant contends that if any of the claims

17   proceed, a class cannot be certified because individual issues will predominate over common issues

18   with respect to consent. Accordingly, Defendant contends that a class cannot be certified under

19   Rule 23(b)(3). The Court is not persuaded by Defendant's contentions. As a threshold matter,

20   Plaintiffs seek injunctive relief as well as damages. A Rule 23(b)(2) injunctive class does not

21   require the Plaintiff to show predominance, the only Rule 23 element that Defendant contends

22   Plaintiffs cannot show. Accordingly, even if the Court were to agree with Defendant, it would be

23   inappropriate to strike Plaintiffs' class allegations.

24        Moreover, the Court finds that the "rigorous analysis" contemplated by the Supreme

25   Court's recent class certification rulings requires discovery and development of the record. *See*

26   *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194 (2013) ("[A] court's class-

27   certification analysis must be 'rigorous and may 'entail some overlap with the merits of the

28

37

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE
TO AMEND

1    plaintiff's underlying claim.'" (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551

2    (2011)); *see also Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) ("Before

3    certifying a class, the trial court must conduct a rigorous analysis to determine whether the party

4    seeking certification has met the prerequisites of Rule 23." (internal quotation marks omitted)).

5    Courts that have stricken class allegations at the pleading stage have recognized that the "granting

6    of motions to strike class allegations before discovery and in advance of a motion for class

7    certification is rare" and have only done so in rare occasions where the class definition is obviously

8    defective in some way. *Lyons v. Bank of Am., NA*, No. 11-1232, 2011 WL 6303390, at *7 (N.D.

9    Cal. Dec. 16, 2011). In fact, in none of the cases Defendant cites have class allegations been struck

10   for a deficiency with respect to predominance. Rather, in these cases, courts have generally struck

11   class allegations (with leave to amend) on the basis that the class definitions were overbroad, and

12   therefore, the classes were not ascertainable. *See id.* (noting that "the proposed class includes many

13   members who have not been injured"); *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1146 (N.D. Cal.

14   2010) (striking class allegations where the proposed class included individuals who had no

15   problems with the purportedly defective product); *Sanders v. Apple, Inc.*, 672 F. Supp. 2d 978, 991

16   (N.D. Cal. 2009) (striking class allegations because the proposed class definition "necessarily

17   includes individuals who did not purchase" the accused product). Therefore, the Court will not

18   strike Plaintiffs' class allegations based on a lack of predominance at the pleading stage. *See Vinole*

19   *v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009) ("Our cases stand for the

20   unremarkable proposition that often the pleadings alone will not resolve the question of class

21   certification and that some discovery will be warranted.").

22   **VI.    CONCLUSION**

23          For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART

24   LinkedIn's Motion to Dismiss and DENIES the Motion to Strike. The Court grants Plaintiffs leave

25   to amend the FAC, because the Court does not find undue delay, bad faith or dilatory motive by

26   Plaintiffs, repeated failure to cure deficiencies, or undue prejudice to LinkedIn. Further, additional

27   allegations may cure the deficiencies identified in this Order, and therefore amendment would not

28

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE
TO AMEND

*United States District Court*
For the Northern District of California

necessarily be futile. Should Plaintiffs elect to file a Second Amended Complaint curing the deficiencies identified herein, they shall do so within 30 days of the date of this Order. Failure to meet the 30-day deadline to file an amended complaint or failure to cure the deficiencies identified in this Order will result in a dismissal with prejudice. Plaintiffs may not add new causes of action or parties without leave of the Court or stipulation of the parties pursuant to Federal Rule of Civil Procedure 15.

**IT IS SO ORDERED**

Dated: June 12, 2014

_Lucy H. Koh_

LUCY H. KOH
United States District Judge

Case No.: 13-CV-04303-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND