# Exhibit C

REDACTED VERSION
SOUGHT TO BE FILED
UNDER SEAL

```
              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
                   SAN JOSE DIVISION


IN RE:                        :
                              :
YAHOO MAIL LITIGATION         : 5:13-CV-4980-LHK
                              :
                              :


       Transcript of the videotape deposition of

ROBERT J. SHERWOOD, called for Oral Examination in

the above-captioned matter, said deposition taken by

and before SILVIA P. WAGE, a Certified Shorthand

Reporter, Certified Realtime Reporter, Registered

Professional Reporter, and Notary Public for the

State of New Jersey, New York, Pennsylvania and

Delaware, at the offices of MORRISON & FOERSTER,

LLP, 250 55th Street, Conference Room 21H, New York

New York, on Thursday, September 10, 2015,

commencing at 8:29 a.m.




JOB NO. SF-054382
```

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER: Now will the court | 08:22:23 |
| 2 | reporter please swear in the witness, after which we | 08:22:25 |
| 3 | can proceed. | 08:22:27 |
| 4 | R O B E R T   J.   S H E R W O O D, | 08:22:27 |
| 5 | 12015 Wenonga Lane, Leawood, Kansas  66209, | 08:22:27 |
| 6 | after having been duly sworn, was examined | 08:22:27 |
| 7 | and testified as follows: | 08:22:27 |
| 8 | EXAMINATION BY MS. KAUFMAN: | 08:22:35 |
| 9 | Q. Good morning, Mr. Sherwood. | 08:22:35 |
| 10 | A. Good morning, Ms. Kaufman. | 08:22:38 |
| 11 | Q. Do you recall when your deposition | 08:22:40 |
| 12 | was taken in this case at the end of July? | 08:22:42 |
| 13 | A. Yes. | 08:22:45 |
| 14 | Q. And my colleague Mark Zwillgen talked | 08:22:45 |
| 15 | to you about you're being under oath for this | 08:22:51 |
| 16 | deposition? | 08:22:53 |
| 17 | A. Yes. | 08:22:54 |
| 18 | Q. And do you understand that you're | 08:22:54 |
| 19 | still under oath today? | 08:22:56 |
| 20 | A. Yes, I do. | 08:22:56 |
| 21 | Q. And that those same requirements will | 08:22:57 |
| 22 | apply? | 08:22:59 |
| 23 | A. Yes. | 08:22:59 |
| 24 | Q. Is there any reason why you can't | 08:23:00 |
| 25 | give your best testimony today? | 08:23:02 |

```
1    you mean by "scan," what you mean by "URL content,"          09:09:05
2    because I don't know -- I mean, let's start there.           09:09:11
3         Q.    Okay.  Let's turn to your Paragraph               09:09:13
4    18.                                                          09:09:16
5         A.    Okay.                                             09:09:16
6         Q.    When you say, "If Dr. Levine is                   09:09:17
7    correct, Yahoo can eliminate more than 99 percent of         09:09:20
8    incoming spam simply by ███████████████████████              09:09:23
9    ████████████████████████████  how did you use the            09:09:28
10   term "content scanning" in your Paragraph 18?                09:09:32
11        A.    Yeah, I used it exactly as it says                09:09:35
12   there.  But that's different than "URL content."             09:09:37
13   What I'm talking about here is where you're looking          09:09:42
14   at the content of an e-mail and looking,                     09:09:45
15   specifically, for known URLs that are known to be            09:09:48
16   spam.                                                        09:09:53
17        Q.    So I just want to understand how that             09:09:53
18   would work in practice.  So, when there's content --         09:09:55
19   if you're limiting content scanning to URL, explain          09:10:01
20   to me how that would work.                                   09:10:05
21        A.    Okay.  I'm not sure at what -- at                 09:10:07
22   what level I can explain it.  But, essentially, if           09:10:18
23   you have let's say some content and inside that              09:10:22
24   content is a URL, then you're going to make a                09:10:32
25   database comparison either letter by letter or item          09:10:38
```

| | | |
|---|---|---|
| 1 | by item or word by word until you get a match on the | 09:10:42 |
| 2 | URL. And then you would conclude from that that is | 09:10:46 |
| 3 | spam. | 09:10:51 |
| 4 | Q. I'm going to go back to your answer | 09:11:02 |
| 5 | just to make sure I understand it, Mr. Sherwood. | 09:11:04 |
| 6 | A. Uh-huh. | 09:11:06 |
| 7 | Q. So you say if you -- you say, let's | 09:11:07 |
| 8 | say you have some content -- and I assume you mean | 09:11:10 |
| 9 | by that e-mail content, correct? | 09:11:13 |
| 10 | A. Yes. | 09:11:16 |
| 11 | Q. (Continuing.) And inside that content | 09:11:17 |
| 12 | is a URL, then you're going to make a database | 09:11:20 |
| 13 | comparison. So tell me how that database comparison | 09:11:23 |
| 14 | works, does it look at the entire content of the | 09:11:27 |
| 15 | e-mail in order to determine whether there is a | 09:11:30 |
| 16 | match? | 09:11:33 |
| 17 | A. Yes, it looks at the content to see | 09:11:38 |
| 18 | if there's a match. That's correct. | 09:11:40 |
| 19 | Q. Just to make sure, I'm not trying to | 09:11:42 |
| 20 | be tricky, I just want to make sure that we are | 09:11:45 |
| 21 | understanding one another. | 09:11:47 |
| 22 | To determine whether a match to a URL can be | 09:11:49 |
| 23 | made, is the database looking at the body of the | 09:11:52 |
| 24 | e-mail to determine whether there is a matching URL | 09:11:57 |
| 25 | in the body of that e-mail? | 09:12:01 |

| | | |
|---|---|---|
| 1 | do.  It wouldn't surprise me if they do do it.  But | 09:30:49 |
| 2 | since most of that's proprietary, I really wouldn't | 09:30:53 |
| 3 | have access to that. | 09:30:56 |
| 4 |     Q.    So sitting here today you don't know? | 09:30:57 |
| 5 |     A.    No, there is no way that I could | 09:30:59 |
| 6 | know. | 09:31:01 |
| 7 |     Q.    And does a simple finite state | 09:31:04 |
| 8 | acceptor, in your opinion, if it were applied to | 09:31:09 |
| 9 | e-mail, would it examine content? | 09:31:12 |
| 10 |     A.    No, it wouldn't examine content. | 09:31:16 |
| 11 |     Q.    What would it do? | 09:31:18 |
| 12 |     A.    It would look at the body of the | 09:31:19 |
| 13 | e-mail.  It would make a comparison character by | 09:31:27 |
| 14 | character, if you will, and two characters at a time | 09:31:29 |
| 15 | and it would compare those characters against let's | 09:31:33 |
| 16 | say a known URL.  It would extract nothing.  It | 09:31:36 |
| 17 | would, actually, do nothing with the content and it | 09:31:39 |
| 18 | would only conclude at the end, after it had | 09:31:42 |
| 19 | compared this content with the URL or compared after | 09:31:45 |
| 20 | it located the URL in the content, it would then | 09:31:49 |
| 21 | simply say, okay, that's a spam e-mail.  It would do | 09:31:53 |
| 22 | nothing else, no extraction, no looking at the | 09:31:58 |
| 23 | content for meaning, just simply a straight database | 09:32:02 |
| 24 | comparison. | 09:32:06 |
| 25 |     Q.    So I want to be clear.  My original | 09:32:09 |

| | | |
|---|---|---|
| 1 | question asked you whether it would examine content | 09:32:11 |
| 2 | and you said, no, it would look at the body of the | 09:32:14 |
| 3 | e-mail. | 09:32:18 |
| 4 | So it sounds to me like you're drawing a | 09:32:19 |
| 5 | distinction between looking at the body of an e-mail | 09:32:23 |
| 6 | and examining content; is that correct? | 09:32:24 |
| 7 | A.   You know, I draw a distinction | 09:32:26 |
| 8 | between "examine" and "look at," yes. | 09:32:27 |
| 9 | Q.   And what distinction is that? | 09:32:29 |
| 10 | A.   Well, "examine" means to me things | 09:32:31 |
| 11 | like this.  I had an earlier question, I think, | 09:32:34 |
| 12 | something about had I examined Dr. Levine's report. | 09:32:38 |
| 13 | At some point in time I had that question.  And I | 09:32:43 |
| 14 | said, no, I looked at it, I read it.  "Examine" | 09:32:45 |
| 15 | means to study, to extract information, to learn, to | 09:32:48 |
| 16 | get something meaningful out of it.  I think it's a | 09:32:53 |
| 17 | far broader definition than simply "look at." | 09:32:56 |
| 18 | Q.   So it sounds like you're drawing a | 09:32:59 |
| 19 | distinction between reading something, looking at | 09:33:01 |
| 20 | something versus analyzing it; is that fair? | 09:33:03 |
| 21 | A.   Yes, yes. | 09:33:08 |
| 22 | Q.   So a simple finite state acceptor, in | 09:33:11 |
| 23 | your opinion, if it were applied to e-mail, it would | 09:33:20 |
| 24 | look at or read the body of the e-mail, correct? | 09:33:23 |
| 25 | A.   I would not say it reads.  I mean, | 09:33:27 |

1  A.  Well, someone has to create this  09:41:55
2  database. A company like Spamhaus, for example, or  09:41:57
3  other companies that create databases of bad URLs or  09:42:00
4  bad domains. So that database has to exist  09:42:03
5  somewhere. That's correct.  09:42:05
6  Q.  And do you agree with me that that  09:42:06
7  database needs to be updated to address changing  09:42:08
8  practices by spammers, hackers, et cetera?  09:42:12
9  A.  Sure. There are dozens of companies  09:42:15
10  that specialize in it.  09:42:17
11  Q.  Okay. Turn to your third opinion  09:42:19
12  regarding the feasibility of obtaining consent from  09:42:31
13  non-Yahoo subscribers.  09:43:05
14  A.  (The witness complies.)  09:43:13
15  Q.  Is it your opinion that a bounceback  09:43:14
16  mechanism for obtaining consent is feasible?  09:43:16
17  A.  I think what I'm actually doing here  09:43:20
18  is kind of rebutting what -- Dr. Levine's opinion.  09:43:34
19  But I think I have testified that I think a  09:43:36
20  bounceback mechanism is technically feasible, yes.  09:43:43
21  Q.  And, in your opinion, what's the  09:43:46
22  difference between impractical and unfeasible?  09:43:47
23  A.  I relate impractical to being of  09:43:50
24  commercial significance.  09:44:04
25  Q.  And how do you distinguish that  09:44:13

1  be small.  He just says, oh, it would -- I believe.                09:50:30
2  I'm not trying to paraphrase him.  But he does talk,                09:50:32
3  in general, about it would burden smaller systems.                  09:50:35
4         Q.    And what content would be in the                       09:50:38
5  message that leads you to conclude it would be very                 09:50:43
6  small?                                                              09:50:45
7         A.    What content would be in the                           09:50:49
8  bounceback message?  Well, it could be as simple as                 09:50:51
9  your e-mail program or your e-mail client or your                   09:50:55
10 e-mail address has been taken over by a spammer.                    09:51:00
11        Q.    Well, as I understand this paragraph                   09:51:07
12 --                                                                  09:51:07
13        A.    Yes.                                                   09:51:07
14        Q.    -- of your report, you're not talking                  09:51:10
15 about spam messages.  You're talking about                          09:51:12
16 bounceback for purposes of getting consent; am I                    09:51:17
17 correct?                                                            09:51:20
18        A.    Oh, excuse me.  That's correct,                        09:51:21
19 right.                                                              09:51:22
20        Q.    So what content would be in that                       09:51:22
21 message that leads you to conclude it would be very                 09:51:26
22 small?                                                              09:51:29
23        A.    Well, it's the same answer,                            09:51:29
24 essentially, except now that you've got a bounceback                09:51:32
25 that says, you know, we've got to either send you                   09:51:35

1  somewhere to get consent, such as a simple sentence, 09:51:42
2  go here to get consent or you don't have consent. 09:51:46
3  So that text message would be very small. 09:51:49
4      Q.    Have you tested it to see whether or 09:51:52
5  not smaller systems could handle those type of 09:51:56
6  messages sent from a large provider like Yahoo? 09:51:59
7      A.    No, I didn't test it.  But neither 09:52:04
8  did -- and this may be argumentive -- but either did 09:52:06
9  Dr. Levine. 09:52:11
10     Q.    Did you do anything to determine how 09:52:12
11 many kilobytes the message you're envisioning would 09:52:34
12 contain? 09:52:38
13     A.    You know, I don't recall which ones 09:52:43
14 that I looked at.  I remember I sent one.  I think I 09:52:45
15 sent a copy of that over to counsel. 09:52:51
16        It seems to me that those are all in the, I 09:52:57
17 don't know, 10 to 20 kilobyte range, which actually 09:53:03
18 seems quite large to me for a small bounceback text 09:53:07
19 message. 09:53:11
20     Q.    You sent a consent e-mail? 09:53:11
21     A.    Oh, not a consent but it was a 09:53:13
22 bounceback. 09:53:15
23     Q.    Okay.  Let me go back and ask my 09:53:15
24 question again because, I think, we're talking about 09:53:18
25 two different things. 09:53:19

| | | |
|---|---|---|
| 1 | A. Right. | 09:53:20 |
| 2 | Q. Did you do anything to determine how | 09:53:21 |
| 3 | many kilobytes the consent bounceback you're | 09:53:24 |
| 4 | envisioning would contain? | 09:53:29 |
| 5 | A. Well, a bounceback message of one or | 09:53:32 |
| 6 | two sentences, you know, would be much less than 30 | 09:53:43 |
| 7 | kilobytes. | 09:53:49 |
| 8 | Q. What did you do to determine that? | 09:53:49 |
| 9 | A. Well, you can construct a one-line | 09:53:54 |
| 10 | rejection of let's say 50 words. A word has 5 | 09:53:57 |
| 11 | letters, that's 250 bytes. I mean, it doesn't take | 09:54:03 |
| 12 | long to get a number lower than the number that I've | 09:54:07 |
| 13 | talked about here. | 09:54:11 |
| 14 | Q. Are you envisioning in this consent | 09:54:12 |
| 15 | bounceback message that there has to be some type of | 09:54:16 |
| 16 | link to, for example, Yahoo's terms of service, | 09:54:19 |
| 17 | something else? | 09:54:25 |
| 18 | A. Well, I don't think I have to design | 09:54:26 |
| 19 | it for Yahoo. But I would say they could put a link | 09:54:28 |
| 20 | in it, yes, yeah. | 09:54:32 |
| 21 | Q. I'm not asking you to design it. I'm | 09:54:34 |
| 22 | just asking you what you did to come to your opinion | 09:54:36 |
| 23 | about the size of the message. Do you understand | 09:54:39 |
| 24 | that? | 09:54:41 |
| 25 | A. Yes. | 09:54:41 |

| | | |
|---|---|---|
| 1 | Q.     Did you consider in reaching your | 09:54:42 |
| 2 | opinion about the feasibility of bounceback messages | 09:55:06 |
| 3 | for obtaining consent whether or how many times | 09:55:10 |
| 4 | Yahoo would need to send the bounceback to any | 09:55:17 |
| 5 | non-user, just once or multiple times, each time he | 09:55:22 |
| 6 | or she sent an e-mail, for example? | 09:55:29 |
| 7 |      A.     No, I didn't make any test of that. | 09:55:31 |
| 8 |      Q.     Did you consider it in coming to your | 09:55:35 |
| 9 | opinion regarding feasibility? | 09:55:38 |
| 10 |      A.     I may have thought about it, but I | 09:55:40 |
| 11 | didn't, specifically, rely on some specific number, | 09:55:42 |
| 12 | no. | 09:55:45 |
| 13 |      Q.     Okay.  So you don't have an opinion | 09:55:45 |
| 14 | either way on that? | 09:55:50 |
| 15 |      A.     On what? | 09:55:51 |
| 16 |      Q.     On how many times a bounceback would | 09:55:52 |
| 17 | need to be sent or would be sent to a non-user. | 09:55:55 |
| 18 |      A.     No. | 09:56:02 |
| 19 |      Q.     And in coming to your opinion | 09:56:14 |
| 20 | regarding the feasibility of obtaining consent | 09:56:16 |
| 21 | through a bounceback mechanism, did you consider | 09:56:20 |
| 22 | what Yahoo is supposed to do with the e-mail message | 09:56:24 |
| 23 | until it obtains consent or doesn't obtain consent? | 09:56:29 |
| 24 |      A.     What is it supposed to do technically | 09:56:33 |
| 25 | or commercially or... | 09:56:39 |

1              C E R T I F I C A T E

2

3  STATE OF NEW YORK    )

4                       ) SS.:

5  COUNTY OF NEW YORK   )

6

7            I, SILVIA P. WAGE, a Notary Public

8  within and for the State of New York, do hereby

9  certify:

10           The ROBERT J. SHERWOOD, the witness whose

11 deposition is hereinbefore set forth, was duly sworn

12 by me and that such deposition is a true record of

13 the testimony given by such witness.

14           I further certify that I am not related to

15 any of the parties to this action by blood or

16 marriage; and that I am in no way interested in the

17 outcome of this matter.

18           IN WITNESS WHEREOF, I have hereunto set my

19 hand this 14th day of September 2015.

20

21

22

23

24    _____
      SILVIA P. WAGE, CCR, CRR, RPR
      Notary Public of the State of New York
25    My Commission expires November 29, 2018