EXHIBIT A

                UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
                    SAN JOSE DIVISION
             CONSOL. CASE NO. 5:13-cv-04980-LHK


- - - - - - - - - - - - - - - -

IN RE:  YAHOO MAIL LITIGATION

                         CIVIL ACTION
                         DEPOSITION OF:
                         PATRICK S. SWEENEY, ESQ
                         AUGUST 5, 2016
                         10:14 a.m.
- - - - - - - - - - - - - - - -




          DEPOSITION BEFORE ALEXIS A. JENSEN, RPR,

CRR and a Certified Court Reporter, at the

Jefferson Street Inn, 201 Jefferson Street,

Wausau, Wisconsin, on Friday, August 5, 2016,

commencing at 10:14 in the morning, pursuant to

Notice.




            JOSEPH ALBANESE & ASSOCIATES
            Certified Shorthand Reporters
                250 Washington Street
            Toms River, New Jersey 08753
                         -
              Telephone (732) 244-6100
                Fax (732) 286-6316

Page 2

1  APPEARANCES:
2
3  KAPLAN FOX & KILSHEIMER, LLP
   BY:  DAVID A. STRAITE, ESQ.
   850 Third Avenue
4  New York, New York  10022
   Attorneys for the Class Plaintiffs
5
6  (VIA PHONE:)
7  MORRISON & FOERSTER
   BY:  ROBERT T. PETRAGLIA, ESQ.
8  425 Market Street
   San Francisco, California  94105
9  Attorneys for Yahoo, Inc.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1  EXHIBITS (CONT'D):
2  15 PACER Case 3:66-mc-00004-sic, page 118
3  16 PACER Case 1:12-cv-03852-GBD, page 121
4  17 PACER Case 0:13-cv-62496-JAL, page 126
5  18 PACER Case 3:11-md-02286-MMA-MDD, page 127
6  19 PACER Case 3:12-md-02311-MOB-MKM, page 128
7  20 PACER Case 1:14-cv-01741, page 130
8  21 PACER Case 3:11-cv-03082-LB, page 138
9  22 PACER Case 3:11-cv-05188-WHO, page 139
10 23 PACER Case 3:11-cv-05188-WHO, page 142
11 24 PACER Case 3:11-cv-05188-WHO, page 143
12 25 PACER Case 0:11-cv-60604-KMM, page 146
13 26 Complaint in OLR case, 7/10/15, page 153
14 27 Answer in OLR case, 11/10/15, page 160
15 28 DFI record, 7/20/16, page 164
16 29 Summons, 16CV0297, page 170
17 30 PACER Case 1:16-cv-00143-LEK-KJM, page 174
18 31 PACER Case 3-13-10621-rdm, page 180
19 32 PACER Case 3-13-10621-rdm, page 186
20 33 PACER Case 1:14-cv-23120-MGC, page 207
21 34 PACER Case 0:14-cv-61978-JIC, page 209
22
23
24
25

Page 3

1  INDEX
2  WITNESS
3  PATRICK SHANE SWEENEY, ESQ.
4
5  EXAMINATION
6  BY MR. STRAITE, page 5
7
8
9  EXHIBITS:
10 Sweeney Exhibits:
   1 Subpoena, page 13
11
   2 Order, page 15
12
   3 Brief summary of cases, page 16
13
   4 Objection of Mr. Sweeney, 7/14/16, page 41
14
   5 PACER Case 5:13-cv-04980-LHK, page 63
15
   6 PACER Case 6:14-cv-01290-GAP-KRS, page 93
16
   7 PACER Case 8:12-cv-00215-FMO-KES, page 101
17
   8 PACER Case 0:14-cv-61978-JIC, page 102
18
   9 PACER Case 0:14-cv-61978-JIC, page 107
19
   10 PACER Case 1:14-cv-01031-DAP, page 109
20
   11 PACER Case 3:12-md-02330-EMC, page 111
21
   12 PACER Case 1:11-cv-07972, page 113
22
   13 PACER Case 8:11-cv-01733-FMO-JCG, page 114
23
   14 PACER Case 4:13-cv-05665-YGR, page 116
24
25

Page 5

1       PATRICK SHANE SWEENEY, ESQ.,
2  having been called as a witness, being duly
3  sworn, testified as follows:
4       EXAMINATION
5  BY MR. STRAITE:
6       Q    Mr. Sweeney, good morning.
7       A    Good morning.
8       Q    Didn't mean to cut you off --
9       A    Is "so help me God" out of the official
10 State swearing in?
11      THE COURT REPORTER:  Yes.  I've
12 been doing this for 24 years and that's
13 the only way I've ever done it.
14      THE WITNESS:  We're nothing if not
15 accommodating.
16 BY MR. STRAITE:
17      Q    Again, Mr. Sweeney, thank you for
18 appearing here at your deposition.  We appreciate
19 you driving down to Wausau.  My name is David
20 Straite, and I'm co-counsel for the Class
21 appointed by Judge Koh in this case, In Re:
22 Yahoo Mail Litigation.
23      Joining me on the phone is counsel
24 for Yahoo, and he'll introduce himself.
25      MR. PETRAGLIA:  Good morning, I'm

Albanese & Associates

Page 6

1       Robert Petraglia, counsel for Yahoo, and
2  thank you for being here.
3  BY MR. STRAITE:
4       Q    Mr. Sweeney, could you please state
5  your full name, including your middle name and
6  spell it for the record.
7       A    Patrick Shane Sweeney, P-A-T-R-I-C-K,
8  S-H-A-N-E, S-W-E-E-N-E-Y.
9       Q    And you're turning off your phone?
10      A    I'm trying to.
11      Q    Okay.  Thank you.
12      A    You know what, it's my wife's phone.  You
13  got a clue?
14      Q    We can just --
15      A    You know what, let me just take the ringer
16  off.
17      Q    You understand you have been
18  administered the oath and your testimony that
19  you're providing today is subject to the oath you
20  just took?
21      A    I do.
22      Q    You understand that's the same oath
23  that you would take as if you were in a court of
24  law?
25      A    I do.

Page 7

1       Q    What is your date of birth?
2       A    3/23/55.
3       Q    That makes you 61?
4       A    It does.
5       Q    And what is your current residence?
6       A    I'm currently residing at Bay Drive in at
7  Manitowish Waters in Wisconsin.
8       Q    How long have you lived at that
9  address?
10      A    Three days.
11      Q    What was your address prior?
12      A    2590 Richardson Street, Madison,
13  Wisconsin.
14      Q    How long were you at that address?
15      A    A little over a year.
16      Q    Why did you move?
17      A    My landlord sold his house.
18      Q    When were you ordered to leave,
19  what date?
20      A    That kept changing.  We sort of thought it
21  would go all the way to the school year and all
22  of a sudden that didn't seem to close, was going
23  to be closing in seven days, and we had not
24  gotten permanent replacement housing as of that
25  time.

Page 8

1       So, we thought just get a place for
2  a month up north while we continue to look in
3  Madison for a permanent residence.
4       Q    So you're residing temporarily for
5  one month in Manitowish Waters?
6       A    Correct.
7       Q    Are all your personal belongings
8  there or have you put some belongings into
9  storage?
10      A    They are in multiple storage units.
11      Q    Okay.  How many storage units?
12      A    I have some in my sister's basement.  I
13  was some at Capital Cartage, and I have some in a
14  private rental storage area.
15      Q    Where is that?
16      A    Middleton, Wisconsin.
17      Q    Any other places that your personal
18  belongings are stored?
19      A    Not with my approval.
20      Q    Explain.
21      A    I had some of those seized in a foreclose
22  by the sheriff, and they are supposed to give
23  things that look like personal files, business
24  files, or in my case, personal business legal
25  files, and I think they did as good a job as they

Page 9

1  thought they could, but I clearly did not get all
2  my files back.
3       Q    When did this happen?
4       A    2013, in the process of trying to retrieve
5  them, went into 2014.
6       Q    Are you still continuing efforts to
7  get those things?
8       A    No.
9       Q    Okay.  Do you own any property?
10  I'm sorry, real property.
11      A    That's a good question.  I would say no,
12  but part of that is subject to a legal
13  interpretation of several foreclosures in the
14  state of Florida.
15      Q    Explain.
16      A    I own property with several other people,
17  and we had local mortgages with those banks in
18  the little towns.  BB&T bought them, foreclosed.
19  In my opinion, as a reality attorney, they
20  haven't properly foreclosed us out, although the
21  tax records would show that BB&T is the owner.
22      Q    We can get to the details of those
23  later.  Right now I'm just trying to determine if
24  any of those properties would be considered a
25  residence for you.

3 (Pages 6 to 9)

Albanese & Associates

Page 10

```
 1      A     No.  I have no other property that would
 2  be considered residence, in my understanding of
 3  the definition, and I practice in Florida and
 4  that's often at issue, because it's a non-tax
 5  state and people are coming from tax states in
 6  the -- for example, in New York, where you live,
 7  there's 100 revenue agents in South Florida for
 8  the sole purpose of figuring out whether
 9  South Florida people are -- who claim Florida
10  residence and in fact former residents and not
11  New York residents for tax purposes.
12          I have been through this residence
13  checklist dozens, if not hundreds, of times
14  during my career, and I don't believe I have,
15  under those definitions, another residence.
16      Q     Okay.  Prior to your Richardson
17  Street address -- you said you were there for one
18  year, correct?
19      A     Correct.
20      Q     Where did you live prior to that?
21      A     I lived in Orange County, California.
22      Q     I'm sorry, immediately prior.
23      A     Orange County, California.
24      Q     Okay.  For how long did you live in
25  Orange County, California?
```

Page 11

```
 1      A     Beginning in July of 2014, ending in
 2  August of 2015.
 3      Q     About 13 months you lived in
 4  California?
 5      A     About 13 months.
 6      Q     Was that a full-time residence?
 7      A     Yes, pretty sure.  I did -- I was in-house
 8  counsel for an EB-5 investment company in Orange
 9  County, and they put me up in the hotel for four
10  months and then a corporate apartment for five
11  months, and I lived with some friends for three
12  months, and then my family came out and we rented
13  a place for two months, so I just call it Orange
14  County, but it's globbed together with several
15  different residences.
16      Q     During your 13 months out in
17  California, did your family -- strike that.
18          Where did your family live during
19  those 13 months?
20      A     In Madison.
21      Q     Do you know what address?
22      A     I don't, actually, but it is -- I used to
23  live on the street, I should know it.  It's in
24  Fitchburg, Wisconsin, which is -- technically,
25  when I say Richardson, Madison, it's really in
```

Page 12

```
 1  Fitchburg, but Fitchburg is a Class A city that
 2  doesn't have a post office.  So, the post office
 3  is Madison, but if you put Fitchburg or Madison
 4  on a letter, it will get there.
 5      Q     I assume you have been deposed
 6  before?
 7      A     Yes, sir.
 8      Q     That's correct?
 9      A     Yes.
10      Q     How many times have you been
11  deposed?
12      A     I'll take a guess, ten.
13      Q     Okay.  When was your most recent
14  deposition?
15      A     I'm not sure.  It had to be during some of
16  the foreclosures that took place in 2011, '12,
17  '13, maybe '14, so some of those proceedings, I
18  know I was deposed, I'm not sure which ones.
19  Unfortunately, there were money.
20      Q     Have you been deposed in the last
21  two years?
22      A     I don't believe so.
23      Q     Have you ever been deposed in your
24  capacity as an objector in a Class action?
25      A     No.
```

Page 13

```
 1      Q     This is the first time?
 2      A     Yes.
 3      Q     Since you've been deposed ten
 4  times, I won't go through the instructions that
 5  we ordinarily go through with a novice witness.
 6      A     And I've taken dozens of depositions
 7  myself.  Although I'm not a litigator, I've done
 8  some motion practice and discovery through my
 9  career.
10      Q     As counsel?
11      A     As counsel.
12      Q     You've taken depositions several
13  times?
14      A     Yes.
15      Q     When was the most recent time you
16  have taken someone's deposition?
17      A     I guess it's 2012.
18      Q     I'd like to put into evidence
19  Exhibit Number 1.
20          (Exhibit Number 1 was marked.)
21  BY MR. STRAITE:
22      Q     I already gave a copy of it to the
23  court reporter.  Here's a copy for you.
24      A     Thank you.
25      Q     Do you recognize this document?
```

Page 14

1    A    Yes, I believe it's the subpoena that has
2    summoned me here today.
3         Q    As you see, it has my signature
4    midway down on the right-hand side.
5    A    That is correct.
6         Q    It says August 3rd, 2016, so this
7    is the revised subpoena that we negotiated this
8    week?
9    A    Correct.
10        Q    And you're here at this deposition
11   pursuant to this subpoena?
12   A    That is correct.
13        Q    Thank you for --
14        THE COURT REPORTER:  Just let him
15   finish his question.
16        THE WITNESS:  Not a problem.
17   BY MR. STRAITE:
18        Q    You also see there's an Exhibit A?
19   A    Yes.
20        Q    And there's an Exhibit B?
21   A    Yes.
22        Q    We'll come back to those as needed
23   throughout the deposition, so you should keep
24   that handy.
25             Entering into Exhibit 2.  Here's a

Page 15

1    copy for you, Mr. Sweeney.
2    A    Thank you.
3         (Exhibit Number 2 was marked.)
4    BY MR. STRAITE:
5         Q    Mr. Sweeney, do you recognize this
6    document?
7    A    I do.
8         Q    What is this document, to the best
9    of your knowledge?
10   A    I believe it's the order that Judge Koh
11   granted giving you leave to conduct the discovery
12   on myself.
13        Q    Have you read this document?
14   A    I have.
15        Q    Any portion of the document you
16   skipped over?
17   A    No.
18        Q    Okay.  Put that aside, we may come
19   back to that.
20             During our negotiations this week,
21   you said you and your son caught muskie.
22   A    My son caught a muskie.  It's a
23   muskellunge, I believe, and it is the Great White
24   shark of the upper midwest fresh lakes.  They can
25   grow to be 60 inches long and 60 pounds, and they

Page 16

1    have been known to eat baby ducks, and we did not
2    get our fingers anywhere near the mouth.  People
3    have lost fingers.
4         Q    How old is he?
5    A    He's 13.
6         Q    And he can handle a 25-pound fish?
7    A    He did.  Actually, I know he can handle a
8    50-pound fish.  He caught an Amberjack this
9    spring break in Florida.
10        Q    Very impressive.
11   A    The franchise, I call him (indicating).
12        Q    The witness is showing a picture of
13   his son.  It's not an exhibit.
14   A    Yet.
15        Q    This is Exhibit 3.
16        (Exhibit Number 3 was marked.)
17   BY MR. STRAITE:
18        Q    Do you recognize this document?
19   A    I do.
20        Q    What is this document?
21   A    I would call it my makeshift summary,
22   which is not numbered correctly, of objection
23   matters that I'm involved in at the present time.
24        Q    And you typed this list?
25   A    I believe I did.

Page 17

1         Q    When did you type this up?
2    A    I try to keep a running list, but I'm not
3    very good at it, so it's -- my guess is -- then I
4    make copies of it and then I modify those, so my
5    guess this is made with different inputs over the
6    last four months, five months.
7         Q    So, this is a running document?
8    A    Generally, yes.
9         Q    What does that mean, "generally"?
10   A    Sometimes I will make it a permanent
11   document and print it out and give it to somebody
12   like I did -- like I emailed it to you.
13        Q    Are there other versions of this
14   document?
15   A    There are, as part of a master list of
16   other matters I have in my life that aren't
17   objection matters, so, yes.
18        Q    Okay.  We're going to return now to
19   Exhibit Number 1.  Do you have that in front of
20   you?
21   A    I do.
22        Q    In Exhibit 1, do you see at the end
23   Exhibit B?
24   A    Yes.
25        Q    And these are the Request for

Page 18

1    Production of Documents?
2    A    Yes.
3         Q    Do you remember reading these?
4    A    Yes.
5         Q    Let's start with the first Request
6    for Production.  We asked for all documents
7    relating to your assertion that you are a member
8    of the settlement Class in the action.
9         Did you bring any documents with
10   you responsive to Request Number 1?
11   A    No.
12        Q    Did you look for documents in
13   responsive to Request Number 1?
14   A    I didn't, because I don't believe I have
15   any documents that fit that description.
16        Q    We should not anticipate a
17   production via email today?
18   A    Correct.
19        Q    Request for Production Number 2:
20   We asked for all documents relating to your
21   objection filed in the action, including drafts
22   of your objection and communications regarding
23   the drafts.
24        Did you look for any documents that
25   would be responsive to Number 2?

Page 19

1    A    Other than the objection, I don't believe
2    any exist, except for my communication with you,
3    which you have.
4         Q    Okay.  Number 3, we asked for:
5    Copies of any and all legal authority in support
6    of your objection.
7         Did you bring any documents with
8    you today that would be responsive to this
9    request?
10   A    I did not.
11        Q    Did you look for any documents that
12   would be responsive to --
13   A    I did not.
14        Q    Were there ever any documents?
15   A    I didn't cite any legal authority, so,
16   directly, no.
17        Do some exist in a research file
18   somewhere on another matter that may apply?
19   Possibly, but not that I referred to in objecting
20   in this case or complying with this request.
21        Q    Request for Production Number 4, we
22   asked for:  All communications with any person
23   including any other objector or any attorney
24   relating to your objection filed in the action.
25        Did you look for any documents

Page 20

1    responsive to this request?
2    A    I didn't, and I didn't because I don't
3    believe any exist.
4         Q    Number 5, we asked for:  All
5    documents what would reflect any person who
6    participated in drafting your objection.
7         Did you look for any documents
8    responsive to this request?
9    A    I assume that meant other than me?
10        Q    Correct.
11   A    No, I didn't, because I don't believe any
12   exist.
13        Q    On the back, top of page 5 of this
14   document, Request Number 6, we asked for:  All
15   documents relating to all agreements between you
16   and any person, including any other objector or
17   attorney, in connection to the action, including
18   any agreement to compensate you for acting as an
19   objector.
20        Did you look for any documents
21   responsive to this request?
22   A    No, because I don't believe any exist.
23        However, I would like to disclose
24   on the record that this sometimes gets shared as
25   a matter of course, not because of this objection

Page 21

1    or any other objections, with both some of my
2    part-time staff, which sort of changes, and I
3    also have an office in Florida where there's
4    staff and sometimes this document or a bigger
5    document would go back or forth, but it is not
6    necessarily in anticipation -- it is certainly in
7    anticipation of their entering into this
8    objection.  They keep a running copy usually of
9    what I'm up to, and I have my staff keep one for
10   me.
11        Q    So, you emailed a copy of Exhibit 3
12   or some version of Exhibit 3 to people in
13   Florida?
14   A    I may have.  Don't know for sure, but I
15   may have.  In the ordinary course of business,
16   it's likely.
17        Q    Did you contact these people in
18   Florida to see --
19   A    No, I did not.
20        THE COURT REPORTER:  Just let him
21   finish his question.  Go ahead.
22        THE WITNESS:  No, I did not.
23   BY MR. STRAITE:
24        Q    Why not?
25   A    I didn't believe it was relevant.

Page 22

1      Q      Number 7, we asked for:  All
2  documents relating to any objection you filed or
3  that was filed on your behalf in connection with
4  any other Class action settlements.
5           Did you look for any documents
6  responsive to this request?
7  A    I did.
8      Q      And did you find any?
9  A    I did not, but I know there are some, and
10  I'm not quite sure which one of the three storage
11  places they may be in.
12           However, I have a pretty good grasp
13  of what settlements were made -- I hesitate to
14  say that -- I have a grasp of what settlements I
15  have been involved in.  Lesser of a grasp of all
16  the cases I have objected in, but certainly I
17  remember the ones of which there was a monetary
18  settlement.
19      Q      What do you mean by "monetary
20  settlement"?
21  A    Where my fees were paid as part of the
22  settlement.
23      Q      Going back to Number 6:  All
24  documents relating to all agreements between you
25  and any person, including any other objector or

Page 23

1  attorney in connection to the action, including
2  any agreement to compensate you for acting as an
3  objector.
4           You said you didn't believe there
5  any such documents.
6  A    I read that wrong.  I read that in my
7  capacity as representing objectors, and of those,
8  I don't have any documents.
9           In cases where I was pro se, I have
10  signed documents that were settlements.
11      Q      How many?
12  A    Let me take a minute here, because --
13      Q      Take as much time as you need.
14  A    About approximately seven.
15      Q      So, you think approximately seven
16  times you received compensation as an objector
17  pro se?
18  A    Yes.
19      Q      But you don't have any documents
20  related to those settlements?
21  A    No, I don't.  I don't keep my -- my
22  documents for much longer than I have to.
23      Q      So --
24  A    Which means after the check clears or the
25  case is dismissed or whatever, they'll lay around

Page 24

1  for a while, but as I clean my home office, which
2  is my office, I don't save those things that
3  belong to me.
4      Q      Do you also delete them from your
5  computer?
6  A    Sometimes, yes.
7      Q      Have you deleted all seven of these
8  settlement agreements from your computer?
9  A    Don't know, some certainly.
10      Q      Did you search your computer for
11  these agreements?
12  A    No.
13      Q      Why not?
14  A    Not sure they're there, and I don't have
15  my computer with me.
16      Q      Where is your computer?
17  A    In storage.
18      Q      When did you put your computer into
19  storage?
20  A    Beginning of July.
21      Q      Let's talk about these seven --
22  approximately seven agreements.
23           What's the most recent one?
24  A    That I objected to and settled?
25      Q      Yes.

Page 25

1  A    Okay.  Including verbal settlement?
2      Q      Yes.
3  A    Most recent one was yesterday.
4      Q      Which case was that?
5  A    I have to remember what it's actually
6  called.  I know what I call it.
7      Q      What do you call it?
8  A    Midland.  I believe it's somebody ver --
9  objector, representative of the Class versus
10  Midland Credit Corp. or something like that.
11      Q      Okay.  And how much were you
12  compensated for it?
13  A    $35,000.
14      Q      Have you received the check yet?
15  A    No.
16      Q      When do you expect to receive the
17  check?
18  A    October.
19      Q      Have you agreed how it would be
20  made out, meaning to you or to your law firm?
21  A    We didn't discuss it, but I assume to me
22  personally.
23      Q      Before that, what was the most
24  recent settlement?
25  A    Hain Celestial.

Page 26

```
 1       Q    And when did that -- when did you
 2  agree to settle that?
 3       A    I agreed in February and got paid in, I
 4  would I guess, April.
 5       Q    How much was that settlement?
 6       A    $20,000.
 7       Q    What's another one you recall?
 8       A    Tom's of Maine.
 9       Q    And when did you agree to settle
10  there?
11       A    March.
12       Q    And how much was the amount of the
13  settlement?
14       A    $5,000.
15       Q    What's the next one you recall?
16       A    I know the amount.
17       Q    How much is that?
18       A    $25,000. I'm going to refer to some old
19  calenders and what have you and see if a name
20  jumps out at me (indicating). I don't recall it,
21  but if it comes to me, I can tell you, but it was
22  earlier this year. Hold on. It was earlier this
23  year, and that's really all I can think of right
24  now.
25       Q    Okay. So --
```

Page 27

```
 1       A    We'll call it, for purposes of now, the
 2  $25,000 settlement case, if it works for you.
 3       Q    It works for me.
 4            What's the next one you recall?
 5       A    One of the overdraft checkings in the
 6  Southern District of Florida, and I believe it
 7  was Fladell versus Wells Fargo.
 8       Q    How much was the settlement there?
 9       A    10,000.
10       Q    When was that settlement agreed to?
11       A    Agreed to summer of '15, funded fall of
12  '15, something like that.
13       Q    What's the next one you recall?
14       A    Land Rover, as I recall it. Somebody
15  versus Land Rover and Jaguar.
16       Q    How much was that settlement for?
17       A    I received 40 -- $47,500.
18       Q    When did you agree to settle?
19       A    I believe February or so, 2014.
20       Q    And funded?
21       A    A month or so after.
22       Q    What's the next one you recall?
23       A    Another one of the overdraft cases in
24  Florida, and I believe it was Bank America.
25       Q    What was the amount of that
```

Page 28

```
 1  settlement?
 2       A    I believe another $25,000. I might be
 3  wrong in that amount. Approximately.
 4       Q    When was that?
 5       A    Early 2012 or 2013.
 6       Q    Are there any others that you
 7  recall? This is seven, but --
 8       A    That's all I recall. If it was anything
 9  else, it was minor minor.
10       Q    What's minor?
11       A    Either such a small amount or no amount
12  that I don't recall sitting here today.
13       Q    That's fine. None of us have
14  perfect memory.
15       A    Particularly the events that didn't do
16  anything for your life.
17       Q    In each of these cases, were they
18  all paid by check or bank wire?
19       A    Some of either, and I don't really
20  remember which were which, but I have received
21  wires and I have received checks.
22       Q    For the wires, were they wired into
23  your personal account or business account?
24       A    Wired into my daughter's account.
25       Q    Which daughter is that?
```

Page 29

```
 1       A    Kerry Ann.
 2       Q    Why were they wired into Kerry
 3  Ann's account?
 4       A    She's my office manager to the extent I
 5  have one. She controls the funds and pays the
 6  bills as necessary, gives dad his allowance,
 7  whatever the case may be.
 8       Q    We'll get to Kerry Ann in a little
 9  bit. We'll finish this Request for Documents.
10            Number 8, we asked for: All
11  documents -- so back to Exhibit Number 1, the
12  last page, picking up with Request for Production
13  Number 8: All documents relating to any monetary
14  payment made in connection with any objection you
15  filed, or that was filed on your behalf, in any
16  other Class action settlement. This is similar
17  to Number 6, but an extension.
18            So, just to confirm, you didn't
19  search for documents related to this --
20       A    I did not. I don't believe I have any.
21       Q    Thank you. As I said before, we
22  appreciate you accepting service of the subpoena
23  via email.
24            What's best for you going forward?
25  Would you like us to mail or email?
```

Albanese & Associates

Page 30

```
 1      A    Email.
 2      Q    So, you'll accept service -- for
 3  example, our final response is due to the Court
 4  on August 11th, which is coming up pretty
 5  quickly.
 6           You prefer email rather than US
 7  mail?
 8      A    Yes.
 9      Q    Which email address do you want us
10  to --
11      A    Patrick@sweeneylegalgroup.com.
12      Q    Patrick@sweeneylegalgroup.com.
13  Okay.  That's not the same email address we've
14  been using, right?
15      A    I believe you have been using
16  Patrickshanesweeney, which -- I had a method to
17  this madness at one time, but it is -- there's
18  been so many exceptions to the rule that, I would
19  just prefer that you use
20  patrick@sweeneylegalgroup --
21      Q    And we'll accommodate your
22  preference.
23      A    Thank you.
24      Q    Going forward, then, for service of
25  anything else in this case, we'll email it to
```

Page 31

```
 1  that address.  Thank you very much.
 2           And I'll extend you the same
 3  courtesy.  You don't need to send things by US
 4  mail to me, but the Court is a different matter,
 5  because you're not filing the ECF, is that right,
 6  in the Northern District of California?
 7      A    Yes.
 8      Q    They still, I assume, want things
 9  US mail, but anything else you file should be
10  emailed to us and also sent to the Court, just to
11  be safe, because I can't speak for the Court.
12      A    Okay.
13      Q    Thanks.  I'll also represent on the
14  record if I receive an email of any service from
15  you, I'll share it with Yahoo counsel.
16           Is that okay with you?
17      A    No problem.
18      Q    Okay.  A couple of preliminary --
19  further preliminary questions before we get to
20  some of the other documents.
21           You know, you've done this before a
22  million times, right?
23      A    Seems like it.
24      Q    Are you under the influence of
25  alcohol right now?
```

Page 32

```
 1      A    I am not.
 2      Q    When is the last time you had a
 3  drink?
 4      A    Two or three years ago.  Two years ago, I
 5  guess.
 6      Q    A while ago.  It was yesterday or
 7  this morning?
 8      A    No.
 9      Q    Are you taking any narcotics?
10      A    Narcotics, no; prescriptions, yes.
11      Q    Are any of those prescription
12  medications -- you don't have to identify them.
13  Are any of those prescription medications
14  interfering or likely to interfere with your
15  ability to testify accurately and truthfully?
16      A    No.
17      Q    Do you have any medical conditions
18  that would interfere with your ability to testify
19  accurately if you weren't on the medication?
20      A    No.
21      Q    Have you ever had any medical
22  condition that would interfere with your ability
23  to remember or interfere with judgment or ability
24  to testify accurately and truthfully today?
25      A    I have had more than one concussion.  None
```

Page 33

```
 1  in the last 20 years, but as a younger man.
 2  That's all I can think of that may -- not that I
 3  was testifying during those times, but --
 4      Q    Okay.  How did you get here today?
 5      A    By automobile, the long way.
 6      Q    What kind of car do you drive?
 7      A    Actually, I have a rental car and it is a
 8  Chrysler sedan.
 9      Q    You've rented it for the month?
10      A    Yes.
11      Q    In your name?
12      A    No.
13      Q    In who's name?
14      A    Kerry Ann's.
15      Q    She rented it for you?
16      A    Yes.
17      Q    Did you keep track of the mileage
18  here today from your home?
19      A    No, I did not.
20      Q    Okay.  Could you please track of
21  the mileage from here on the way back?
22      A    Yes.  On the way here it wouldn't have
23  been accurate.
24      Q    I understand.  Why is that?
25      A    I thought I was doing a good deed picking
```

Albanese & Associates

Page 34

1  up a young man hitching a ride.  We ended up -- I
2  was in Taylor County, I was in Price County, and
3  I don't think either one of those are on the way
4  from Manitowish Waters to Wausau.
5      Q    Is that why you were a few minutes
6  late this morning?
7  A    That is absolutely why.
8      Q    Okay.  Are you returning tonight
9  back to Manitowish Waters?
10  A   Yes.
11      Q    Are you parked in the garage?
12  A    No, actually I just parked here
13  (indicating), I was so late.
14      Q    Okay.  What did you do to prepare
15  for today's deposition?
16  A    Actually, I think I looked at my objection
17  and looked at the notice.  I take that back.  I
18  looked at the subpoena.  I did not look at this,
19  but I thought it would be helpful for you --
20      Q    When you say "this"?
21  A    Is this an exhibit?
22      Q    It is an exhibit.
23  A    Exhibit 3.  I didn't look at it, but I
24  brought it up from my email and forwarded it to
25  you thinking it might be helpful, but I knew what

Page 35

1  was in it, and I knew I was forwarding it to you,
2  and I read the order of Judge Koh.
3      Q    By "order," you mean Exhibit 2?
4  A    Yes.  I'm sorry.  Yes.
5      Q    Other than Exhibit 3, did you
6  provide me with any other documents?
7  A    No.
8      Q    Did you provide any other documents
9  to any other counsel in this case?
10  A    In this case?
11      Q    Yes.
12  A    No.
13      Q    Who did you speak with about
14  today's deposition?
15  A    My wife, my daughter, Kerry Ann.  I think
16  that's all.
17      Q    What did you discuss with Kerry Ann
18  regarding this case?
19  A    Just that I was going to a deposition in
20  Wausau, Wisconsin in lieu of going to Madison.
21  Mostly about who was using the car when.
22      Q    Did you discuss the substance of
23  the objection?
24  A    No.
25      Q    Did you discuss the substance of

Page 36

1  the case?
2  A    No.
3      Q    Did you mention the case name to
4  her?
5  A    I believe so.
6      Q    Did she ask any questions?
7  A    No.
8      Q    What did you say to your wife?
9  A    I said, "I'm, again, going to Wausau."
10      We discussed how the kids would get
11  to the beach today, and we discussed that it was
12  Yahoo that was the Defendant in this case.
13      Q    Did you discuss the substance of
14  the objection?
15  A    No.
16      Q    Did you discuss the substance of
17  the case?
18  A    No.
19      Q    You said you're employed?
20  A    I'm self-employed.
21      Q    What do you do for a living?
22  A    I'm an attorney.
23      Q    Sole practitioner?
24  A    Yes.
25      Q    You said you have employees or

Page 37

1  part-time employees?
2  A    I have independent contractors that do
3  some of my secretarial work, and my daughter does
4  some of my office management work, most of it.
5      Q    Any other lawyers working for you?
6  A    No.
7      Q    Even on a contract basis?
8  A    No.
9      Q    What's your office address?
10  A    Well, last year it's been 2590 Richardson.
11      In our discussion, you brought up
12  an interesting point of what is my address in my
13  office as we speak, and, I guess, it's Bay Road
14  Manitowish Waters, because that's where I reside
15  with my files.  And 2590 Richardson, although
16  they are accepting and saving my mail, and I have
17  not had it forwarded, because I don't want to
18  forward it up here, because by the time they
19  forward it up here, I probably won't be here
20  anymore.
21      So, we did for the last week, we
22  went and got mail, and I will be back next
23  Tuesday or Wednesday and I'll stop at Richardson
24  and get mail, but my mailing address or office
25  address would be Bay Road in Manitowish Waters.

1     Q     Do you also have an address in
2  Florida?
3  A    Yes.
4     Q     What's that address?
5  A    750 South Dixie Highway, Boca Raton, which
6  is B-O-C-A, R-A-T-O-N, Florida 33432.
7     Q     Do you practice law out of that
8  address?
9  A    I do.
10     Q     How often?
11  A    Meaning how often do I go there?
12     Q     Yes.
13  A    Almost never.  I haven't been there
14  physically in seven years, eight years.
15     Q     Okay.  It's another law firm?
16  A    I rent from a law firm that is a
17  litigation firm, and for the last 20 years, I
18  have done their corporate real estate work.
19     Q     Are you of counsel to the firm in
20  the formal way?
21  A    We've never agreed to a formal of counsel.
22  Having said that, about seven or eight years ago
23  in just looking through a file that had some of
24  their stationery, lo and behold, there I was
25  listed at the top of their letterhead as of

1  counsel.  We changed it, and it didn't always
2  appear -- it didn't appear as quickly changed as
3  I thought it might, and then through the years,
4  and I don't know if it's just a secretary calling
5  up a form, through the years, I've seen it again,
6  but we definitely had discussed that I am not and
7  let's make sure there's not stationery going out
8  that says I am.
9     Q     Okay.
10  A    That's a liability issue for them and for
11  me.
12     Q     What's the name of the firm?
13  A    Lavalle, L-A-V-A-L-L-E, Brown & Ronan,
14  R-O-N-A-N.
15     Q     How do you know this firm?  How did
16  you come to know them?
17  A    I originally practiced out of law school
18  in South Florida only and lived in Boca Raton.  I
19  worked for a couple firms for a few years and
20  then I went solo.
21       When I went solo, I was looking for
22  office space, and they had just gone through a
23  reverse merger.  They were at one time the
24  biggest law firm in Boca Raton, which in 1992
25  wasn't all that big, probably 20 people, and it

1  broke up, but they still had the offices.  I
2  started renting in June of 1992 and I rent there
3  today.
4     Q     How much do you pay in rent today?
5  A    In the past six or seven years when I'm
6  not going there physically, 200 a month.  Prior
7  to that, it was 600 a month, plus any actual
8  expenses they may have incurred on my behalf.
9       At one time, you may recall, long
10  distance was a deal, faxes were a deal, copies
11  were a bigger deal than they are today.
12     Q     Are you current on your rent with
13  them?
14  A    Yeah, we -- we do quite a bit of work
15  together, and so it kind of comes out in the
16  wash.  About two or three or four times a year,
17  we try to -- try to -- what's the word? --
18  straighten up our accounts and rent is just one
19  of them -- usually the smallest of them so, yes.
20     Q     So, they'll waive rent sometimes in
21  exchange --
22  A    Right, or they'll owe me money and I'll
23  say just put it in my rent credit account.  It's
24  pretty loose.  We're good friends.  We're -- and
25  professional associates in one way, shape or

1  form.  For 20 years we've been partners in
2  multiple business transactions, all the way from
3  real estate holdings to minor league baseball
4  teams to vacation homes to --
5     Q     It sounds like it goes back a
6  while?
7  A    It does.
8     Q     I'd like to introduce the next
9  exhibit.
10       (Exhibit Number 4 was marked.)
11  BY MR. STRAITE:
12     Q     Mr. Sweeney, do you recognize this
13  document?
14  A    Yes, I do.
15     Q     What is this document?
16  A    This is the objection that I filed in this
17  case.
18     Q     And turning to page 4, is that your
19  signature?
20  A    Yes.
21     Q     And is that email accurate?
22  A    Email address?
23     Q     Yes.
24  A    Yes.
25     Q     Let's go through this starting on

Page 42

```
 1    page 1. Let me know if you need a break.  We'll
 2    spend a few minutes on this.
 3        A    I'm good.  I would rather propel ahead, as
 4    they say.
 5        Q    I can accommodate the request.
 6             Let's start with proof of
 7    membership in the Class.  It says:  Upon a
 8    forward view of that certain notice of Class
 9    action.
10             What notice are you referring to?
11        A    The one I described that I reviewed for
12    this deposition.  Bear with me for a second, if
13    you would.
14        Q    Of course.
15        A    I, for some reason, only have the summary
16    notice.
17        Q    Is that the notice that you
18    reviewed?
19        A    It is the one I reviewed last night.  I
20    can't say for a fact whether there was another
21    one I reviewed earlier.  Let me ask you:  Is
22    there a long form?
23        Q    I just want to know what you
24    reviewed.  I'm just curious what you meant when
25    you said you made a full review of a certain
```

Page 43

```
 1    notice.
 2             I'm just curious what you reviewed.
 3        A    Then, I don't recall.  It certainly could
 4    have been this.  There was a full notice.  By the
 5    way I operate, it would have been that, but I'm
 6    not seeing that there was one, so maybe this was
 7    the only notice I reviewed.
 8        Q    When you say "reviewed," what does
 9    that mean?
10        A    I read it.
11        Q    Every word?
12        A    I don't know if that's a "gotcha" question
13    or not.  I didn't read every word.
14        Q    No, it's not a "gotcha" question.
15             Just some people use the word
16    "review" to mean skim and some people use the
17    word --
18        A    No, I read them generally.  I'd like to
19    think I do.
20        Q    You say you're a member of the
21    Class as defined in the notice.
22             What is the Class here?
23        A    I believe there's two subclasses, if
24    that's the term, and I'm going to consult the
25    notice, if that's okay with you.
```

Page 44

```
 1        Q    Sure.
 2        A    (Reviewing document.)  I believe one of
 3    the definitions of the Class is if you're a Yahoo
 4    mail subscriber and then if you're not a Yahoo
 5    mail subscriber but you sent emails or received
 6    them from a Yahoo mail subscriber after October
 7    2nd, 2011, or if you intend to do so in the
 8    future, which I thought sort of meant everyone on
 9    earth, except in China.
10        Q    What is your understanding of this
11    case, generally?
12        A    My understanding is that the Plaintiff has
13    accused Yahoo of scanning emails sent or received
14    from Yahoo subscribers for purposes of
15    advertising.
16             I'm not quite sure what that means.
17    I know they're not putting it up on a billboard,
18    but I assume that possibly could mean selling a
19    mailing list to advertisers.  Maybe it is using
20    those as an example of what Yahoo can do or -- I
21    didn't find a real extensive definition of the
22    act, but that's my understanding.
23        Q    What does "scanning" mean?
24        A    My understanding is scanning is taking a
25    hardcopy document and running it through a
```

Page 45

```
 1    character recognizer, sort of copying it
 2    electronically so you're able to store it
 3    electronically.
 4        Q    There are two classes in this case,
 5    you are correct there.  One is defined to be a
 6    CIPA Class, California Invasion Privacy Act.
 7             Are you familiar with that law?
 8        A    I am familiar with it.
 9        Q    What is it?
10        A    It's a cutting-edge law, as California
11    often has, covering the Internet part of invasion
12    of privacy.  I think it's even broader than that,
13    but I think that's where it comes up in
14    violations.
15        Q    But it's a state law?
16        A    State law, yeah, California code.
17        Q    Right.  And you don't live in
18    California?
19        A    I did for a while.  I went to law school
20    in California.  I have clients in California,
21    friends in California, business relations in
22    California.  I law clerked prior to being a
23    lawyer in California.
24        Q    Are you currently a California
25    resident, though?
```

Albanese & Associates

Page 46

1    A    No.
2         Q    Would you be surprised to learn
3    that the CIPA Class only includes California
4    residents?
5    A    Not shocked.  Didn't know one way or the
6    other, but --
7         Q    Are you claiming to be a member of
8    the CIPA Class?
9    A    I am, yes.
10        Q    Even though you don't live in
11   California?
12   A    I did live in California during the Class
13   period.
14        Q    So your part is based on prior
15   residence?
16   A    It is, but I believe the second part of it
17   is even broader than that, so I think the SCA
18   part is even broader than the California
19   residence.
20        Q    What is SCA, do you know?
21   A    I don't know off the top of my head.
22        Q    Would you be surprised to learn it
23   means the Stored Communications Act?
24   A    No, not surprised.
25        Q    You believe that's a national

Page 47

1    Class?
2    A    I believe it is.
3         Q    And what claims were asserted in
4    this case under the Stored Communications Act?
5    A    That the stored data was improperly used
6    by Yahoo.
7         Q    If that's the allegation, do you
8    have any evidence that your data was improperly
9    shared?
10   A    No.  And I'll tell you, in my opinion,
11   most Class members have very little evidence that
12   other than the two or three sentences often in a
13   notice that they're part of a Class, and I've
14   gone so far as in representing a client, the fact
15   of getting a green card didn't make you a member
16   of the Class, and often, and maybe even usually,
17   asking you about did something that happened
18   seven or eight or nine or ten or four or five
19   years ago happen to you, and then the absurdity
20   of it is that some of the claim forms say -- if
21   not most of them, if not all of them -- say, I
22   swear under penalty of perjury, and my guess is
23   95 percent of Americans are guessing when they
24   become a member of the Class.
25        So, I've always found it an odd

Page 48

1    part of the process, not necessarily the law, but
2    the actual process, and you've got to say, I
3    think that's me.
4         And they say, well, do you swear
5    under perjury?
6         And I guess, yeah.
7         Q    So it's an informed guess?
8    A    It's certainly an informed guess, at best.
9    I'm not just speaking of me, but I'm speaking of
10   Class members everywhere and always and often.
11        Q    When you say you're a member of one
12   of two of the classes, are you making an informed
13   guess?
14   A    Yes.
15        Q    What informed that guess?
16   A    Recollection mostly.
17        Q    For which Class?  For the
18   CIPA Class?
19   A    For both.
20        Q    Do you have any reason to believe
21   that an email that you sent to a Yahoo subscriber
22   was ever share to a third party in violation of
23   the SCA?
24   A    Do I have actual evidence?  No.  I have
25   reason to believe it was pled by a -- you, on

Page 49

1    behalf of a member of a Class that represented
2    members that I believe I am one, a Class of which
3    I am a member of.
4         I have no evidence of what Yahoo
5    does or does not do internally with anything, for
6    that matter.  I'm not even sure where they are.
7    They are out West somewhere, Silicon Valley
8    somewhere.
9         THE WITNESS:  Where are you guys?
10   BY MR. STRAITE:
11        Q    He's not the one under oath.  I'm
12   not sure we can ask Robert any questions.  Maybe
13   when we're off.
14   A    That's okay.
15        Q    Do you have a Yahoo email account?
16   A    No.
17        Q    If the settlement were rejected, do
18   you anticipate filing your own individual action?
19   A    I haven't decided.  You mean rejected by
20   Judge Koh?
21        Q    Correct.
22   A    I haven't decided.
23        Q    But it's a possibility?
24   A    Might.  I reserve the right to, certainly.
25        Q    If the settlement were reserved,

1 would that right be foreclosed?
2 A    That calls for speculation. I think
3 objecting is -- my understanding is it's similar
4 to opting out, but I'm not really sure on that.
5 I have never had to research it. It's never come
6 up. Interesting question. Maybe I'll do it in
7 my free time tonight.
8      Q    Going back to your objection on
9 page 1, the next sentence after you assert you're
10 a member of a Class. You say you intend to file
11 a claim in this matter.
12 A    Yes.
13      Q    When do you intend to file the
14 claim?
15 A    I don't know off the top of my head, and I
16 don't know if I filed one already or not.
17      Q    Do you know if there's a deadline?
18 A    I'm certain there's a deadline. I take it
19 back. I don't think there's any claim process,
20 because there's no money going to the -- to the
21 Class members.
22      Q    So, this sentence, you intend to
23 file a claim in this matter, that's no longer
24 true?
25 A    I don't believe it's true. I may be wrong

1 on that, and I'm not sure why, but this is --
2 this is a Class action where there is no payment
3 to a Class member. I'm thinking there's no claim
4 process.
5      Q    So your understanding is there's no
6 claim process?
7 A    That's my understanding, as I sit here
8 today.
9      What I thought when I filed this,
10 I'm not sure.
11      I am sure I have not seen a Class
12 action that doesn't have a claims process, and my
13 guess is maybe there's not a settlement
14 administrator, because there's no proceeds to
15 deal out.
16      Q    So, this was a guess here? The
17 "you intend to file a claim," that was a guess?
18 A    I'm not sure if it was a guess or it was
19 what I intended to do at the time, not knowing
20 that there was no claim to be filed.
21      Q    And I know we went through this
22 before, but just to clarify, your last sentence
23 in your proof of membership in the Class you say:
24 His address and telephone number are listed at
25 the conclusion of this objection.

1      You list on page 4, 2590 Richardson
2 Street, and you have since moved since the
3 objection was filed?
4 A    That is correct.
5      Q    Have you notified the Court of your
6 new address?
7 A    I have not, but after talking to it Class
8 counsel this week, it is on my list this weekend.
9      Q    Let's go to page 2, Reasons for
10 Objecting to the Settlement.
11      You wrote: For the following
12 reasons, inter alia, the settlement agreement is
13 not fair, reasonable and adequate.
14      Below that you have Number 1, you
15 have Number 2, and then Number 2 goes on for a
16 couple of pages, and at the top of page 4, you
17 have a Number 3; is that correct?
18 A    Yes.
19      Q    So there are three reasons?
20 A    Correct.
21      Q    Let's talk about reason Number 1
22 for your objection. You say: The claims
23 administration process fails to require reliable
24 oversight, accountability and reporting about
25 whether the claims process actually delivers what

1 was promised.
2      What did you mean by this
3 objection?
4 A    In this case, there's not a claims
5 administrator. So, who does the process of, for
6 lack of a better word, policing Yahoo fall to? I
7 was really unable to tell who was the new sheriff
8 after fees are paid. Is there any oversight?
9      Arguably, the judge has a duty to
10 do it, because it always happens. I question
11 whether it always does.
12      Does Class counsel -- are they as
13 vigorous as they get paid as they were before?
14 I've seen Class counsel not as vigorous after
15 they were paid on cases. It's just human nature.
16      I'll relate it to the title
17 "Insurance Industry." They get paid at closing
18 when they've only issued the title commitment,
19 but they really are getting paid for the future
20 issuing of title insurance policy, so the stack
21 of policies to be issued is usually very high,
22 because they're paid at closing prior to issuing
23 the premium.
24      I think it's just human nature that
25 the -- once all the fireworks are done and once

1  the administrators have been paid or the lawyers
2  have been paid or the judge has been able to move
3  it off its calendar, it just has a human tendency
4  to becoming history and doesn't always get the
5  attention it did when it was an ongoing open
6  matter.
7      Q     If there were no claims
8  administration process in this settlement, would
9  you still be asserting objection Number 1 or
10  would it be dropped?
11  A     I would, and maybe from a drafting
12  point-of-view, I would put the -- I don't know
13  the word. It's not injunctive release -- maybe
14  it is injunctive release, but at least provided
15  by the settlement, that process is able to
16  require reliable oversight.
17      Do you see where I'm going?
18      I called it the claims
19  administration process. Maybe that's the right
20  word, maybe it's not. A more precise word would
21  have been the following up on Yahoo that they
22  comply with the terms of the settlement
23  agreement.
24      Q     Your second reason for objecting to
25  the settlement is the fee calculation is unfair.

1  That's the beginning of paragraph 2 on page 2 of
2  Exhibit 4.
3      Why is the fee calculation unfair?
4  A     I have a couple thoughts on that matter,
5  and I have to be honest, one of the things that's
6  difficult for me when I object is, it's part of
7  my philosophy of objecting, is usually the most
8  likely objection is the fee calculation.
9      So, that requires me as an
10  attorney to say to my brethren in law, I'm going
11  to try to take some money out of your pocket,
12  that you may already have, but for me in of your
13  pocket.
14      Frankly, I have a professional
15  problem with that. I'm sort of from the old
16  school, we're all on the same side.
17      There are objector attorneys who
18  could tell you stories about myself that would
19  back up my position that I've taken. I've taken
20  some actions simply because I had a member of the
21  Bar that came out and said, look, it's not a good
22  time for me for you to be doing this.
23      I said, okay. What do you want me
24  to do?
25      Q     Then what happens?

1  A     It has happened where they have said, can
2  you just go home on this one?
3      And I say, correct, or yes.
4      So, inherently, I have a problem
5  making an objection.
6      Almost always, I could come up with
7  several grounds of why Class counsel is overpaid.
8  Clearly, the American public feels they are.
9  Clearly, the Chamber of Commerce across the
10  nation feels they are. Clearly, business owners
11  feel they are. Clearly, insurers think they are.
12      Having said that, in this one,
13  there's a couple real hot ones. One, there's no
14  monetary payment to the Class. I think, as we've
15  talked about this, I'll use a real overbroad --
16  you'll see it cited sometimes but it's so broad,
17  not a great legal authority, but it's in the
18  little book that is the judge's guide to -- it's
19  either Class actions or mass tort, but they have
20  indications of improper fees, and the first one
21  that screams out at you is the lawyers are the
22  only ones getting -- the Class lawyers are the
23  only ones getting the money. That's the case
24  here.
25      Second of all, there wasn't a lot

1  of stuff going on in this case. My recollection
2  is there wasn't a trial. I don't believe there's
3  summary judgment.
4      I think it had less than 200 docket
5  entries, and in Federal Court, docket entries,
6  unlike most state courts, you've got a notice
7  that you're going to notice that you're going to
8  send a letter, and then you send a letter, and
9  then you have another entry that indicates that
10  you, in fact, sent the letter. I say that in
11  humor a bit, but there are just an awful lot of
12  entries that are hardly even procedural.
13      So, if it's less than 200 entries,
14  and let's say 140 of them are procedural or
15  subprocedural, then I think $4,000 is an awful
16  lot of money for the Defendant to be paying
17  without the Class getting anything.
18      And those are my two really big hot
19  buttons on each one.
20      Q     Let's talk about each hot buttons.
21  You talked about $4,000.
22      You meant 4 million?
23  A     Yeah, I said 4,000, I hopefully wrote
24  4 million. I did.
25      Q     So the first basis is you said is

Page 58

1   the fact that no money goes to the Class, but
2   lawyers get paid to secure the injunction.
3           And that bothers you?
4   A    Inherently rubs me the wrong way.
5       Q    Suppose -- you're an attorney, of
6   course, right?  Suppose a client comes to you and
7   says, my neighbor is wire tapping my phone, it's
8   creeping me out, it's illegal, and you say, well,
9   I can get you monetary penalties, and the client
10  says, I don't want his money, he's just a creep,
11  can you go to court and get me an injunction and
12  stop him from doing it, and you work your butt
13  off, and you get the injunction and you stop the
14  neighbor from tapping your client's phone, all
15  you got for him was an injunction, do you think
16  it's fair that you be paid?
17  A    In that scenario, I do.
18      Q    Okay.  So, why is it unfair for
19  lawyers to get paid when an injunction is
20  obtained for millions of people and not just one
21  person?
22  A    Because it -- let me go back to your
23  hypothetical.
24          The client was asked if they wanted
25  to get monetary relief, and the client declined.

Page 59

1   I think that's absent here.
2       Q    So, your concern is if lawyers
3   obtain injunctive relief in place of monetary
4   relief and then the Class is foreclosed from
5   getting the money, that's the part that bothers
6   you?
7   A    Yes.
8       Q    Would the settlement --
9   hypothetically, if a settlement could ever be
10  agreed to where the Class didn't release money at
11  the end of this and it could still pursue money
12  damages so an injunction wasn't in place of the
13  money damages, it was in addition to it, would
14  that be something that wouldn't rub us the wrong
15  way?  Would that be more acceptable?
16  A    Just so I understand, there's money and
17  injunctive relief?
18      Q    No.  It was injunctive relief in
19  addition Class members having the right to get
20  money later, so it didn't foreclose them.
21  A    Yeah, that's certainly better, more
22  tolerable.
23      Q    Okay.  For an injunction -- what
24  injunction -- strike that.
25          What injunction was obtained here

Page 60

1   if the settlement was going to be approved?  What
2   was obtained?
3   A    My understanding in a very simple sense
4   was that the activities they were accused of but
5   denied doing and continued to deny doing, if they
6   were doing them, they weren't going to do them
7   anymore.  That's generally.
8           You know, there were some technical
9   things they were doing that, frankly, I don't
10  really grasp.  I'm not a high-tech guy.
11      Q    That's okay.  We don't need to be
12  high-tech guys here.
13          To your knowledge, has Yahoo
14  implemented the injunctive relief yet today?
15  A    I don't know.
16      Q    If it were true that the injunctive
17  relief was delayed until the Court approved the
18  settlement and if it were true that your
19  objection delayed that relief, would that be a
20  factor you would consider?
21  A    I haven't considered it, but as presented
22  to me, I would think I would -- I would hope I
23  would consider that as a factor in my objection.
24      Q    Would that delay of relief harm or
25  help the Class?

Page 61

1   A    It would -- assuming the behavior by Yahoo
2   harms the Class, a delay in stopping that would
3   harm the Class.
4       Q    Before making your objection, did
5   you research whether Yahoo's injunctive relief is
6   being held up by approval?
7   A    I did not.
8       Q    The second hot button issue you
9   have here is that the attorneys' fees on a
10  per-docket-entry basis are high in your view.
11  A    Yes.
12      Q    And you said in part because it's a
13  federal docket and you believe that much of the
14  active in a case gets noticed; is that correct?
15  A    Yeah, and that was just per example.
16          I just think Federal Court by its
17  rules, the Rules of Civil Procedure, requires an
18  awful lot of non-substantive activities that are
19  counted as docket entries.
20      Q    I think I understand what you're
21  saying.  We're both lawyers.  I'm licensed in
22  Delaware.  I'm also admitted in the District of
23  Delaware, and I believe there, if I'm going to
24  serve discovery, I have to serve a notice on the
25  Court letting them know I served discovery.

16 (Pages 58 to 61)

Albanese & Associates

Page 62

```
 1              Is that the kind of notice you're
 2  talking about?
 3  A    Yes.
 4       Q    I'm not licensed in California,
 5  although I'm admitted pro hac in this case.
 6              Does the Northern District require
 7  those same types of notices to keep your Court
 8  informed --
 9  A    I'm not a California attorney.
10       Q    So you don't know whether those
11  sort of notices are required in California?
12  A    I believe they are.  I'm under the
13  impression they are required by the Federal Rules
14  of Civil Procedure and not necessarily the local
15  rules for the Northern District, if that's your
16  question.
17       Q    Yes, it is.
18              You said you reviewed the PACER
19  docket in paragraph 2 on page 2.
20  A    Yes.
21       Q    How did you review the PACER
22  docket?
23  A    Being an old-fashioned guy, I called it up
24  and printed it up.
25       Q    Where did you call it up?  On your
```

Page 63

```
 1  computer?
 2  A    No.  On the library computer in Fitchburg,
 3  Wisconsin.
 4       Q    Why didn't you use your own
 5  computer?
 6  A    For whatever reason, maybe it's a learning
 7  disability, I'm much better reviewing a printed
 8  document than a document on a screen.  There's
 9  probably a shrink that would tell you what's the
10  matter with me, but that's just how it is.
11       Q    I pray not, because I do the same
12  thing.  I'm a paper guy, and I still like tabs.
13  In fact, I have a copy of the docket here, and
14  I'll mark it as Exhibit 5.
15              (Exhibit Number 5 was marked.)
16  BY MR. STRAITE:
17       Q    Mr. Sweeney, in front of you is
18  Exhibit 5.  Please take a minute to peruse it.
19  A    (Reviewing document.)  Okay.
20       Q    Exhibit 5 is the docket for Case
21  Number 5:13-cv-04980-LHK.  It says: Holland, et
22  al. v. Yahoo, Inc., that's the old name before
23  the "in re" designation was assigned.
24              Other than the last three docket
25  entries on the back of this exhibit, is this the
```

Page 64

```
 1  PACER docket you printed off?
 2  A    Yes.  Actually, the print is a little
 3  different than whatever my font is, but it
 4  appears to be the PACER civil docket printout.
 5       Q    And when you reviewed this docket,
 6  did you click on any of these hyperlink --
 7  A    Yes.
 8       Q    Which ones?
 9  A    I don't recall exactly, but my procedure
10  is, I go through and try to put X next to
11  something I think is substantive, help me get my
12  arms around the case.
13              So, certainly, the Complaint would
14  be something I would click on.  I would peruse on
15  the screen.  Often, I understand, it's almost
16  redundant, particularly if it's the same type of
17  case, possibly the same law firm who does that
18  type of Class action, sometimes I've seen that
19  before.
20              If I haven't, I often print it out,
21  and just go through it, try to get my arms around
22  the Complaint.
23              Another -- without particularly
24  looking at this, another one would be the Answer
25  or a Motion to Dismiss, certainly a summary
```

Page 65

```
 1  judgment, I don't see that very much in Class
 2  actions, but certainly if there was one.
 3              Certainly, documents presented at
 4  trial, but I don't see that -- I don't know if
 5  I've ever seen that, frankly.  I know it happens.
 6              The rest of it is a lot of pro hac
 7  vice, and I've never seen, I don't know why this
 8  is in Class actions, so many replacements.  It's
 9  like a basketball team sending five replacements
10  in and five people out, but there's a lot of
11  notices of entries.  There's a lot of clerks'
12  entries.
13              But here's another one, let's look
14  at item docket Number 41, the reply in support of
15  the Motion to Dismiss.  I would have at least
16  clicked that on.  If it really looked like it had
17  some meat to it, I would print it out and
18  probably read it.
19              I would like to think unlike some
20  people in the objection bar, for lack of a better
21  word, they don't have one yet, they probably will
22  someday.  I might be the one to organize it.  You
23  know, they don't -- there are some that clearly
24  do what their detractors say they do.  They're
25  just stickup artists, and you can fill in the
```

Albanese & Associates

Page 66

```
1    blanks, you may already have.
2         I'd like to think I put a little
3    more brain power into it. I like to think my
4    objections generally can stand on their own as
5    substantive issues, which I'm not bragging, but I
6    think just the nature and breadth of what goes
7    into a Class action settlement and how many
8    factors that are involved that almost all of them
9    arguably are subject to some sort of criticism, a
10   valid substantive criticism.
11        Did the attorneys do the best they
12   could? Maybe so, probably.
13        Does the third eye from the judge
14   often move it around a little bit? Sometimes.
15        Does the objectors move it around a
16   little bit? I'd like to think so, sometimes.
17   Sometimes not.
18        But I'd like to think that I do
19   more reading than the average bear. I think
20   about it more certainly than the average bear.
21        I -- we'll probably get into this a
22   little bit later, a little bit of philosophy --
23   my philosophy on objections and whether they're
24   appropriate or not.
25        I'd like to think I look at a
```

Page 67

```
1    docket sheet like this and will spend some time
2    on it, if it's something I will follow up.
3         I'm also proud of the fact, unlike
4    I think some members of the objection bar, every
5    objection I file, my guess is I've looked at 50
6    settlements, 100 settlements, somewhere between
7    those two numbers, and said, yeah, maybe you did
8    this on that basis or that basis, but
9    (indicating). I like to think I take ones that
10   are not bad settlements necessarily, that's not
11   what I mean to say, but one that I'd like to
12   think can stand some assisting from a third or
13   fourth eye.
14        Q    If it's true what the Plaintiffs
15   alleged here that the way Yahoo was processing
16   mail violated law and if it's true that Yahoo's
17   change of business practices puts it into
18   compliance with the laws as the Plaintiffs see
19   it, is that a good result?
20   A    It's a positive result.
21        Q    How did you learn about this
22   particular settlement?
23   A    My -- I don't know for a fact. I can tell
24   you what my business procedures are in
25   objections, and I have no reason to believe this
```

Page 68

```
1    one was any different. I review several
2    Websites; Top Class Action, Law360. There's a
3    Website that ends in org that describes -- kinds
4    of gives you the lay of what's going on out
5    there, and I'm stunned at how many Class actions
6    are filed, frankly.
7         But I would go to three or four or
8    five, and as I go through them, I'll click on --
9    if it's interesting, I'll write it down and come
10   back, and my first procedure is to go through,
11   and I do this weekly, almost every week, and
12   there are sometimes several weeks in a row where
13   I look at them and, for a whole bunch of reasons,
14   they look okay, the attorneys' fees seem to be
15   reasonable and some are below reasonable.
16   Sometimes the cause is great. Sometimes the
17   cause is absolutely silly in my point-of-view.
18   That will usually get an asterisk.
19        For example, the first time I was
20   ever introduced in 2010 to the world of Class
21   actions was in 2010. I got a call from an
22   objector who said, I'm in an objection in the
23   state of Wisconsin, could you cover a hearing for
24   me?
25        I said, I'm not even quite sure
```

Page 69

```
1    what a Class action is.
2         I know what it is, because I'm a
3    lawyer and it was in some Class 20 years ago and
4    I read in the paper about a Class action, but I
5    don't think you want me at the hearing, I
6    couldn't represent your client very well because
7    I know nothing more than I just explained to him.
8         He said, all you have to do is go,
9    you have to sign in, you don't have to speak.
10        I said, well, what if the judge
11   speaks to me?
12        He won't.
13        I said, how do you know?
14        He said, there will be 25 lawyers
15   in the room and you'll just be one of them.
16        I said, come on, 25 lawyers.
17        Well, he was wrong. There was
18   probably 100 lawyers.
19        So, this is my introduction. I
20   said, give me some background.
21        Well, there's a Class action
22   brought in Milwaukee, the Eastern District of
23   Wisconsin, Federal Court, and it's against all
24   the lawnmower engine manufacturers.
25        And I said, okay, what did big, bad
```

Page 70

1    Corporate America do now?
2          Well, they are advertising and
3    stating, for example, that their lawnmower
4    engines are 2-horsepower.  The truth is it's only
5    like 1.8, and they know it.
6          I said, come on, someone is suing
7    someone over that?
8          Yeah, but it's settled.
9          I said, did someone get money in
10   this?
11         Yeah, the settlement that you're
12   going to be going to the hearing to see if it
13   gets approved, the Class counsel is asking for
14   $60 million.
15         And I went, come on, you got to be
16   kidding me.
17         The deponent is laughing.  He said,
18   no, that's it.
19         On this one, they even had
20   employees on the inside helping document this
21   incredibly bad historic act.
22      Q    So you think some of these Class
23   actions are silly?
24   A    Some are downright silly.
25      Q    Are some worthy?

Page 71

1    A    Certainly.
2       Q    Is personal data privacy a worthy
3    object for you with a Class action?
4    A    Yeah, you're not in the lawnmower category
5    here.
6       Q    Thank you.  So, this case is
7    pursuing worthy goals in your mind and not the
8    silly goals?
9    A    Right.  But that would be one of the
10   factors.
11         If -- and sometimes I have a
12   problem with Class counsel going after the drug
13   companies, because they do such -- some wonderful
14   things.  I have, in my own family, some -- I, for
15   example, will never buy a generic.  I will ask my
16   doctor to prescribe the full, because, you know
17   what, I want the pharmaceutical companies to make
18   a ton of money so they keep doing the R&D, so
19   they keep coming up with stuff that kept my mom
20   alive eight years longer than she should have.
21         Then you look at what happens in
22   the Third World prescriptions, and you got them
23   right here.
24         So when Class counsel piles on
25   that, it bugs me sometimes.

Page 72

1       Q    Got it.  Let's go back to the PACER
2    docket.
3    A    Got it.
4       Q    Exhibit 5, and also in front of us
5    you should have Exhibit 4, which is your
6    objection.  You should have them side by side.
7    Do you have them both?
8    A    I do.
9       Q    Back to the beginning of your
10   objection Number 2, the one that starts with the
11   "fee calculation is unfair," the next paragraph
12   says:  This case has been litigated for only two
13   years.
14         You note the 193 docket entries; is
15   that correct?
16   A    That's what it says.
17      Q    Right.
18   A    It appears as though, as I look at it, it
19   started in '13, which would be three years,
20   right?  You know what, I can find this out.  I
21   have the docket.  10/25/13, it was actually then
22   only two years.  It's more than two years.
23      Q    You then say:  Very few entries
24   were substantive in nature, and you had talked
25   about this before.

Page 73

1    A    Yes.
2       Q    In your mind, what is the
3    difference between a substantive PACER entry and
4    a procedural PACER entry?
5    A    Would it help if I used the docket?
6       Q    However you want to answer.
7    A    Let's use the docket, and I'm on page --
8    what page am I on? -- 5.
9       Q    So you're looking at the PACER
10   stamp at the top of the page 5 of 22?
11   A    Yes.
12      Q    Of Exhibit 5?
13   A    Yes.
14      Q    Okay.
15   A    I'll kind of rip and read 4 through 16,
16   and hopefully there will be an example for each
17   one.
18      Q    Absolutely.
19   A    In 4, it's an ADR scheduling order, which
20   is issued by the Court, not an entry by either
21   Plaintiff or Defendant.
22         The next one doesn't have number,
23   but it reads:  Case designated for electronic
24   filing.  I would call that subprocedural.
25         3, the summons, although the

Page 74

1  summons is what, in law, has the legal effect.  I
2  don't know that it's a document that any attorney
3  works very hard on.
4          6, certificate of interested
5  entities.  I believe this is the CIP Rule 26(1)
6  filing, which is a fairly basic disclosure
7  document.  I've never seen one very big, but I've
8  never looked at public company ones.  I don't
9  find them very important.  I think they're there
10 to see whether the judge needs to excuse
11 themselves, recuse themselves from the case.
12          Stipulation with proposed order to
13 extend time to respond to compliant, procedural.
14          Notice -- and these are my opinion
15 of what they are in attempting to answer your
16 question.
17          8, Notice of Appearance,
18 procedural.
19          Number 9, administrative motion to
20 consider whether case should be related by
21 Brian Pincus, which I assume is the magistrate
22 maybe.  I don't know what it is, but it doesn't
23 sound like it has a lot of meat to it.  I may
24 have clicked on that one because I didn't have
25 any idea what was, which I often do.

Page 75

1          Q    Okay.  And in your objection -- and
2  this is illustrative for us, thank you.
3          In your objection, you then say:
4  In fact, [sic] the Plaintiffs' Complaint,
5  Defendants' Motion to Dismiss, no Answer was even
6  filed, and Plaintiffs' Motion to Approve
7  Settlement, Motion for Class Certification and
8  Award of Attorneys' Fees had any significant
9  legal basis to its content.
10         A    Only.  Did I say "only"?  I should have.
11 Yeah, "only."
12         Q    You believe only the Complaint, the
13 Motion to Dismiss, the Motion to Approve
14 Settlement, the Motion for Class Cert and Award
15 of Attorneys' Fees had any significant legal
16 basis in this context?
17         A    I'd have to cross-check that with the
18 docket to make sure that was an accurate
19 statement, but certainly when I wrote it, I
20 probably had the docket printed out in front of
21 me and going through it and those are the ones
22 that I opined to have legal significance to them.
23         Q    Okay.
24         A    Substantive significance.
25              A lot of procedural stuff is

Page 76

1  significant because it's got to be done.  If it
2  isn't done, there are consequences, but that's
3  different to me than legal substantive meaty
4  issues.
5          Q    Following the phrase "Defendants'
6  Motion to Dismiss," you say "no Answer was even
7  filed."
8          Do you mean no Answer to the
9  Complaint or do you mean there was no Answer to
10 the Motion to Dismiss?
11         A    I believe I meant no Answer, a definitive
12 responsive pleading that wasn't a motion, the
13 Answer, Answer.
14         Q    To the Complaint?
15         A    To the Complaint.
16         Q    Okay.  If you had seen other
17 meatier documents, let's say a Motion for Summary
18 Judgment or a Response to Summary Judgment, those
19 sorts of documents, would that give you more
20 comfort that additional substantive legal work
21 was done here?
22         A    Those would be two that I would consider
23 would go on the substantive list.
24         Q    Okay.  And did you evaluate how
25 much discovery was done in this case?

Page 77

1          A    In this case, I don't believe I did,
2  because I don't believe I know.
3               And sometimes I look at -- this
4  isn't totally accurate, but when I only have a
5  docket sheet to go on, if there's not a discovery
6  dispute, it's hard for me to see from the docket
7  how much discovery went on, which I admit is not
8  a perfect science.
9          Q    Did you review the Motion for
10 Preliminary Approval of Settlement?
11         A    I don't recall that I did specifically.  I
12 traditionally would, or at least the order, which
13 often -- often looks an awful lot like the
14 proposed order in the Motion, which looks a like
15 a motion.
16         Q    In your experience in reviewing
17 Motions for Preliminary Approval, do counsel
18 typically disclose either in the Motion or in a
19 Declaration the amount of discovery that was done
20 in detail?
21         A    If it's significant, it's certainly at
22 least mentioned.  I have seen in some where it's
23 described in agony.
24              You know, it's not all the same,
25 but usually if you're asking for fees, the more

1  things you can lay in front of the judge that you
2  did, the better off you are as a moving party to
3  have a judge be inclined to grant your fees.
4      Q    Are you aware of any case in the
5  Ninth Circuit or elsewhere, where a Court
6  evaluated the reasonableness of the fee request
7  based on the number of docket entries?
8      A    No.  No, I'd like to think I'm a
9  trendsetter in that area.
10          Again, it's not a perfect science.
11 I don't know that courts generally do it.  It
12 wouldn't be a bad habit to get into for the
13 courts.
14          Again, it's not -- you could have
15 arguably a 15-docket entry case that had tens of
16 millions of dollars in fees, I guess,
17 theoretically.
18          So, it's not a science, it's an
19 art.  It's a helper.  It's a tool.
20      Q    Isn't it also possible that, say,
21 there are prolonged discovery disputes in one
22 case where the parties are repeatedly going to
23 the Court asking for Motions to Compel and
24 everything, they just can't get along, and
25 they're really burdening the Court, and you see

1  all these docket entries, that case might
2  actually involve just as much work as another
3  case where the attorneys are civil and
4  professional and they resolve all their discovery
5  disputes without court intervention, they don't
6  burden the courts, and yet it still involves the
7  exact same amount of effort; isn't that possible?
8      A    Right, and I think discovery is sort of
9  the outlier here, because sometimes -- although
10 discovery sometimes can take up a very large
11 portion of the case.  A docket wouldn't
12 necessarily reflect that without discovery
13 disputes.
14      Q    In this objection, did you try to
15 evaluate how much of the discovery is reflected
16 on the docket or whether the parties were able to
17 resolve their discovery disputes amicably without
18 asking for Court intervention?
19      A    I don't recall, as I sit here today, and I
20 don't see any reference to, in my objection, any
21 reference to document disputes -- I'm sorry,
22 discovery disputes.
23      Q    Going down to the bottom paragraph
24 on the bottom of page 2, it starts with:  The fee
25 calculation is unfair in that the percentage of

1  the settlement amount is far too high.  In
2  addition, no fee request is reasonable in the
3  absence of documentation, including detailed
4  billing records.
5          What's your authority for that?
6      A    How could a Court possibly determine the
7  reasonableness when one of the factors has to be:
8  How much time do you guys got in this?  How much
9  work did you do?  What were your rates?  Tell me
10 everything.
11          I believe, and I see this in Class
12 actions where they put this little chart in
13 there.  I don't know how a judge could sanely
14 determine whether a fee is fair and appropriate
15 without reviewing the entire billing.  I know a
16 client wouldn't pay it.
17      Q    Right.  And here -- let's assume we
18 stayed at 193 docket entries.  Assuming that
19 number stays the same, if counsel here had
20 provided the detailed billing records to the
21 Court, would that allay your concerns?  Would
22 that be an improvement you could make to this
23 process?
24      A    It would be one less thing on my checklist
25 I could complain about.  I don't think it's

1  solely determinative, and some people just don't
2  do very good time entries.  Some attorneys do
3  crack time entries, really detailed.
4      Q    Could you repeat that?
5      A    Crack.  My crack staff here is going to --
6      Q    Thank you.
7      A    Nothing referring to crack the drug.
8  They're right on, very detailed.
9      Q    Thank you for the clarification.
10          The top of page 3, you say -- we
11 could get some water.  Do you need some water?
12      A    No.
13      Q    Top of page 3, you say:  It is also
14 notable that the settlement was reached in
15 principle in two years following the commencement
16 of this action.
17          Why is that notable?
18      A    And this is something I couldn't have told
19 you before 2010, surveying Class action suits,
20 but it never ceases to amaze me how long some of
21 these cases go on for.  Two years is -- I've seen
22 them shorter, I've seen only the Complaint as the
23 real meaty one, but two years is in what I would
24 call the really quick resolution of a Class
25 action case.

Page 82

1          Q      If Plaintiffs believe that the
2    injunctive relief they secured is pretty close to
3    the best they could accomplish at trial, what
4    would be the advantage of continuing on with
5    litigation beyond two years?
6          A      I'm not sure there would be.
7                There's nothing saying that you
8    can't get a perfect settlement in an hour, but
9    particularly when the only one getting money is
10   the attorney, I specifically pointed out to the
11   Court that -- and the Court knows this, Judge Koh
12   knows this more than I know this, but that's --
13   if you charted all the cases, two years is
14   probably in the top 10 or 15 percent of
15   resolution times.
16         Q      Shouldn't counsel be commended for
17   an efficient resolution if they get everything
18   they wanted?
19         A      I guess that, yep, and sometimes the short
20   period of time is a reflection of Class counsel's
21   big hammer, being right on, doing great legal
22   work, and sometimes it's a case that just settled
23   quickly without all that much Plaintiffs' work to
24   it.
25               It doesn't stand by itself to

Page 83

1    indicate that the fee is -- the fee is adequate
2    or fair.
3          Q      The next paragraph starts with a
4    quote, and it says:  There has been a great deal
5    of criticism, and the rest of the language goes
6    on.
7                Is this a quote from something?
8          A      It was, and I can't tell you, as I sit
9    here, page 3 --
10         Q      It's most of page 3, starting with:
11   There has been a great deal.
12         A      I don't know if this is from the Internet,
13   legal resource guide that's at the very last few
14   letters -- or last few words on this page.
15               It's clearly -- these quotes are
16   clearly from somewhere, and the idea that there's
17   not a denotation or a citation is probably my
18   fault.  I didn't make these quotes up, though.
19   That, I know.
20         Q      What were you trying to convey in
21   this paragraph?
22         A      In looking at this, I think this may be
23   from what I talked about before, the manual, but
24   if -- I think I'm attempting to convey, to the
25   extent I did it well or not is up to others, the

Page 84

1    nakedness of the settlement.
2                To the naked eye, to the common
3    man, the first reaction would probably be
4    outrage.  I know there's newspaper articles or
5    magazine articles that say "nothing for Class, 4
6    million for attorneys," and they're playing on
7    that sense that this inherently looks wrong, and
8    I think that's the starting point.
9                In my opinion, my objection doesn't
10   say don't give the attorneys anything, but it
11   does say a couple other things.
12               Could they have gotten money out of
13   the third of a trillion market cap value company?
14               And I think -- and it's even odd in
15   the world of Class action, this is a unique
16   settlement.
17               The joke -- I don't know if you
18   know the joke, but the joke I first heard in the
19   week after that lawnmower engine hearing I went
20   to, I was talking to the attorneys, telling them
21   of this incredible scene I saw, and they would
22   say, you don't know about Class actions.
23               Yeah, that's where the Plaintiffs'
24   attorneys get millions of dollars and the members
25   of the Class get a Dave and Harold fruit basket,

Page 85

1    whatever that Dave and Harold is.
2                So, there is that thought out there
3    in the public.
4          Q      Is that a thought you have?
5          A      I do.  I do.  I think -- I came into this
6    with eyes open, and if you listen to the general
7    descriptions -- what I saw in this first hearing
8    was, Class counsel got up and talked about
9    corrupt Corporate America, and, by the way, Class
10   counsel is saving the world from bad Corporate
11   America.
12               Corporation got up and talked about
13   the vipers in the Class bar, and they're just in
14   it for the money, and they are protecting their
15   client who provide millions of jobs in America,
16   and have to withstand this nonsense nonetheless
17   of all the civic things they do.  Put their kids
18   through college and da, da, da.
19               And then the objector gets up and
20   says they're both out of line, and then the other
21   two get back up and say, objectors are the real
22   weasels here, and I walked way from this saying,
23   there's a little bit of truth in all that.
24         Q      And you're talking about the
25   lawnmower case?

Page 86

1    A    Lawnmower case.
2         But going forward, I've kept all
3    those thoughts in my head and see it all the
4    time.
5         Q    So you believe this quote in the
6    middle of page 3 may be from a manual and then
7    the citation at the bottom of page 3, the
8    "Internet Legal Resource Guide"?
9    A    Is separate, I believe.
10        Q    You think so?
11   A    I believe that's how it looks to me as I
12   sit here today.
13        Q    What is the Internet legal resource
14   guide?
15   A    My guess is it's a legal resource that's
16   on the Internet.
17        Q    Do you know anything further about
18   it?
19   A    Well, it might be a guide, too.  No, it
20   doesn't ring a bell offhand.  It may be something
21   and more than likely something I discovered off
22   the Internet.
23        Q    Top of page 4, you have your third
24   basis for your objection, which says you are
25   adopting and joining all other objections.

Page 87

1    A    Yes.
2         Q    Which objections specifically are
3    you referring to or do you just mean the other
4    objections?
5    A    I even put this in if I'm not aware of
6    other objections as a prudent catchall.  I've had
7    opponents say, you can't just can't do this.
8         You can't just say you object --
9    whatever else comes on, yeah, yeah, I say that,
10   too.
11        Q    I don't think it's improper.  You
12   can always adopt another objection by reference.
13   A    I put it in every one as being prudent.
14        Q    It's your prudent catchall here?
15   A    Correct.
16        Q    You say you adopt and join all
17   other objections.
18        What if, hypothetically speaking,
19   an objector in this case says, I object to money
20   going to David Straite because he's Episcopalian
21   and I don't like those Anglicans, would you adopt
22   that objection?
23   A    Well, that's totally reasonable.  I'm just
24   being funny.
25        Q    But as a serious hypothetical.

Page 88

1    A    Let me give that some thought.  Of course
2    not, and how that relates to this paragraph is --
3    I would adopt it, but not because I'm adopting
4    things I don't know what they are necessarily
5    yet.  They may be coming later.  I think I can
6    undue my adoption by saying that one, I do not
7    incorporate, and I hire nothing but
8    Episcopalians.
9         Q    And if an objection said, I object
10   to only 4 million, I think the attorneys deserve
11   5 million, would you join that objection?
12   A    No.
13        Q    Are you aware of any other
14   objections in this case?
15   A    Not as I sit here.
16        Again, I would put it in even if
17   there weren't any other objections.  I've seen
18   late objections.  I've seen objections at the
19   fairness hearing.  I've seen ore tenus
20   objections, which weren't made in writing;
21   O-R-E-O [sic], new word, T-E-N-U-S, Latin for
22   oral objection.
23        (Discussion held off the record.)
24        THE WITNESS:  I can tell you this
25   when you put it in a document, spell check

Page 89

1    wants nothing to do with it.
2    BY MR. STRAITE:
3         Q    And your conclusion on page 4,
4    you're asking the Court for three things:  To
5    sustain your objections; next, enter such orders
6    as are necessary and just to adjudicate these
7    objections; and then to award an incentive fee to
8    this objector in her role in improving the
9    settlement.
10   A    I'm a woman trapped in a man's body.
11   That's an error.
12        Q    Minor typos are not the problem.
13        I understand the first one, you
14   want the Court to sustain your objections.
15        What order would make you happy
16   here?
17   A    If I got to write one?
18        Q    Yes.
19   A    That the settlement has been modified that
20   the Class has a Class settlement fund of X, Y or
21   Z, that -- and this is one I always wish and will
22   never see, that Yahoo admits their errors and bad
23   ways as opposed to saying, we'll change them, but
24   there's nothing wrong with them.  That always
25   bugs me.

23 (Pages 86 to 89)

Albanese & Associates

Page 90

1      But it's sort of the SEC-type
2  thing; if they're going to get a settlement, the
3  person gets to say, I didn't do anything wrong,
4  but here's 50 million.
5      Q    Are you aware that the Classes were
6  certified before the Motion to Approve a
7  Settlement?
8      A    Yeah, and it's my take that that almost
9  has to be all the time, I think.
10     Q    Are you aware of the difference
11 between a 23(b)(2) and a 23(b)(3) settlement --
12 sorry, 23(b)(2) and 23(b)(3) Class?
13     A    Not by those names, no.
14     Q    More colloquially, are you familiar
15 with the distinction between an injunction-only
16 Class and a damages Class?
17     A    Yes.
18     Q    What's the distinction between
19 those two things?
20     A    One, by its nature, will only have
21 modification of behavior, prohibition of a
22 certain behavior, and the other one will have
23 just money.  Some have both.
24     Q    Are you aware that Judge Koh only
25 certified a (b)(2) injunction-only Class here?

Page 91

1      A    I don't know if I'm aware of it, but
2  clearly by the fact that that's what we have here
3  going to the final hearing, I guess, I could
4  deduce that.
5      Q    If it's true that this Class is
6  certified only under 23(b)(2) and if it's true
7  that that's an injunction-only provision, would
8  it even be procedurally proper to award money
9  damages on the Class one basis in that scenario?
10     A    Probably not.
11     Q    So, can your objection be
12 accommodated in this situation?
13     A    Oh, sure.
14     Q    How?
15     A    By the -- at least the two -- going back
16 and reviewing the settlement.  I would ask --
17 what she would have to do, when you talk about
18 necessary and justly adjudicate these objections
19 and alleviate inherent unfairness, she would have
20 to, in this case, from a technical procedural
21 point-of-view modify her Class certification so
22 that she could modify the settlement so that she
23 could accommodate my objection.
24     Q    If that's not done, hypothetically,
25 if it cannot be changed to a (b)(3)

Page 92

1  certification, can we distribute money on a
2  Class-wide basis?
3      A    I don't really know the answer to that.
4  Legally I suspect the answer is no.
5      Q    Did you research that point before
6  making your objection?
7      A    No.  In hindsight, I think my objection is
8  inherent that whatever you got to do to fix the
9  car, you gotta fix the car.  If that means
10 technically re-reviewing your certification
11 order, then that's what it means.  If it means
12 simply rejecting and having everyone going back
13 to the drawing board, then that's what it means.
14     So, inherently, I'd like to think
15 that my objections really don't get into -- you
16 know, I'm asking the Court to do a tune-up, but
17 I'm not asking the Court to clean the spark
18 plugs, to check the timer.  Although, in asking
19 for the tune-up, that might be what the Court has
20 to do, but I just don't go into that much
21 procedural detail, and, frankly, I don't think
22 about what the procedural detail will be, because
23 it's my experience, federal judges have an awful
24 lot of leeway, and even if they don't they often
25 take it.

Page 93

1      Q    Are you referring to any case in
2  particular?
3      A    No, just -- oh, to be an Article 3 judge.
4          MR. STRAITE:  I think this would be
5  a good time to take a break.
6          (Break taken.)
7          MR. STRAITE:  We are back on the
8  record.
9          Robert, are you on, for the record?
10         MR. PETRAGLIA:  Yes, I am.
11 BY MR. STRAITE:
12     Q    Mr. Sweeney, you understand you're
13 still under oath?
14     A    I do.
15     Q    Same oath you took this morning?
16     A    Yes.
17     Q    Did you have a sufficient break?
18     A    I did.
19     Q    Let's go on -- we just talked about
20 the objection you filed in this case.
21     I'd like to talk about a few other
22 objections you filed in other cases to understand
23 some of the other points you've raised and to
24 understand the past history.
25     Turn back to Exhibit Number 3.

24 (Pages 90 to 93)

Albanese & Associates

Page 94

1    Leaving aside the numbering, and I'll just count,
2    this is the brief summary of each objection case
3    below, 1, 2, 3, 4, 5, 6, on page 1; 7, 8, 9, 10,
4    11, 12, 13, and that includes Yahoo, correct?
5    A    That is correct.
6         Q    What does this list represent?
7    A    It represents cases that I'm involved in
8    from an objection standpoint.
9         Q    You say "are involved in." These
10   are cases where you filed an objection, correct?
11   A    Yes, either for myself or on behalf of
12   someone as an attorney.
13        Q    Okay. Does this include objections
14   that you helped draft for Pamela or Kerry Ann?
15   A    Good question. I believe Western Union,
16   both Pam and I objected.
17        Q    And by "Pam," you mean your wife,
18   right?
19   A    I'm sorry, my wife, yes.
20        Number -- the first Number 9 on
21   page 2, that is one I have -- I am appellate
22   attorney-of-record for objector Jeff M. Brown.
23        Q    Are there any objections that you
24   have filed that are not listed here?
25   A    Yes.

Page 95

1         Q    Which ones?
2    A    Land Rover.
3         Q    You don't happen to know the court
4    that's in? Which court is that? We can look it
5    up.
6    A    I'm not really sure, to be honest with
7    you.
8         Q    Any others?
9    A    Yes, the overdraft cases.
10        Out of the Southern District of
11   Florida, there were, I don't know how, many
12   sub-cases there were. I was involved in two or
13   three, maybe four. Although if you go to
14   serialobjector.com, it's got me listed, like, I'm
15   in a whole bunch. I just don't think I was in
16   that many.
17        Electrolux. I'm probably
18   forgetting one or two.
19        Q    Okay. Going through the list of --
20   you identified seven --
21   A    Oh, I know one more.
22        Q    Go ahead.
23   A    I'm sorry. A little brain freeze here.
24   I'll have to get back to it. It's Miller Law
25   Firm in Ohio Northern District, come on, and it

Page 96

1    involved -- I just can't recall.
2         Q    That's okay. Earlier you
3    identified seven cases where you filed objections
4    and then settled with counsel, and I want to make
5    sure I can match them up with the cases that are
6    listed on Exhibit 3.
7    A    The cases on Exhibit 3 are all ongoing --
8    matters that are ongoing.
9         Q    Okay. So, for example, Number 2 on
10   page 1 of Exhibit 3, that's Midland Funding, is
11   that the same as the Midland Credit case you
12   identified to earlier in your testimony?
13   A    Yes.
14        Q    And that was settled verbally
15   yesterday for $35,000?
16   A    Yes.
17        Q    The next one you identified was
18   Hain Celestial, $20,000 settlement.
19        Is that --
20   A    That is not on here.
21        Q    Same question, Tom's of Maine, you
22   identified --
23   A    Not on here.
24        Q    The fourth one you identified was a
25   $25,000 settlement, you could not recall at the

Page 97

1    time.
2         Does this document refresh your
3    recollection?
4    A    No. In fact, it does to the extent that
5    it's not on here.
6         Q    You identified two overdraft cases
7    in your earlier testimony. One, you thought,
8    might be Wells Fargo, and one might be B of A,
9    Bank of America, sorry.
10        And those are not on here either?
11   A    Correct.
12        Q    And also, finally, the Land Rover
13   case.
14   A    Right. And just so we're on the same
15   page, those are settled and, therefore, not open,
16   and the only exception being Midland, because I
17   didn't have time to take it off the open files.
18        Make sense?
19        Q    Makes sense. Thank you.
20   A    Okay.
21        Q    I'd like to go through some of your
22   prior objections quickly one by one. Not going
23   to spend too much time on them, because we do
24   have the object of ending early if we can.
25        This is Exhibit 6.

Page 98

1          (Exhibit Number 6 was marked.)
2    BY MR. STRAITE:
3          Q     Mr. Sweeney, in front of you is a
4    document that says:  Objections of
5    Patrick S. Sweeney to the Proposed Settlement and
6    Notice of Intention Not to Appear at Fairness
7    Hearing, and this is in the case of Martin v.
8    Global Marketing, the PACER date stamp at the top
9    is July 27, 2016.
10         Do you have this document in front
11   of you?
12   A    I do.
13         Q     Can you please turn to --
14   A    Is this an exhibit?
15         Q     It is, it's Exhibit 6.  It's a
16   two-sided document.  Could you please turn to
17   page 4 of 8.
18         Is that your signature?
19   A    Yes.
20         Q     Do you recall making this
21   objection?
22   A    Yes.
23         Q     Why did you object to this
24   settlement?
25   A    Several reasons.  This one had far more

Page 99

1    reasons.
2          Would it be helpful if I just went
3    through my reasons for objections?
4          Q     If you need to refresh your
5    recollection, feel free to take as much time as
6    you need.  I'm just looking for a quick summary
7    just to understand.
8    A    Okay.
9          Q     It's not this case.
10   A    Again, the attorneys' fees, I thought were
11   too high.  I see I objected to some of the
12   cy pres procedures; C-Y, new word, P-R-E-S,
13   procedures.
14         Someone someday might make a Ore
15   Tenus Motion on a cy pres procedure.
16         Another one of reasons, and I'm
17   growing more and more frustrated as I get into
18   this, with so many administrators, my opinion,
19   they get paid quite handsomely, and I'm coming to
20   question what the heck they do.
21         This one was particularly
22   inefficient.  You weren't allowed to talk to
23   anybody.  You weren't allowed to leave a message,
24   and there were questions -- I found the notice to
25   be somewhat vague in places.

Page 100

1          So it says, if you've got any
2    questions, call the settlement administrator,
3    here's the number.  There's nobody there.
4          Q     Okay.  And just to be clear, this
5    Exhibit 6, this objection dated last week, does
6    not appear on Exhibit 3; is that correct?
7    A    Oh, I thought it did.
8          Q     Did I miss it?
9    A    Yeah, it's Number 10, the first Number 10
10   of page 2.
11         Q     Oh, I see, top of page 2 of
12   Exhibit 3.
13   A    10.1.  Could we quick -- I wasn't marking
14   these, and I'd sure like to.
15         Q     There are two ways we could do it.
16   As I hand you the document, you can mark them
17   with a number or the court reporter could also
18   prepare one with a sticker.
19         What is your preference?
20   A    I'll just mark them, but I want to go
21   backwards and be up to date.
22         MR. STRAITE:  Of course.  So, we're
23   off the record.
24         (Break taken.)
25   BY MR. STRAITE:

Page 101

1          Q     Mr. Sweeney, this is Exhibit 7.
2          (Exhibit Number 7 was marked.)
3    BY MR. STRAITE:
4          Q     This is a document that says:
5    Objections of Patrick S. Sweeney, Pro Se, to the
6    Proposed Settlement and Notice of Intent Not to
7    Appear at Fairness Hearing.
8          On the top of the document, it is
9    PACER-stamped July 22, 2016.  This is filed in
10   the case of Spann versus JC Penney Corporation.
11         Do you have this document in front
12   of you?
13   A    I do.
14         Q     Does this look familiar?
15   A    It does.
16         Q     Can you please turn to the top of
17   page 14 with your signature?
18   A    Yes.
19         Q     Can you please confirm that's your
20   signature?
21   A    Yes, and in both places on that page.
22         Q     Is this the same document you
23   referred to as Number 4 on page 1 of Exhibit 3?
24   A    Yes.
25         Q     Thank you.  What was the basis of

1  this objection?
2  A     And, again, the quick basis was the amount
3  of the fee.  I just thought it was relatively
4  high for a two-year Class and for the amount of
5  the award.
6       Q     This was relatively recent, but
7  have you received any response to this objection
8  yet?
9  A     I have to think about that.
10      I have not received, and I haven't
11  checked PACER recently to see if one was filed.
12      I often do not get copied on the
13  response to my objections, and I think part of
14  that is the electronic, everyone is figuring
15  everyone is electronic filing and the clerical
16  person in the law firm figures, if it's filed
17  electronically, everyone gets it, and forgetting
18  that us pro se people don't have that in most
19  circuits, although there is one circuit, 6, I
20  think it's optional now.
21      Q     I'm not sure.  You can put that
22  aside.  The next exhibit is Number 8.
23      (Exhibit Number 8 was marked.)
24  BY MR. STRAITE:
25      Q     This document is filed in the case

1  of Legg versus Spirit Airlines, Inc., and this is
2  the Florida, Fort Lauderdale Division, bearing
3  the date June 20th, 2016 in the PACER stamp at
4  the top.
5       On the second page, we see the
6  title of the document:  Objection of Kerry Ann
7  Sweeney to Proposed Settlement and Notice of
8  Intent Not to Appear at Fairness Hearing?
9       Are you familiar with this
10 document?
11 A     I am.
12      Q     When did you last see this document
13 before today?
14 A     I assume the day it got filed.
15      Q     Did you help Kerry Ann draft this
16 document?
17 A     I did.
18      Q     Which portions did you draft?
19 A     I think all of them.  I think I signed as
20 counsel, because I think this is in Florida.  Let
21 me double-check and make sure I'm not talking
22 through my hat.
23      Yeah, I appeared as counsel and was
24 allowed to use electronic filing system.
25      Q     So, you used your own PACER

1  account?
2  A     Either mine or my office in Florida.  I
3  have a separate account there, just because they
4  have their an account, and I have an account, and
5  I don't recall which one was used for this, but
6  it'd be one of the two.
7       Q     Okay.  And you do have a PACER
8  account, even if you didn't use it for this one?
9  A     Yes.  Yeah, I think it was mine.
10      Q     When accessing a docket, either to
11 look at a docket or to look at documents linked
12 on the docket or the file, if a fee is required,
13 how do you pay the fee?
14 A     They bill me.
15      Q     They send me a bill and you pay it?
16 A     Yes.
17      Q     How do you pay it?
18 A     Kerry Ann pays it.
19      Q     With what?
20 A     That's a good question.  I assume a check.
21      Q     And is she using your money to pay
22 it or is it a gift from her?
23 A     No, it's money I provide.
24      Q     Okay.  Do you have a checking
25 account?

1  A     No.
2       Q     Do you have a credit card?
3  A     No.
4       Q     Why do you keep all of your money
5  in her account?
6  A     Because I don't have an account.
7       Q     Why don't you have an account?
8  A     I can't get one.
9       Q     I understand.  Does your law firm
10 have an account?
11 A     No.
12      Q     No operating account?
13 A     No.
14      Q     Do you have an IOLTA, I-O-L- --
15 A     A trust account.
16      Q     A trust account.
17 A     No.
18      Q     Is one required in Wisconsin?
19 A     No, they prefer you don't.
20      Q     What was the basis of this
21 objection?
22 A     This was -- I'm sorry, did you say
23 objection or --
24      Q     I'm sorry, yeah, the objection you
25 filed here on behalf of Kerry Ann, what was the

1   summary basis of it?  What was wrong with the
2   settlement?
3       A    As always, the fees I thought were high.
4   As always, I think the claim administration
5   underwhelms me, and the attorneys' fees really
6   bug me here, because I have several -- I went on
7   and on and on; the cy pres procedure.  I call
8   those the Holy Trinity.
9            Someone accused me of having form
10  objections, and the judge said, yeah, what about
11  that, Mr. Sweeney?
12           And I said, Your Honor, this isn't
13  rocket science.  There's only so many ways I can
14  object and the same language works, so I'm
15  guilty.
16       Q    Was that in person?
17  A    Yes.
18       Q    Which case was that?
19  A    That -- the Florida one.
20       Q    Do you remember the judge?
21  A    Yeah, the judge's name is the same as the
22  courthouse.  The courthouse is named for his dad,
23  and he's Junior.  What the hell is that guy's
24  name?
25       Q    That's an interesting research

1   project.  I don't know the answer to that.
2   A    Well, it may be named after him.  I just
3   assume you can't do enough good stuff during your
4   lifetime to have a courthouse named after you.
5   That will come to me, as well as I almost had
6   that Cleveland case, which is one of my trophy
7   cases, so I'd like to get that on the record.
8        Q    The next document --
9   A    It's the foam case, the polyurethane foam
10  case, Northern -- Northern District of Ohio
11  Federal Court.
12       Q    Okay.  Next Exhibit is Number 9.
13           (Exhibit Number 9 was marked.)
14  BY MR. STRAITE:
15       Q    This document at the very bottom is
16  titled:  Withdrawal of Objections of Kerry Ann
17  Sweeney, filed in the same case as before,
18  Legit -- sorry, Legg versus Spirit Airlines, Inc.
19  It bears a PACER stamp of July 7, 2016, that was
20  last month.
21           Do you have this document in front
22  of you?
23  A    I do.
24       Q    Does this document look familiar?
25  A    Very.

1        Q    Why did you withdraw objections on
2   behalf of your daughter Kerry Ann Sweeney?
3   A    Because it was shown to me that,
4   notwithstanding the definition of Class in the
5   notice, my daughter could not have -- although
6   she qualified under the definition in the notice,
7   there were other facts learned since that would
8   make it seemingly impossible for her to qualify
9   as an objector.
10           I took the attorney's word for it
11  and withdrew the objection based on his
12  representations.
13       Q    Did you or Kerry Ann receive any
14  money in exchange for withdrawing the objection?
15  A    No.
16       Q    Did the judge here -- and it says,
17  JIC; is that possibly Judge Cohn?
18  A    I believe it is Judge Cohn.
19       Q    Did he refer this to a magistrate
20  to evaluate possible sanctions against you?
21  A    No.
22       Q    Is that a different case?
23  A    Yes.
24       Q    What case is that?
25  A    Tom's of Maine.

1        Q    Okay.  We'll get to that later.
2   A    Okay.
3        Q    Turning to page 2 of Exhibit 9.
4   Page 2, underneath your signature there, you used
5   Patrickshanesweeney@gmail.com email address, but
6   the email you used on Exhibit 8 was the Sweeney
7   Legal Group email?
8   A    As I said before, at one time, there was a
9   method to the madness, and it has just crumbled
10  into no apparent procedure.
11       Q    You check both email accounts?  You
12  checked both email accounts?
13  A    Oh, yeah.
14       Q    Does anyone else have access to
15  those email accounts?
16  A    Kerry does.
17       Q    And you conduct business through
18  those email accounts?
19  A    I do.  When she needs to -- if she sees
20  anything she needs to take care of.  I usually
21  tell her when it's time to get into the email,
22  because there's something she needs to do.
23       Q    Now, we're at Exhibit 10.
24           (Exhibit Number 10 was marked.)
25           THE WITNESS:  Thank you.

Page 110

1   BY MR. STRAITE:
2       Q    This document is labeled:
3   Objection of Jeff M. Brown to Proposed
4   Settlement. It bears the date of June 8th, 2016,
5   in the PACER stamp at the top. It was filed in
6   the case of a New Jersey Division of Investment
7   versus Cliffs Natural Resources, Inc., in the
8   Northern District of Ohio.
9            Mr. Sweeney, do you have this
10  document in front of you?
11  A    I do, yes.
12      Q    Does this document look familiar?
13  A    It does.
14      Q    This is the Jeff Brown that you
15  were referring to earlier in your testimony?
16  A    Yes.
17      Q    And he's a partner in the firm that
18  you used as your Florida address?
19  A    Yes.
20      Q    Why does this look familiar to you?
21  A    I drafted this for Jeff, or most of it.
22      Q    At his request?
23  A    Yes.
24      Q    Have you received any response to
25  this objection since filing? And by "you," I

Page 111

1   mean you or Jeff.
2   A    I don't believe I have. And if Jeff would
3   have got it, I believe he would have forwarded it
4   to me. I wouldn't have got it, because I'm not
5   counsel-of-record, but I don't believe Jeff sent
6   me anything.
7       Q    This is Exhibit 11.
8            (Exhibit Number 11 was marked.)
9            THE WITNESS: Thank you.
10  BY MR. STRAITE:
11      Q    I told you we'd go through these
12  fast.
13           This document bears the title:
14  Objections of Patrick Sweeney to Proposed
15  Settlement. It has a date of June 7th, 2016, in
16  the PACER stamp at the top of page 1, filed in In
17  Re: Carrier IQ, Consumer Privacy Litigation in
18  the Northern District of California.
19           Do you have this document in front
20  of you, Mr. Sweeney?
21  A    I do, yes.
22      Q    Does this document look familiar?
23  A    Yes, it does.
24      Q    On page 4, is that your signature
25  on the bottom?

Page 112

1   A    Yes.
2       Q    What did you object to in the
3   Carrier IQ case?
4   A    Similar to some of the other ones, there's
5   the administrative process, there's the
6   attorneys' fees, and that's it. There was not a
7   cy pres objection.
8       Q    Have you heard from anyone in
9   response to this objection?
10  A    Yes, I received a letter from opposing --
11  Class counsel.
12      Q    When did you receive that letter?
13  A    Sometime not long after I filed this.
14  This is, what, June something? June 7th. I
15  would say June 20-something.
16      Q    Do you still have that letter?
17  A    I don't think so.
18      Q    You threw it away?
19  A    I believe I did when we moved.
20      Q    To the best of your recollection,
21  what did the letter say?
22  A    How can you file two claims, and one of
23  the two claims didn't appear in the database,
24  whatever database they had and please explain
25  myself.

Page 113

1       Q    Did you respond?
2   A    I don't recall. I know I had a response
3   to what they said. Whether I actually responded
4   to them or not, I don't know. If I did, I would
5   have some sort of copy in my computer, so I can
6   make a note of that if you would like.
7       Q    I'll make a note of that as well.
8            This case, Carrier IQ, this is the
9   same Carrier IQ case you identified as Number 7
10  on Exhibit Number 3?
11  A    Correct, the only Number 7.
12      Q    Now, Exhibit 12.
13           (Exhibit Number 12 was marked.)
14  BY MR. STRAITE:
15      Q    This document is called: Objection
16  of Patrick S. Sweeney, Pro Se, to Proposed
17  Settlement and Notice of Intent Not to Appear at
18  Fairness Hearing. It bears the date May 31,
19  2016, according to the PACER stamp at the top of
20  page 1, filed in the case of Pearson versus NBTY,
21  otherwise known as the Target case, in the
22  Northern District of Illinois.
23           Do you have this document in front
24  of you, Mr. Sweeney?
25  A    I do.

1      Q     Does this document look familiar?
2    A    It does.
3      Q     On page 4, is that your signature?
4    A    It is.
5      Q     Have you received a response to
6    this objection?
7    A    I don't believe I've received one.
8      Q     What's the status of this case?  Do
9    you know whether the settlement has been
10   approved?
11   A    No, but I know the settlement hearing has
12   come and gone.
13     Q     Is this case listed on Exhibit 3?
14   A    Yeah, it is -- I call it Rexall.
15     Q     This is Number 8, Rexall, on page 2
16   of Exhibit 3?
17   A    Correct.
18     Q     Thank you.  Did you file an appeal
19   in this case?
20   A    I don't know.  Should I have?
21     Q     I'm not familiar with the case.
22   A    Actually, the product is tremendous.  I
23   don't think they lied at all.
24     Q     This is Exhibit 13.
25         (Exhibit Number 13 was marked.)

1    BY MR. STRAITE:
2      Q     This document is:  Objection of
3    Patrick Sweeney to Proposed Settlement.  It has
4    the date May 31, 2016, according to the PACER
5    stamp at the top of page 1.  It's filed in
6    Chambers versus Whirlpool Corporation in the
7    Central District of California?
8         Do you have this document in front
9    of you, Mr. Sweeney?
10   A    I do.
11     Q     Does it look familiar?
12   A    It does.
13     Q     On page 6 of 7, is that your
14   signature?
15   A    It is.
16     Q     This was filed on the same day you
17   filed the objection that is Exhibit 12; is that
18   correct, May 31st?
19   A    Sometimes the stamp date is not the same
20   as the sent date, so, before I say -- May 27th
21   for Whirlpool, and May 26th for Rexall or NBTY or
22   Target, so I filed them a day party.
23     Q     In the Whirlpool case, have you
24   received a response to your objection?
25   A    No, I have not received a response.

1      Q     Do you know whether the case has
2    concluded or has received final approval?
3    A    I don't think so.  I think the settlement
4    hearing is later in August, yeah, August 25th.
5      Q     Do you intend to appear?
6    A    I do not, and I think I said I do not.
7      Q     There it is on page 2.  I didn't
8    see it on page 1.  Thank you.
9         This is Exhibit 14.
10         (Exhibit Number 14 was marked.)
11   BY MR. STRAITE:
12     Q     This document is the:  Objection of
13   Patrick S. Sweeney to Proposed Settlement and
14   Notice of Intent Not to Appear at Fairness
15   Hearing.  It bears the date May 9th, 2016,
16   according to the PACER stamp at the top of the
17   page.  It was filed in Lofton v. Verizon in the
18   Northern District of California.
19         Do you have this document in front
20   of you?
21   A    I do.
22     Q     Does this document look familiar to
23   you?
24   A    Yes.
25     Q     On page 4, is that your signature?

1    A    Yes.
2      Q     Below your signature, Mr. Sweeney,
3    it says your address is in Santa Monica,
4    California?
5    A    Yes.
6      Q     And you have a telephone number in
7    California there?
8    A    Yes.
9      Q     And the email is
10   eb5ventures@gmail.com?
11   A    Correct.
12     Q     Were you living in California at
13   the time you signed this?
14   A    I was at my daughter's.
15     Q     Is this her address?
16   A    Yes.
17     Q     You didn't reside there?
18   A    I was staying there.
19     Q     You were staying there.
20   Eb5ventures@gmail.com, is this a
21   work email address?
22   A    A business email address.
23     Q     What is EB-5 Ventures?
24   A    It's an unformed LLC whose purpose was to
25   do EB-5 investments.

1      Q     When you say "unformed LLC," what
2  does that mean?
3      A    It never got formed.  It got a Website --
4  I'm sorry, it got an email address, and that's
5  all the farther the formation process got.
6      Q     Did you generate revenues from this
7  business?
8      A    No.
9      Q     Were you the only --
10     A    I would have been.
11     Q     You would have been the only
12  principal?
13     A    Yes.  Excuse me, this is 14, correct?
14     Q     Yes.  I'm sorry, and this case,
15  Lofton v. Verizon, which is the case you were
16  referring to as Number 10 at the bottom of page 2
17  of Exhibit 3?
18     A    Yes.
19     Q     Thank you.  Mr. Sweeney, this is
20  Exhibit 15.
21          (Exhibit Number 15 was marked.)
22  BY MR. STRAITE:
23     Q     It says:  Objections and Notice of
24  Intent Not to Appear of Pamela Sweeney.  It bears
25  the date of May 6, 2016, in the PACER stamp at

1  the top of page 1, filed in the Blue Buffalo
2  Company Marketing and Sales Practices Litigation.
3          Do you have this document in front
4  of you?
5      A  I do, yes.
6      Q     Does this document look familiar?
7      A    It does.
8      Q     Why is that?
9      A    Because I've seen it before.
10     Q     Did you draft this document?
11     A    I don't believe I did.
12     Q     Did you help your wife draft it?
13     A    I don't think I did.
14     Q     Do you know what computer she used
15  when she drafted this?
16     A    Probably our home one, our family one.
17     Q     Okay.  Do you think she might have
18  used a form you had on the computer?
19     A    No.
20     Q     You think she just created this
21  from looking at printouts or looking at computer
22  --
23     A    Oh, no, I think she just made this up off
24  the top of her head and typed it.
25     Q     What's your basis for believing

1  that?
2      A    Because I think someone smarter in the
3  house suggested she do something else, and it
4  was -- the idea was rejected.
5      Q     So, you recall advising her, and
6  she rejected your advice?
7      A    Yes.
8      Q     I won't ask what advice you gave
9  her.
10     A    And her big point was, and they'd been
11  such loyal customers.  This is the dog food we
12  buy.  How could they lie to us?
13          And I said, I don't think it's
14  important.
15     Q     It's not important to know how they
16  lied to you?
17     A    Just how could they.
18     Q     Oh, how could they.  That's not
19  important?
20     A    I didn't think it was.
21     Q     What is the resolution of this
22  case, to your knowledge?
23     A    I think it's on appeal.
24     Q     Who appealed this case?
25     A    I think Pamela did.

1      Q     Did you help with the appeal?
2      A    I helped.  I'm trying to think if I
3  drafted the Notice of Appeal.
4      Q     Are you attorney-of-record on the
5  appeal?
6      A    No.  Maybe I am.  I can't recall as I sit
7  here.
8      Q     But you recall some involvement in
9  helping --
10     A    Yeah, yeah.  I either gave her the form of
11  the Notice of Appeal or I drafted it.  Whether I
12  appeared or not, I just don't know off the top of
13  my head.
14     Q     In Blue Buffalo, did you or Pamela
15  ever speak with counsel in that case?
16     A    I didn't, and I don't think Pam did.  You
17  know what, does it say -- no, it doesn't say who
18  they are.  I don't believe she did and I did not.
19     Q     Okay.  Here we have Exhibit 16.
20          (Exhibit Number 16 was marked.)
21  BY MR. STRAITE:
22     Q     Mr. Sweeney, this document is:
23  Objection of Jeff Brown to Proposed Settlement
24  and Notice of Intent Not to Appear at Fairness
25  Hearing filed In Re:  JP Morgan Chase & Co.

1    Securities Litigation.  It bears the date of May
2    3rd, 2016, in the PACER stamp at the top of page
3    1.
4            Does this document look familiar?
5    A    It does.
6        Q    Why does it look familiar to you?
7    A    I helped Jeff draft it.
8        Q    Is this the same document you're
9    referring to as Number 9 at the top of page 2 of
10   Exhibit 3?
11   A    Yes.
12       Q    If you notice on page 5 -- if you
13   will please turn there.
14   A    Yes.
15       Q    Jeff Brown, pro se, signs the
16   objection and uses your home address of 2590
17   Richardson Street; is that correct?
18   A    Yes.
19       Q    Do you know why Mr. Brown used your
20   home address as his address?
21   A    I believe because he was going to be out
22   of the country for a period of time, so if there
23   was anything coming back, he wanted to make sure
24   it went to me.
25       Q    What's the basis for that belief?

1    A    That's my recollection.
2        Q    He told you this?
3    A    Oh, Jeff definitely told me that, but the
4    basis that I think it happened is because I think
5    it happened.
6        Q    Did he ask permission to use your
7    home address as his address?
8    A    I don't know if he asked permission.  I
9    may have even suggested it.
10       Q    Why wouldn't he use his law firm
11   address in Boca Raton?
12   A    You know, I -- I'm trying to think, and I
13   think because he was more comfortable, being
14   gone, that I had first shot at something and not
15   staff maybe in his office.
16       Q    Or his own law partner?
17   A    Yes.
18       Q    To the best of your knowledge, does
19   his law partner know that he has been filing
20   these objections?
21   A    I have no idea.  His law partner?
22       Q    Correct.
23       Is it fair to say you're more
24   friendly with Mr. Brown than his law partner --
25   I'm sorry, I think his name is Lavalle; is that

1    correct?
2    A    Larry Lavalle has passed on.  Ken Ronan is
3    just the remaining partner.
4        Q    Are you friendly with Mr. Ronan?
5    A    Yes.
6        Q    To the same extent with Mr. Brown?
7    A    No, not so much.  I have positive
8    relationships with both but do way more business
9    with Jeff than Ken.
10       Q    Mr. Brown also used your email
11   address here under his signature line.
12       Did you know that he had done that?
13   A    Yeah, and I think that was probably at my
14   advice, too.
15       Q    It looks like you sent this to
16   Daniel Lawrence Berger at Grant & Eisenhofer,
17   according to the address on --
18   A    I think his office did, because I can't
19   type envelopes.  I assume that's a copy of the
20   envelope.
21       Q    To the best of your recollection,
22   has Mr. Brown or yourself been contacted by
23   Counsel in this case?
24   A    No, I don't think we've heard a word, and
25   we've appealed it, which is strange.

1        Q    The appeal or --
2    A    No, just nothing.
3        Q    But you took an appeal?
4    A    I believe it's on appeal, and I believe I
5    am the attorney-of-record of the appeal.
6        Q    Do you know the status of the
7    appeal?
8    A    Just initial filings going on.
9        Q    Okay.
10   A    Actually, there's an issue with us that I
11   have never heard of before and never had a
12   problem with.
13       Our filings keep getting rejected,
14   because they're not searchable PDFs, which is all
15   news to me.  I filed in several other federal
16   circuits, and it's just fine, and these get
17   filed, and three days later, PACER says they're
18   --
19       Q    Not searchable?
20   A    It doesn't even say that.  It just says
21   that -- there's a word they're using, something
22   is wrong with it and I have to file again, and I
23   then it happened again.  So, I'm working with the
24   clerk's office on how to convert what we have
25   into what they need.

```
 1        Q     Okay.  Here we have Exhibit 17.
 2        (Exhibit Number 17 was marked.)
 3   BY MR. STRAITE:
 4        Q     This is the:  Objection of
 5   Pamela A. Sweeney and Notice of Intent Not to
 6   Appear at Fairness Hearing, filed in the Southern
 7   District of Florida, Miami Division, in the case
 8   of Barron v. Snyder's-Lance.  It's dated May 3rd,
 9   2016, according to the PACER stamp at the top of
10   the page.
11        Do you have this document in front
12   of you, Mr. Sweeney?
13   A    I do.
14        Q     Does this document look familiar?
15   A    It does.
16        Q     Why is that?
17   A    I either drafted it or assisted Pam in
18   drafting it.
19        Q     Do you remember when she drafted
20   it?
21   A    Not -- not exactly.
22        Q     Have you or Pamela been contacted
23   by counsel in this case?
24   A    Yes.
25        Q     When?
```

```
 1   A    First of all, Pamela was subpoenaed for
 2   deposition.  So, there was contact then.  There
 3   has been some settlement negotiations back and
 4   forth, but the matter is not resolved, and I
 5   believe it is on appeal, and I am the
 6   attorney-of-record on appeal in the 11th Circuit.
 7        Q     What's the status of the appeal?
 8   A    Just recently filed, last couple weeks,
 9   and apparently my PDFs are searchable there or --
10        Q     Now we have Exhibit 18.
11        (Exhibit Number 18 was marked.)
12   BY MR. STRAITE:
13        Q     This document is the:  Objection of
14   Patrick S. Sweeney to Proposed Settlement and
15   Notice of Intent Not to Appear at Fairness
16   Hearing, filed in the case of In Re:  Midland
17   Credit Management, Inc., in the Southern District
18   of California.  It's dated April 26th, 2016,
19   according to the PACER stamp at the top of the
20   page.
21        Do you have this document in front
22   of you?
23   A    I do.
24        Q     Turning to page 4 of 6, is that
25   your address?
```

```
 1   A    Yes.
 2        Q     Okay.  What is the status of this
 3   objection?
 4   A    This is the one I settled yesterday.
 5        Q     So, this is Number 2 --
 6   A    Yes.
 7        Q     -- on the first page of Exhibit 3?
 8   A    Correct.
 9        Q     Okay.  Thank you.
10        Now, you have Exhibit 19.
11        (Exhibit Number 19 was marked.)
12   BY MR. STRAITE:
13        Q     This is:  Objections of
14   Patrick Sweeney to Proposed Settlement filed in
15   In Re:  Automotive Parts Antitrust Litigation,
16   dated April 5th, 2016, according to the PACER
17   stamp at the top of page 1, filed in the Eastern
18   District of Michigan.
19        Mr. Sweeney, do you have this
20   document in front of you?
21   A    I do.
22        Q     Does it look familiar to you?
23   A    Yes.
24        Q     On page 5 of 6, is that your
25   signature?
```

```
 1   A    Yes.
 2        Q     What is the status of this case, to
 3   the best of your knowledge?
 4   A    Good question.  There are multiple
 5   Defendants, each with -- I use -- let me put it
 6   this way:  I use this case style.  Some people
 7   use a case style that is about a page and a half
 8   in some of the cases that are going on.  Some of
 9   them are settling Defendants; some of them are
10   not.
11        To keep score from PACER is nearly
12   impossible.  I have called the clerk more on this
13   case than probably all of the other objections I
14   have ever been in combined.
15        It's tough to tell if they've had a
16   fairness hearing, which I'm told they are, but
17   there's not an order, but there's multiple,
18   multiple settlements, and it's not clear which
19   ones you should object to or can object to or
20   which ones aren't or whether they're all under
21   this one case number.
22        Frankly, I don't know the status
23   other than I believe that they've had a fairness
24   hearing, but not a final judgment issued, and
25   there have been multiple additional announced
```

1    settlements that I see in the news that I get
2    nothing about.
3          So, I -- I'm confident -- I'm least
4    confident that I know the exact status of this
5    case on all the objections that have been made.
6          Q    Have you been contacted by counsel?
7    A    No.
8          Q    Have you received any communication
9    at all regarding this case?
10   A    No.
11         Q    Any response you're aware of, filed
12   or not filed?
13   A    Not that I'm aware of.
14         Q    Have you appealed anything at this
15   point?
16   A    No, I can't even figure out if there's a
17   deadline started.
18         Q    I think it's called complex
19   litigation for a reason.
20   A    Yes, I tried once to do a white board of
21   all the players.  After severe writing cramp, I
22   ceased.
23         Q    You now have Exhibit 20.
24         (Exhibit Number 20 was marked.)
25   BY MR. STRAITE:

1          Q    This is:  Objection to Patrick S.
2    Sweeney and Pamela A. Sweeney to Proposed
3    Settlement and Notice of Intention to Appear at
4    Fairness Hearing, filed in the case of Douglas v.
5    The Western Union Company.  It says, filed
6    February 25th, 2016.  The PACER stamp at the top
7    is blacked out, but it appears on all the other
8    pages.
9    A    That's weird.
10         Q    Bearing the same date,
11   February 25th, 2016.
12         Do you have this document in front
13   of you?
14   A    I do.
15         Q    Does this document look familiar?
16   A    It does.
17         Q    Turning to page 5 of 6, is that
18   your signature?
19   A    Yes.
20         Q    What is the status of this case?
21   A    It's in limbo.  They haven't had the
22   fairness hearing yet.  There is -- it's one of
23   the ugliest cases I've ever been involved with.
24         Class counsel went after another
25   objector, and the response to that objector's

1    objections included all sorts of personal
2    accusations of criminal and personal conduct to
3    which the judge said, why am I getting this?  Why
4    do I care?
5          Which led then to a question of
6    whether -- Class counsel questioned whether that
7    person actually was a member of the Class, which
8    started a whole rigamarole of, well, if you think
9    my client is not a member of the Class for that
10   reason, Objector, then I don't think your lead
11   counsel -- your lead Plaintiff is.
12         And, so the judge is going back
13   through that, and then the subject of fees came
14   up, and the subject -- the judge asked that all
15   Class counsel produce all hourly billing records,
16   and apparently those were not in as good as shape
17   as they should have been in, and now there's a
18   whole rigamarole about that.
19         I sit quietly on the sideline as
20   maybe the only adult in the room.  Everyone is
21   very angry in this, including the judge.
22         Q    Have you -- I guess I may have
23   missed it.
24         Have you had contact with counsel
25   in this case?

1    A    Yes.
2          Q    What contact have you had?
3    A    It's a call I used to make all the time.
4    I call -- I think one of the faults of the system
5    is that -- between objectors and Class counsel is
6    Class counsel thinks objectors are only in it for
7    the money and objectors think Class counsel is
8    only in it for the money.
9          Oddly enough in this case, the
10   judge, in a hearing, Judge Feinerman, when the
11   Class counsel was going on and on about the
12   objector, he's a drug addict and drug dealer and
13   bad person and this and that, is only in it for
14   the money, the judge stopped, which was very
15   refreshing I thought, and said, hold on a second,
16   are you saying that the objection is
17   money-driven?
18         He said, I do.
19         And he said, okay.  Is your
20   client's case money-driven?
21         Well, in some ways, yes, Your
22   Honor.
23         And the judge just said, time out.
24   He stayed on the record, but said, time out, if
25   you don't think I'm aware that the entire Class

Page 134

1    action regime is money-driven, then you don't
2    think much of me, and I'll tell you this, my
3    brethren on the 7th Circuit knows it as well.
4          It was very refreshing, but this
5    case remains in chaos.
6          Q    So, what communications have you
7    had with Counsel?
8    A    I called Class counsel and said --
9          (Interruption.)
10          MR. STRAITE:  The telephone just
11    cut out, so we no longer have
12    Robert Petraglia.  We're going to pause on
13    the record.  Hopefully he'll call back.
14    If he doesn't call back in a few seconds,
15    we'll go off the record and find him.
16          THE WITNESS:  Let's go off the
17    record for a second.
18          MR. STRAITE:  Okay.
19          (Break taken.)
20          MR. STRAITE:  We are back on the
21    record.
22          Robert, are you back on?
23          MR. PETRAGLIA:  Yes, I am, thank
24    you.
25    BY MR. STRAITE:

Page 135

1          Q    We were on Exhibit 20 before the
2    break.  Mr. Sweeney, of course, you understand
3    you are still under oath?
4    A    Yes.
5          Q    You understand it's the same oath
6    you took this morning?
7    A    Yes.
8          Q    Do you have Exhibit 20 in front of
9    you?
10    A    I do.
11          Q    Okay.  We were discussing the
12    communications you had with counsel in Douglas
13    versus Western Union.
14    A    Yes.
15          Q    So, let's start from the beginning.
16    A    My first discussion with counsel, which is
17    Joe Siprut of SIPRUT PC in Chicago, was something
18    I did early on in my Class action career and that
19    was to call Plaintiffs counsel and say, I think
20    I've got some good ideas that would improve your
21    preliminary order, so that in the final order, it
22    would contain some things that may help.
23          It usually didn't go very far,
24    because part of it, as I explained, is usually
25    lowering your attorney fee bill, but Mr. Siprut

Page 136

1    got pretty emotional about my call, pretty angry
2    about objectors in general.  He explained his
3    business model.  I explained how I thought
4    objectors could serve a purpose, and, obviously,
5    in the drafting of Rule 23, there was a purpose
6    someone thought for an objector, and then I gave
7    him what I thought was somewhat sage advice,
8    because he's a young guy and I'm an old guy, that
9    he's barking up the wrong tree with the filings
10    he made regarding not my and Pam's objection but
11    another objector, whose name I don't recall, that
12    it just doesn't make any sense just to tear down
13    the objector, which I told him I thought it went
14    on way too much in the Class action world, but
15    his was the worst exhibition of such conduct.
16          He kind of just blew me off.  I
17    think he now wishes he would have listened to me,
18    because he really ticked the judge off.
19          I then reached out to him and said
20    that I believed he was up a creek without a
21    paddle or something like that, and if he wanted,
22    I would see if we could salvage this with -- I
23    believe there were three other objectors.
24          He said he didn't really care what
25    I did, and it doesn't make any sense to reach

Page 137

1    out, and before he hung up, he said, but, if you
2    want to, I won't stop you.
3          Now, I contacted all counsel, all
4    of whom thought it was a good idea, but all of
5    whom put such limitations on me that my first
6    attempt at being a mediator of anything was a
7    disaster, and I withdrew the offer from all
8    counsel and just let the judge decide.
9          Q    Do you remember which counsel you
10    spoke with in the mediation attempts?
11    A    Yes, a gentleman named Alan McDonald from
12    Kentucky -- or Tennessee, who represented the
13    objector, who got slammed in Mr. Siprut's
14    response to her objection.
15          The other objector?  Oh, he's
16    famous.  What is his name?  Bandas, Chris Bandas,
17    I reached out to him who said, that's a great
18    idea, Sweeney, and said, I'm happy to play a
19    part, except here's my rules, I only deal
20    one-on-one with myself and Class counsel and only
21    through a mediator and only one mediator, which I
22    said, well, that doesn't help my reaching out to
23    you.
24          So, that was the end of that.
25    Those were the two -- there might have been a

35 (Pages 134 to 137)

Page 138

1    third, I don't think so, but I remember those two
2    guys -- or three guys, including Siprut.
3        Q    This case, Douglas versus Western
4    Union, I assume that's the same case you're
5    referring to as Case Number 3 on page 1 of
6    Exhibit 3?
7    A    Correct.
8        Q    Okay.  Next exhibit is Number 21.
9        (Exhibit Number 21 was marked.)
10       THE WITNESS:  You're going to get
11   to my $25,000 case.
12   BY MR. STRAITE:
13       Q    Okay.  This one is:  Objections of
14   Patrick S. Sweeney to Proposed Settlement and
15   Notice of Intent to Appear, filed in the case of
16   Brown versus the Hain Celestial Group, Inc., in
17   the Northern District of California.  It bears
18   the date January 20th, 2016, according to the
19   PACER stamp at the top of page 1.
20       Do you have this document in front
21   of you, Mr. Sweeney?
22   A    I do.
23       Q    And does this look familiar?
24   A    It does.
25       Q    On page 3, is that your signature?

Page 139

1    A    It is.
2        Q    What is the status of this
3    objection?
4    A    This matter is settled.
5        Q    Is this the Hain case you referred
6    to earlier in your testimony?
7    A    Yes.
8        Q    And just to make sure I have my
9    notes right, this is the one that settled for
10   sure $20,000?
11   A    Yes.
12       Q    And the 20,000 you received from
13   Class counsel?
14   A    Yes.
15       Q    Was there an appeal filed prior?
16   A    I don't know.  That would have been in the
17   9th Circuit.  I don't think so.  We got a
18   misspelled word.
19       Q    This case, is it listed on Exhibit
20   3?
21   A    No, because those are the open cases.
22       Q    Right, you had said that.  Thank
23   you.
24       Okay.  This is Exhibit 22.
25       (Exhibit Number 22 was marked.)

Page 140

1    BY MR. STRAITE:
2        Q    Here we have a document that's more
3    like a letter rather than a pleading, and it's
4    dated May 31st, 2014, although it bears the pages
5    stamped June 6th, 2014, at the top of page 1,
6    filed in the Trader Joe's Class Action by Patrick
7    Sweeney.
8        Mr. Sweeney, do you have this
9    document in front of you?
10   A    I do.
11       Q    And on the back, on page 2, is that
12   your signature?
13   A    It is.
14       Q    Does this document look familiar?
15   A    Not really.
16       Q    Do you recall making an objection
17   in the Trader Joe's case?
18   A    This refreshes my recollection that I did,
19   and I don't recall it.
20       Q    At the top of page 1, it uses the
21   address 430 Matterhorn Drive in Verona,
22   Wisconsin.
23   A    Um-hmm.
24       Q    Is that an old residence of yours?
25   A    Yes.

Page 141

1        Q    Were you residing in Verona in May
2    of 2014?
3    A    I'm trying to think when we went to
4    California.  Yeah, I believe May of '14, we were
5    at Matterhorn.
6        Q    Okay.  So, going through the
7    history back in time.  So, today, you're up in
8    the North Woods, making everybody jealous; and
9    then last week you were at Richardson Street in
10   Fitchburg, and you were there for about a year?
11   A    Yes.
12       Q    Prior to the Richardson Street
13   address, what was your residence prior to that?
14   A    California.
15       Q    Okay.  When did you move to
16   California?
17   A    July of 2014, shortly after this letter.
18       Q    Okay.  Prior to moving to
19   California, you lived in Verona?
20   A    Um-hmm.
21       Q    For how long?
22   A    Nine months.
23       Q    Did your family live with you
24   during your time in Verona?
25   A    Yes.

Albanese & Associates

Page 142

1      Q    So, Pamela's address was in Verona
2  at that time?
3  A    Correct.
4      Q    When did you move to Verona; do you
5  remember?
6  A    Yes, September 2013.
7      Q    And what was your address prior to
8  that?
9  A    5763 Golden Terrace.
10     Q    In?
11 A    In Madison -- Fitchburg, but Madison
12 address.
13     Q    How long were you on
14 Golden Terrace?
15 A    20 years.
16     Q    Did you rent or own in Verona?
17 A    Rent.
18     Q    Area code 608 is used for your
19 phone number.
20     What is area code 608?
21 A    That's Madison.
22     Q    That's Madison.  Thank you.
23     Now we're up to Exhibit 23.
24     (Exhibit Number 23 was marked.)
25 BY MR. STRAITE:

Page 143

1      Q    Mr. Sweeney, it may be helpful to
2  also have Exhibit 22 in front of you at the same
3  time as 23.
4      This document appears to also be an
5  objection in the Trader Joe's Class Action, with
6  the exact same date, May 31, 2014, although it
7  bears the PACER date of June 6, 2014, filed by
8  Kerry Ann Sweeney, and it appears to be similar
9  in format to your letter.
10     Would you agree?
11 A    No, it's far more brief.
12     Q    In terms of how it's formatted,
13 though?
14 A    Oh, yeah.
15     Q    Do you recall this document?
16 A    I don't.
17     Q    Do you recall whether you helped
18 Kerry Ann with the objection in the Trader Joe's
19 case?
20 A    I don't, but I don't know that she would
21 have known how to do it without my assistance,
22 so, I don't specifically remember, but it's more
23 than likely that I did help her.
24     Q    The next document is Number 24.
25     (Exhibit Number 24 was marked.)

Page 144

1  BY MR. STRAITE:
2      Q    This document is a third objection
3  in the Trader Joe's Class Action case, also dated
4  May 31, 2014, from Pamela Sweeney at the address
5  of 2935 South Fish Hatchery Road, Unit Number 7.
6  It also bears the PACER stamp June 6, 2014, at
7  the top.
8      Do you have this document in front
9  of you?
10 A    I do.
11     Q    Does this document look familiar?
12 A    It really doesn't.
13     Q    It's similar in format to the
14 previous two documents; is that correct?
15 A    Yes.
16     Q    So, you and Pamela and Kerry Ann,
17 your wife and your daughter, all three of you
18 filed objections in the same case on the same
19 day?
20 A    Apparently.
21     Q    Do you recall how this case was
22 resolved?
23 A    I don't.
24     Q    Do you recall whether you received
25 a settlement or --

Page 145

1  A    I don't.
2      Q    Do you recall whether Pamela or
3  Kerry Ann received a settlement?
4  A    I don't.
5      Q    Thank you.  Before we put this
6  document away, why is Pamela Sweeney using the
7  South Fish Hatchery Road address?
8  A    My guess is because that's a FedEx place.
9  My guess is we're contemplating moving -- I'm
10 looking at the date -- moving out to California,
11 and if she used -- we were in Verona at the time,
12 if she used that address, I assume she thought
13 she might not get any of the response stuff
14 either at all or timely.
15     Q    You said the FedEx office.  Did you
16 mean the UPS office that's at that address?
17 A    It might be an UPS office.
18     Q    It's a mail-drop?
19 A    Yes.
20     Q    You had a box there?
21 A    Yes.
22     Q    For how long?
23 A    From July or August 2013 to August or
24 September 2015.
25     Q    Okay.  You never maintained an

1    office there?
2    A    No.
3        Q    Now we're up to Exhibit 25.
4        (Exhibit Number 25 was marked.)
5    BY MR. STRAITE:
6        Q    This is the:  Objection of
7    Patrick S. Sweeney, Proposed Settlement, dated
8    December 29th, 2015, according to the stamp,
9    although the PACER date is December 30th, 2015,
10   at the top of page 1.  This was filed in the case
11   of Gay versus Tom's of Maine.
12       Do you have this document in front
13   of you, Mr. Sweeney?
14   A    I do.
15       Q    Does this document look familiar?
16   A    It does.
17       Q    On page 3 of 4, is that your
18   signature?
19   A    It is.
20       Q    Do you recall making this
21   objection?
22   A    I do.
23       Q    Did you receive any response to
24   this objection?
25   A    I don't think I received a response to

1    this objection, although this is the one where
2    they filed sanctions.  I don't know whether it
3    was a motion or referred it anyhow -- you know
4    what?  There was a response, and in the response,
5    I believe this is how it went, there was a
6    request that the judge examine whether I should
7    be -- whether I had a conflict and whether that
8    should amount to sanctions.
9        Q    Why was there a potential conflict?
10   A    Because I was pro se in this, and I also
11   represented an objector in this.
12       Q    How did this case resolve?
13   A    It was settled.
14       Q    How much did you receive?
15   A    $5,000.
16       Q    From Class counsel?
17   A    Yes.
18       Q    That's the $5,000 you referred to
19   in your earlier testimony?
20   A    Yes.
21       Q    Thank you.  Are we okay if we keep
22   plowing through, or do you need a break?
23   A    No, I'm good.
24       You know what, can we take a
25   five-minute bathroom break?

1        MR. STRAITE:  Yes.  Robert, we're
2    going to take a five-minute bathroom
3    break, and now we are off the record.
4        MR. PETRAGLIA:  Okay.
5        (Break taken.)
6        MR. STRAITE:  We are back on the
7    record.
8        Robert, counsel for Yahoo, are you
9    on the phone?
10       MR. PETRAGLIA:  Yes, I am.
11   BY MR. STRAITE:
12       Q    Okay.  Mr. Sweeney, welcome back,
13   and I'll remind you you're still under oath.
14   A    Yes.
15       Q    Do you understand it's the same
16   oath that you took this morning?
17   A    I do.
18       Q    We went through a number of
19   objections, there were a couple not from this
20   calendar year, but almost all of them were from
21   2016, if you recall.
22       Do you know whether the number of
23   objections that you filed or Kerry Ann
24   or you filed on behalf of other objectors was the
25   same number in 2015 or less or more, and what

1    were the PACERs you were seeing in 2016?
2    A    I think, if I've got your question right,
3    '16, I have accelerated my part of my practice
4    that is involved with Class action objections
5    certainly.
6        Q    And then in 2015 -- comparing 2015
7    to 2014, did you file more objections in 2015 or
8    2014?
9    A    I don't know what the answer is.  My
10   overall feeling is that, as time has gone on
11   since 2010, I have become more involved as an
12   objector in Class actions.
13       Q    Why has your pace accelerated this
14   year and last year?
15   A    I have made a conscious decision to make
16   that a more viable part of my practice, because I
17   felt a real niche was open, and that's an
18   objector who really does some homework, really
19   has some cerebral comments to it, has good
20   intentions, and it's probably 50 percent of my
21   practice, where before it was nominal -- several
22   years ago, it was nominal.  I enjoy it.
23       Q    Going through the settlements that
24   you disclosed, we'll start with the Midland
25   Credit settlement for $35,000, that money came

1    from Class counsel; is that right?
2    A    Yes.
3         Q    Did any come from the Defendants?
4    A    I don't think so. I'm not sure. You
5    know, it may have gone from Defendant to Class to
6    me, but I think it all has come from Class
7    counsel.
8         Q    Did you seek court approval for
9    that?
10   A    I did not.
11        Q    Do you know whether the Court was
12   informed of the settlement?
13   A    Which one is this?
14        Q    Midland Credit.
15   A    Oh, no, it just was yesterday, so the
16   Court will be informed.
17        Q    Okay.
18   A    There's actually a special master or the
19   magistrate has got a hearing before the final
20   hearing, and it's the intent of Class counsel,
21   once he settled, he just said, you don't need to
22   appear by phone at this thing with the
23   magistrate, and he's going to represent the terms
24   of the settlement to the magistrate.
25        Q    Okay.  In Hain Celestial, it

1    settled for $20,000, if I recall, that money came
2    from Class counsel?
3    A    I believe it did.
4         Q    Did you seek Court approval for
5    that?
6    A    I did not.
7         Q    Do you know whether the Court was
8    informed?
9    A    I think they were, but I'm not positive.
10        Q    In the Tom's of Maine case, you
11   disclosed the $5,000 settlement; am I correct?
12   A    I think we did, but not to the Court. The
13   sanction deal got signed out to the magistrate.
14   I think we went through all that with the
15   magistrate.  It was disclosed. I don't know if
16   it was ever approved.
17        Q    The $25,000 settlement, we're still
18   trying to figure out which case that is, do you
19   know whether that money came from Class counsel
20   or Defendants?
21   A    I think so they all came from Class
22   counsel.
23        Q    Did you seek Court approval for
24   that?
25   A    I don't remember the case, so I can't

1    remember if we did.
2         Q    Same questions, then, for the Wells
3    Fargo case, the $10,000 settlement; the
4    Land Rover case, which is a 47.5 thousand-dollar
5    settlement, and then the Bank of America
6    settlement for 25,000.
7              In each of those, did the money
8    come from Class counsel?
9    A    I believe so.
10        Q    Do you recall whether Court
11   approval was sought for any of them?
12   A    No.
13        Q    Do you know whether these
14   settlements were disclosed to the Court?
15   A    I don't.
16        Q    The next few documents will, of
17   course, be a little more personal, and it's not
18   my intention to attack you, and, in fact, here's
19   an opportunity to give your side.  If you didn't
20   appear for your deposition, then we would just
21   have documents we found.
22              So, this actually can be used to
23   put things in context.
24   A    I'm okay with it.
25        Q    Okay.  This is Exhibit Number 26.

1              (Exhibit Number 26 was marked.)
2              THE WITNESS:  A client of mine once
3         said he was accused of having skeletons in
4         the closet, and he said, hell, I've got a
5         whole warehouse full of corpses.
6    BY MR. STRAITE:
7         Q    This document says:  Complaint.
8    It's in The Matter of Disciplinary Proceedings
9    Against Patrick S. Sweeney, Attorney at Law,
10   Office of Lawyer Regulation, Complainant, versus
11   Patrick S. Sweeney, Respondent.  It's stamped:
12   Received by the Supreme Court of the State of
13   Wisconsin, July 10th, 2015.
14              Do you have this document in front
15   of you?
16   A    I do.
17        Q    Mr. Sweeney, does this document
18   look familiar?
19   A    It does.
20        Q    What is this document?
21   A    This is a Complaint to the Office of
22   Lawyer Regulation against me from -- from two
23   sources that made a complaint to the Office of
24   Lawyer Regulation on me.
25        Q    Who were those two sources?

1    A    The first person was Attorney
2  Debra Remington.
3        Q    Who is Attorney Debra Remington; do
4  you know?
5    A    She was an attorney -- yeah, I do.  She
6  was an attorney with the Department of Justice,
7  who represents, among other state entities, the
8  University of Wisconsin.
9        Q    Why did she complain?
10   A    Because I filed an Answer in a case while
11 my license was suspended.
12       Q    Why was your license suspended?
13   A    Because I didn't pay my fee, annual fee.
14       Q    How long was it suspended?
15   A    It had -- that's a good question.  I think
16 October 21st, so 23 days.
17       Q    Did this Complainant make any other
18 accusations?
19   A    No.
20       Q    Who is the second Complainant?
21   A    Attorney Paul Schwarzenbart.
22       Q    Who was Attorney Schwarzenbart?
23   A    He was an attorney that represented a bank
24 that I was in -- at a litigation in.
25       Q    Could you please turn to page 4,

1  looking at paragraph 13.  The Complaint says
2  that: Sweeney served as a managing member of
3  three corporations.  It identifies Fairview
4  Ridge, LLC, Fairview Ridge II and Fairview Ridge
5  III, LLC?
6    A    That is correct.
7        Q    Those are correct?
8    A    Yes.
9        Q    What is the status -- let's look at
10 the first corporation, although I would take
11 issue with an LLC being a corporation.
12   A    I do too.
13       Q    Fairview Ridge, LLC, what is the
14 status of that LLC?
15   A    It's an active LLC that owns a piece of
16 property that houses a high-tech firm in
17 Middleton, Wisconsin.  It's a roughly
18 138,000-square-feet commercial property.
19       Q    And at the time of this Complaint,
20 it says you held a 65 percent interest?
21   A    That's what it says, yes.
22       Q    What's your interest today?
23   A    Zero.
24       Q    Why is that?
25   A    My shares were pledged for a personal loan

1  to the State Bank of Cross Plains, which is who
2  Paul Schwarzenbart represented.
3        Q    Did you repay the loan?
4    A    No, I did not repay the loan.
5        Q    Did they seize the shares?
6    A    Among other things, yes.
7        Q    The second corporation or LLC is
8  called Fairview Ridge II, LLC.
9             What is the status of that LLC?
10   A    That is 100 percent owned by my former
11 partners, as is Fairview Ridge, and that owns a
12 piece of property that my former partner's
13 company has now built a warehouse on.
14       Q    Is it correct that you once held a
15 40 percent interest?
16   A    Correct.
17       Q    What's your interest today?
18   A    Zero.
19       Q    Why?
20   A    The bank foreclosed on their security
21 interest in my shares.
22       Q    The final LLC is Fairview Ridge
23 III, LLC.  It says you once held a 40 percent
24 interest.
25             Is that accurate?

1    A    Yes.
2        Q    Is that still accurate?
3    A    No.
4        Q    What's your interest today?
5    A    Zero.
6        Q    Why is that?
7    A    Because the State Bank of Cross Plains
8  foreclosed on their security interest.
9        Q    Turning to page 5 of this
10 Complaint, paragraph 21, it says that:  Sweeney
11 transferred approximately $400,000 from the
12 Fairview entities to Sweeney's control.
13            Did I read that correctly?
14   A    You've read that correctly.
15       Q    The Fairview entities refers to
16 those three LLCs we just discussed?
17   A    Yes.
18       Q    Did you transfer approximately
19 $400,000 from the entities to yourself?
20   A    Yes.
21       Q    Why did you do that?
22   A    It was part of a loan transaction.
23       Q    Did you intend to repay it at the
24 time you took the loan?
25   A    Yes.

Page 158

1      Q     Did you repay the loan?
2      A     It's in dispute with millions of other
3   dollars in an accounting dispute, but it is given
4   full credit in that dispute.
5      Q     Do you have $400,000 to repay this
6   loan?
7      A     No.
8      Q     Turning to page 6.
9      A     Let me go back and answer.  Do I have
10  $400,000 in cash to repay this loan?
11     Q     Yes.
12     A     No.
13     Q     Do you have $400,000 in assets
14  other than cash to repay this loan?
15     A     I believe I do.
16     Q     What are those assets?
17     A     They are causes of action against my
18  former partners, who own all of my shares, and a
19  cause of action against the State Bank of Cross
20  Plains.
21     Q     Any other assets that could satisfy
22  the $400,000?
23     A     Oh, yes, I believe the cause of action
24  that I have personally, which are separate from
25  what my wife and children may have, is

Page 159

1   approximately 3 and a half million to $4 and a
2   half million, depending on how you valuate
3   certain things.
4      Q     These are contingent assets
5   depending on winning the lawsuits?
6      A     The lawsuits have not been filed yet.
7      Q     Other than those potential assets,
8   are there any other assets that you have to repay
9   the $400,000 loan?
10     A     None of significant value.
11     Q     We can exclude the shirt on your
12  back, of course.
13           But not counting contingent assets
14  from potential legal claims or current legal
15  claims, your total assets are less than 400,000?
16     A     That is correct.
17     Q     Turning to page 6, paragraph 25 of
18  the Complaint, midway through the paragraph, it
19  says that:  There was an additional $225,000
20  taken, and another $788,000 is owed, consisting
21  of 481,000 in principal and 306,0000 in interest,
22  and, of course, I'm rounding to the nearest
23  thousand.
24           Is that correct?
25     A     I don't believe that's correct.

Page 160

1      Q     I'm sorry.
2            Did I read that correctly?
3      A     You read it correctly.
4      Q     That's what it says here?
5      A     Correct.
6      Q     Thank you.  That's 26.
7            Now we're on 27.
8            (Exhibit Number 27 was marked.)
9   BY MR. STRAITE:
10     Q     Exhibit 27 is Respondent Patrick S.
11  Sweeney's Answer, Affirmative Defenses and
12  Mitigating Factors to the Complainant's Complaint
13  in the same matter, the Disciplinary Proceedings
14  Against Patrick S. Sweeney, Attorney at Law, in
15  the Supreme Court of the State of Wisconsin.
16  This is stamped filed November 10th, 2015.
17           Do you have this document in front
18  of you, Mr. Sweeney?
19     A     Yes, I do.
20     Q     Does it look familiar to you?
21     A     Yes, it does.
22     Q     Can you please turn to page 6.
23  Bottom of page 6, is that your signature?
24     A     Yes.
25     Q     Okay.  I have one question on this

Page 161

1   document.  Also on page 6, where your signature
2   is, you list one mitigating factor, and I'll read
3   this and please tell me if I did it wrong:  At
4   all times pertinent, the Respondent was suffering
5   from multiple medical disabilities that clouded
6   his judgment, adversely affected his memory and
7   otherwise adversely affected his decision-making.
8   All said disabilities have now been properly
9   diagnosed, treated and resolved through ongoing
10  treatment with licensed medical physicians.
11           Did I get that about right?
12     A     Yes.
13     Q     Do you remember typing this?
14     A     I don't remember typing it.
15     Q     But you did assert this mitigating
16  factor?
17     A     Yes.
18     Q     What were the multiple medical
19  disabilities you were referring to here?
20     A     I have to object under HIPAA privacy.
21     Q     You believe HIPAA applies to you
22  right now?
23     A     I believe that I'm not required to reveal
24  parts of my medical record unless they're at
25  direct issue in this case, which they're not, so

1    I think HIPAA does apply.
2         Q    Could you take out of your stack
3    Exhibit 2.  This is the order of Judge Lucy Koh,
4    dated July 25th, 2016.  It's Exhibit 2 in this
5    case.  Could you please turn to page 1 of her
6    order, bottom of the order.
7    A    Bear with me a second.
8         Q    Of course.
9    A    Got it.
10        Q    It's the next page, numbered 1.
11        Do you see paragraph 3 of her
12   order, numbered 3?
13   A    Yes.
14        Q    "Mr. Sweeney is ordered to comply
15   with the subpoena in all respects.  The parties
16   may negotiate alternative dates for the
17   deposition, so long as the deposition and
18   production of documents occur on or before
19   August 5, 2016."
20        Did I read that correctly?
21   A    Yes.
22        Q    Turning to the subpoena that she
23   ordered you to comply with, this is Exhibit 1.
24   Could you please pull Exhibit 1.
25        On page 1, it says you are

1    commended to appear, and it says:  See
2    Attachment A.
3         Attachment A starts in the middle
4    of the document.  You see page 1 and then you see
5    page 2.  On page 2, it says:  Identification of
6    Subject Matters For Examination.
7         Do you have this document in front
8    of you?
9    A    Yes.
10        Q    You see there are ten topics listed
11   here under the section:  Identification of
12   Subject Matters for Examination; do you see those
13   ten?
14   A    Yes.
15        Q    Turning to page 3 of the subpoena,
16   Number 8 says:  Your medical condition that you
17   identified in your response to the disciplinary
18   complaint filed against you by the Wisconsin
19   Director of the Office of Lawyer Regulation.
20        Do you see that?
21   A    Yes.
22        Q    Do you understand that Judge Koh
23   ordered you to comply with this subpoena?
24   A    I don't think Judge Koh mentioned in here
25   that I'm waiving my HIPAA rights, and I'm not

1    waiving my HIPAA rights, so I'm not answering the
2    question.  You can -- you can certify it for
3    Judge Koh.  If she wants me to answer it, then
4    there are several protective orders and appellate
5    matters -- she might get to see it at the 9th
6    Circuit.
7         Q    You said that:  All disabilities
8    have been properly diagnosed, treated and
9    resolved with ongoing treatment with licensed
10   medical physicians.
11        What ongoing treatment is this?
12   A    Same objection.
13        Q    Which licensed medical physicians
14   are providing you treatment?
15   A    Same objection.
16        Q    And for the record, this is not
17   just an objection; you're refusing to answer
18   these questions?
19   A    On the basis of my objection to the
20   questions, I'm refusing to answer the questions.
21        Q    We are on Number 28.
22   A    What is this one?  28?
23        Q    Number 28.
24        (Exhibit Number 28 was marked.)
25   BY MR. STRAITE:

1         Q    Mr. Sweeney, in front of you is a
2    letter from the Department of Financial
3    Institutions from the State of Wisconsin, signed
4    by George Petak, P-E-T-A-K, certifying that the
5    attached corporate record is authentic.
6         Turning to the next page, these are
7    the Articles of Incorporation, Stock For-Profit
8    Corporation for Sweeney Legal Group, S.C.
9         Do you have this document in front
10   of you?
11   A    I do.
12        Q    Do you recognize this document?
13   A    Not specifically, but I've formed several
14   legal entities, and these are the forms that the
15   Wisconsin DFI looks like, yes.
16        Q    Are you familiar with Sweeney Legal
17   Group, S.C.?
18   A    I am.
19        Q    What is that?
20   A    It is a service corporation I formed in
21   2012 for me to practice under.
22        Q    Is it fair to say that this is your
23   law firm?
24   A    The technical question is the legal entity
25   that I practice under.

Page 166

1     Q     Did you have a legal entity that
2  you practiced under prior to forming Sweeney
3  Legal Group, S.C.?
4     A     Yes, I practiced under Sweeney & Sweeney,
5  S.C.
6     Q     Why did you change from Sweeney &
7  Sweeney, S.C. to Sweeney Legal Group, S.C.?
8     A     Because I left the Sweeney & Sweeney firm.
9     Q     Who else was at the Sweeney &
10 Sweeney firm other than you?
11    A     As partners?
12    Q     Anyone.  Attorneys, I mean.
13    A     Attorneys?  Timothy Sweeney, the other
14 Sweeney; Cory Buye; Mike Abledinger, spelled like
15 Abledinger.  I'm blanking on a name, and one
16 young associate, I can't remember her name.
17    Q     And who was the other Sweeney you
18 mentioned?
19    A     Timothy.
20    Q     Who is Timothy?
21    A     My brother.
22    Q     Why did you leave Sweeney &
23 Sweeney, S.C.?
24    A     I needed to cut my overhead.  I had -- and
25 I had several of the issues that were coming up

Page 167

1  with my foreclosures that I just simply had to
2  deal with, and I didn't think it helped the
3  firm's image for me to be a member of that firm
4  and be taking on what I knew was going to be
5  coming.
6     Q     What is the status of Sweeney Legal
7  Group, S.C.?
8     A     It is dissolved, I believe.
9     Q     Why do you believe that?
10    A     Because I think, at least on information
11 and belief, when I left, the other partner,
12 Cory Buye, the firm became Sweeney & Buye, and
13 then they dissolved for Cory to go out on his
14 own, and Tim has since gone with another firm.
15    Q     So, that's the response for the
16 current status of Sweeney & Sweeney?
17    A     Yes.
18    Q     What's the current status of
19 Sweeney Legal Group, S.C.?
20    A     I have allowed it to be administratively
21 dissolved.
22    Q     And you still practice law simply
23 now as a sole practitioner?
24    A     A sole practitioner under the brand doing
25 business as Sweeney Legal Group, without the S,

Page 168

1  period, C, period.
2     Q     Why did you allow your law firm to
3  be administratively dissolved?
4     A     The Bar in Wisconsin has a whole series of
5  requirements if you want to practice under a
6  liability limiting entity.  They don't have those
7  requirements if you just want to practice as a
8  sole proprietor, doing business as, or not doing
9  business as, and with that in mind, I allowed
10 this to lapse, and am now a sole proprietor,
11 although using a d/b/a of Sweeney Legal Group,
12 without the S.C., because that's no longer an
13 entity.
14    Q     Turning to our earlier discussion
15 of your Office of Lawyer Regulation Complaint,
16 when is the hearing scheduled for?
17    A     January of 2017.
18    Q     When was that date chosen?
19    A     Probably a month ago.
20    Q     Was there an earlier date original
21 planned?
22    A     Yes.
23    Q     When was the original date?
24    A     Sometime in August, this month.
25    Q     Why was the date moved?

Page 169

1     A     I petitioned the OLR to move the date.
2     Q     For what reason?
3     A     Other's people's HIPAA here.  Due to
4  medical reasons of people other than me.
5     Q     Mr. Sweeney, are you currently a
6  party to any lawsuit?
7     A     Besides the OLR?
8     Q     Yes, and besides objections.
9     A     Yes.
10    Q     Could you name them?
11    A     I am a Plaintiff against the Hyatt
12 Corporation in the Federal District Court in
13 Hawaii.
14          I don't know if I'm in any current
15 ones.  I do have several draft Complaints that
16 are about to be filed, but I don't know if any of
17 them are still going on.  I don't think so.
18    Q     Have you been sued --
19    A     I could be wrong.
20    Q     Have you been sued by the Director
21 of Athletics of the University of Wisconsin?
22    A     Oh, yes, I have been.
23    Q     Is that another ongoing suit?
24    A     Yes.
25    Q     This is Exhibit 29.

Page 170

```
1              (Exhibit Number 29 was marked.)
2    BY MR. STRAITE:
3         Q    This document is a Complaint filed
4    in the case of Barry Alvarez versus Sweeney &
5    Sweeney, S.C., Patrick S. Sweeney and others,
6    filed in the Circuit Court, State of Wisconsin,
7    Dane County.  It bears a stamp February 1, 2016,
8    on the first page.
9              Do you have this document in front
10   of you?
11   A    I do.
12        Q    Are you familiar with this
13   document?
14   A    I am.
15        Q    What is this document?
16   A    This is a Complaint for fraud and
17   malpractice.
18        Q    What's being alleged here?  And, of
19   course, I understand and am not asking --
20   A    The -- I think there's two things.  The
21   trial we're going to, I think they're trying to
22   trip a potential punitive damage.  So, they say
23   that we fraudulently held ourselves out to be an
24   expert in bankruptcy and made express
25   representations to that, but the key, what they
```

Page 171

```
1    call the linchpin to the Complaint is we
2    represented them in a -- in a Ponzi scheme where
3    they were taken for millions of dollars, so they
4    say, and that we missed the filing of a claim in
5    Bankruptcy Court.  That's what they say.
6         Q    Have you responded to this
7    Complaint?
8    A    Yes.
9         Q    Did you file a Motion to Dismiss or
10   an Answer?
11   A    No, we filed an Answer.
12        Q    Are you represented by counsel?
13   A    Yes.
14        Q    How are you paying counsel?
15   A    The insurance company is.
16        Q    You say "the insurance company,"
17   what insurance company?
18   A    The Defendant insurance company.  Oddly
19   enough, in some states you can't even tell the
20   jury that there's insurance.  Wisconsin, you must
21   list the insurance company as a named party.  So,
22   it's -- do you have it in front of you?
23        Q    I do.
24   A    Okay.  So, Wisconsin Lawyers Mutual
25   Insurance Company.
```

Page 172

```
1         Q    And that was the malpractice
2    carrier for --
3    A    Correct.
4         Q    Do you currently have malpractice
5    insurance?
6    A    I do not.
7         Q    Did you have malpractice insurance
8    when you had Sweeney Legal Group, S.C.?
9    A    Yes.
10        Q    When did you stop carrying
11   malpractice insurance?
12   A    When I left Sweeney & Sweeney.
13        Q    So, you did or did not have
14   malpractice insurance when you were at Sweeney
15   Legal Group, S.C.?
16   A    I did.  That's why they are covering this
17   suit.  The time frame was when I was with Sweeney
18   & Sweeney, which is why they're a Defendant.
19        Q    Then you moved to Sweeney Legal
20   Group, S.C.?
21   A    Right.
22        Q    Did you carry malpractice insurance
23   at the time you were at Sweeney Legal Group,
24   S.C.?
25   A    No.
```

Page 173

```
1         Q    What is the status of this case?
2    A    It's in discovery.
3         Q    When's the next hearing?
4    A    I don't know.  I assume the next hearing
5    would be a scheduled hearing of some sort, but I
6    don't go to anything of the hearings.  At least I
7    haven't.  I'm not even sure there's been one.
8         Q    What are the limits of liability on
9    the insurance policy?
10   A    I don't know.
11        Q    Is it possible that the amount
12   being sought, including the punitives, could
13   exceed the limits of liability coverage?
14   A    Including punitives makes it endless, so,
15   yes.
16        Q    Without the punitives?
17   A    No.
18        Q    Do you know whether the insurance
19   policy covers acts of fraud?
20   A    I don't believe it does.
21        Q    So, if they prove fraud, then
22   there's no insurance coverage?
23   A    For those damages.
24              I think -- we have been through
25   this.  I think there's a duty to defend fraud if
```

Page 174

```
1    it's coupled with a duty to defend and a duty to
2    pay claim, which it is, but not a duty to pay,
3    which is my understanding.
4            It's sort of out of my area of the
5    law, but, unfortunately, I learned something I
6    didn't want to, but that's my understanding.
7        Q    Now we're at Exhibit 30.
8            (Exhibit Number 30 was marked.)
9    BY MR. STRAITE:
10       Q    This document is a Complaint filed
11   in the case of Sweeney versus Hyatt Corporation,
12   et cetera, filed in the District of Hawaii on
13   March 24th, 2016, according to the stamp and the
14   PACER stamp at the top of the page.
15           Do you have this document in front
16   of you, Mr. Sweeney?
17   A    I do.
18       Q    Does this document look familiar?
19   A    It does.
20       Q    Can you turn to page 12, the last
21   page of the Complaint.
22   A    Yes.
23       Q    Is that your signature?
24   A    Yes.
25       Q    What are you suing about in this
```

Page 175

```
1    case?
2    A    This is a premise liability suit that my
3    wife was injured while staying at the hotel and
4    my participation is a loss of consortium claim.
5        Q    When were you in Hawaii?
6    A    I wasn't.  My wife was there, I believe,
7    February 2014.
8        Q    Okay.  Is it possible it was March
9    2014?
10   A    Possible.
11       Q    Is it possible exactly two years
12   minus a day before this Complaint?
13   A    Probably.
14       Q    And she stayed at the Grand Hyatt
15   Kauai Resort & Spa?
16   A    She did.
17       Q    She did that without you?
18   A    Yes.
19       Q    Who did she go to the Grand Hyatt
20   Kauai Resort & Spa with?
21   A    With my two daughters, Kerry Ann and Erin.
22       Q    Kerry Ann is the adult daughter?
23   A    Um-hmm.
24       Q    And Erin is the minor daughter?
25   A    Yes.
```

Page 176

```
1        Q    Who paid for this trip?
2    A    Pamela did.
3        Q    She had money for a trip to Hawaii?
4    A    Apparently.
5        Q    In 2014?
6    A    Apparently.
7        Q    Is Kerry Ann a Plaintiff?
8    A    No.
9        Q    I don't see her in the caption.
10   A    No.
11       Q    What's the status of this case?
12   A    Very beginning, discovery.
13       Q    Have they filed an Answer?
14   A    Yes.
15       Q    Have you been in contact with
16   counsel?
17   A    Yes.
18       Q    Did you call them or did they call
19   you?
20   A    The Federal Rules in Hawaii require that
21   Plaintiff and Defendants present a joint opening
22   statement, for lack of a better word, and a
23   consultation, and we sort of got along.
24           So, we have had two, three, four
25   conversations, but I sometimes like to say I'm
```

Page 177

```
1    about ready to become a professional Plaintiff
2    due to my status as a professional Defendant for
3    a two-year period.
4        Q    Did you pay the filing fee for that
5    lawsuit?
6    A    I'm sure we did.
7        Q    Did you personally pay it?
8    A    I think Kerry Ann -- out of Kerry Ann's
9    account, I think.  I think we got a money order.
10       Q    Why would Kerry Ann pay for a
11   lawsuit if she's not a Plaintiff?
12   A    Because I'd send her the money, and she'd
13   put it into her checking account, so she could
14   send a check.
15       Q    Okay.  How much money have you
16   deposited into Kerry Ann's account in the
17   aggregate?
18   A    Over the years?
19       Q    Yes.
20   A    Including when she was in college, and I
21   was paying for her stuff?
22       Q    No, money you've put in her account
23   for your use.
24   A    Since I haven't had a bank account?  That
25   would have been -- I filed bankruptcy -- I've got
```

45 (Pages 174 to 177)

Page 178

1  to think this through.  Since 2013, my estimate
2  would be $100,000.
3       Q    Have you tried to open a bank
4  account recently?
5  A    Yes.
6       Q    And what has been the result?
7  A    I can't get a bank to open one for me.
8       Q    Which bank did you try at?
9  A    The recent one?
10      Q    Say, the most recent one.
11 A    The most recent one is UW Credit Union.
12      Q    And why wouldn't they give you an
13 account?
14 A    I'm on the list.
15      Q    The list?
16 A    There's an FDIC list, I guess, I'm told.
17 Pam's on it, too.
18      Q    Is that because you filed
19 bankruptcy?
20 A    I don't know.  I don't think so.  I don't
21 know why.  I know people that have filed
22 bankruptcy that have bank accounts.  We've even
23 tried Associated Bank that has a starter account
24 or start-over account, and they wouldn't open an
25 account for me either.

Page 179

1       Q    Does Pamela work outside the home?
2  A    No.
3       Q    Does she have any other source of
4  income?
5  A    She sometimes does objections.
6       Q    Okay.
7  A    She sometimes does some consulting.  She
8  has an MBA.
9       Q    Who does she consult with?
10 A    She used to consult for all our
11 corporations, which are numerous.  Now, from time
12 to time, she'll consult for friends.
13      Q    Okay.  When is the most recent
14 consulting that she did?
15 A    2014.
16      Q    Okay.  So, it's been two years
17 since she has had income other than the
18 objections?
19 A    Yes.
20      Q    How much money has she made in
21 settlements in her objections this year, to the
22 best of your recollection?
23 A    That's an interesting point, because she's
24 subject to a non-confidentiality -- an NDA.  I
25 have to think through whether I'm subject to it.

Page 180

1  I don't think I am, but I believe she got
2  $45,000.
3       Q    Do you remember which case that
4  was?
5  A    I do.  Walgreen's.
6       Q    Walgreen's.  Do you know of any
7  others this year?
8  A    That she received money for?
9       Q    Yes.
10 A    I don't believe there are any, no.
11      Q    Was there any in 2015?
12 A    No.
13      Q    So, in the last year and a half,
14 she's only brought in 45,000 for her part-time
15 work as an objector?
16 A    Yes, that's her sole contribution, that
17 she's reminded of from time to time by others.
18      Q    Just a couple more things,
19 Mr. Sweeney.  Thank you for your patience, and I
20 applaud your decision to plow through without a
21 lunch break.
22           Our next Exhibit is Number 31.
23           (Exhibit Number 31 was marked.)
24 BY MR. STRAITE:
25      Q    This is a Voluntary Petition For

Page 181

1  Bankruptcy of Patrick S. Sweeney and Pamela A.
2  Sweeney, filed in the Western District of
3  Washington.  It bears --
4  A    Wisconsin.
5       Q    Thank you, Western District of
6  Wisconsin.
7            It bears the date February 14th,
8  2014, according to the PACER stamp at the top.
9            Do you have this document in front
10 of you?
11 A    I do.
12      Q    Does this look familiar?
13 A    It does.
14      Q    Can you please turn to page 3.
15 A    Yes.
16      Q    Is that your signature?
17 A    Yes.
18      Q    Why did you file for bankruptcy?
19 A    We had millions of dollars more in assets
20 than debts, and the bank refused to stop or slow
21 or impede their lawsuits, which they were seeking
22 to take all of the assets to pay for a very small
23 portion of debt that was owed to them.
24      Q    So, at the time you filed this in
25 February of 2013, you believe you had more assets

Page 182

1      than debt?
2      A    I do.
3          Q    But you filed for bankruptcy
4      anyway?
5      A    Yes, for bankruptcy protection.
6          Q    Turning to page 4 as numbered on
7      the PACER stamp at the top, Creditor Matrix, one
8      of the creditors is the Wisconsin Department of
9      Revenue.
10     A    Yes.
11         Q    How much money did you owe to the
12     Wisconsin Department of Revenue?
13     A    I don't believe I owed them anything.
14         Q    At the time you filed this?
15     A    Yes.
16         Q    But you listed them as a creditor?
17     A    My understanding of the bankruptcy laws is
18     anyone who's making a claim, regardless of your
19     opinion of the merits of that claim, you need to
20     list them as a creditor.
21         Q    So, you just disagreed with
22     their -- what is the status of their claim today?
23     A    Limbo, I would say.  From time to time,
24     they file a tax warrant, but they haven't been in
25     contact with me since they -- I would say 2012.

Page 183

1          Q    How much did they claim was owed?
2      A    They claimed originally $85,000 of sales
3      tax in a restaurant that I was a small partner
4      with, only was there three or four times, and
5      they -- it was with a baseball player, Ryan
6      Braun, and they refused to go after Ryan, for, I
7      think, publicity purposes, even though he was
8      there almost daily, but they went after me, and
9      my position is they emailed the notices to the
10     wrong address, and when they did find out about
11     it, they refused to allow me to adjudicate it.
12     So, it is what it is.
13         Q    So, it's still outstanding?
14     A    Yes.
15         Q    The next creditor listed is the
16     IRS.
17              Is this the Internal Revenue
18     Service?
19     A    Yes.
20         Q    The Federal government?
21     A    Yes.
22         Q    How much did they claim you owed as
23     of the date of this filing?
24     A    I think it's 8- or $9,000.
25         Q    What's the status of that claim

Page 184

1      today?
2      A    They set up a payment program for me and
3      were sending me payment -- they put together a
4      nice payment book for you, and I have requested
5      three times letting them know they haven't sent
6      me the payment book, and they promised to send
7      the payment book, and it's probably been five or
8      six years, and I still haven't got the payment
9      book and haven't made the payments, and I haven't
10     heard from them at all.
11         Q    When was the last time you filed a
12     Federal tax return?
13     A    I think 2013.
14         Q    You haven't filed for 2015 yet?
15     A    No.
16         Q    Have you filed for 2014?
17     A    No.
18         Q    Why not?
19     A    I don't have all the documentation to be
20     able to sign one as to the veracity of the
21     information.
22         Q    Turning to the next page, this is
23     page 5 as numbered by the PACER stamp, the next
24     creditor at the top is Jeff Brown.
25     A    Yes.

Page 185

1          Q    This is the same Jeff Brown you
2      were speaking of earlier?
3      A    One in the very same.
4          Q    Why is he listed as a creditor?
5      A    Because I owe him money.
6          Q    How much do you owe -- did you owe
7      him at the time of this filing?
8      A    I think 25,000.
9          Q    How much do you owe him today?
10     A    I think about 70,000.
11         Q    Let's start with what was owed in
12     2013.
13              Why did you owe Jeff M. Brown
14     money?
15     A    Because he lent me money.
16         Q    So, he --
17     A    They're all loans.
18         Q    Okay.  Since then, he's given you
19     additional loans?
20     A    Yes.
21         Q    Okay.  Were these from Jeff Brown
22     individually or from Lavalle, Brown & Ronan?
23     A    Jeff Brown.
24         Q    Okay.  Below that, Kenneth Ronan is
25     listed as a creditor?

47 (Pages 182 to 185)

1    A    Yes.
2        Q    He gave you a loan?
3    A    He actually -- we settled the case with
4  State Bank of Cross Plains, and Jeff and Ken paid
5  the settlement amount, and we're each third
6  owners, and I didn't pay anything, so I owed them
7  each half of a third.
8        Q    Have you since paid them?
9    A    I've made some payments.  I have not paid
10 either one in full.
11       Q    Okay.  When you say you've paid
12 them, do you mean you've asked Kerry Ann to write
13 a check to them?
14   A    No, I think they owed me money for fees on
15 a case, and that got credited.
16       Q    Got it.  This is 32.
17           (Exhibit Number 32 was marked.)
18 BY MR. STRAITE:
19       Q    Next document is 32.  It's also a
20 filing in the same bankruptcy matter, Western
21 District of Wisconsin, In Re: Patrick S. Sweeney
22 and Pamela A. Sweeney.  The PACER stamp bears the
23 date July 17th, 2013.
24           Do you have this document in front
25 of you, Mr. Sweeney?

1    A    I do.
2        Q    Does this document look familiar?
3    A    Unfortunately, it does.
4        Q    Towards the end, we have page 29 of
5  40.  Let me know when you're on that page.
6    A    Got it.
7        Q    Is that your signature on the
8  right?
9    A    It is.
10       Q    Okay.  Turning to page 5, it is
11 Schedule B, personal property, Number 13, you
12 list under Stock and Interests in Incorporated
13 and Unincorporated Businesses a number of
14 interests.
15           Do you see these?
16   A    You know, I don't.  What page?
17       Q    Number 5 as the PACER stamp says.
18   A    Which number are you on?
19       Q    Number 13 on the left.
20   A    Yes.
21       Q    So, the first stock interest you're
22 reporting is less than 1 percent interest in
23 Green Wood Financial, LLC.
24           What's that?
25   A    That's a bank in Lake Mills, Wisconsin.

1        Q    You own some percentage of that?
2    A    I did.
3        Q    Do you own that today?
4    A    No.
5        Q    The next asset you list at a 50.1
6  percentage of interest in Fairview Ridge, LLC,
7  along with other interests in related entities,
8  and you valued them combined at $2,510,000; is
9  that correct?
10   A    That's correct.
11       Q    Do you still have any of these
12 interests?
13   A    No, and I'd like as to point out that
14 those were put in as -- as a basis and not -- not
15 as current market value.
16       Q    Okay.  I guess I'm confused.
17 Isn't this column reporting
18 "current value of debtor's interest in property"?
19   A    It does, but I can tell you that the
20 equity in those three properties was way more
21 than that, but I did what the attorneys told me
22 to do.
23       Q    And today, you don't have any of
24 these interests?
25   A    I still have -- no, I don't.  Actually,

1  yes, I still have the interest in Catholic
2  Knights of St. Nazianz, N-A-Z-I-A-N-Z, LLC.
3        Q    And by the "membership interest,"
4  you're referring to the 28 percent membership
5  interest --
6    A    Yes.
7        Q    -- you list here and valued at
8  270,000?
9    A    Yes.
10       Q    Do you still have a membership
11 interest in the Catholic Knights of St. Nazianz?
12   A    Yes.
13       Q    What's that current value today?
14   A    Nominal.
15       Q    Less than $20,000?
16   A    Yes.
17       Q    Why did it fall so much in value?
18   A    It's a very old, large seminary, and at
19 the time, there was a tenant -- actually an owner
20 who was making improvements and preserving
21 100-year-old buildings, and he's since deceased.
22           Without someone there doing it, I
23 don't know who you'd sell it to in the condition
24 it's in.
25       Q    Next page, which is numbered page 6

1    of 40, according to the PACER number at the top,
2    you list another asset, a promissory note to
3    John Sweeney.
4    A    Um-hmm.
5         Q    Or from John Sweeney.
6    A    Right.
7         Q    Valued at $10,000.
8             What is this?
9    A    That's a loan I made to my brother and the
10   note he gave back to me for the loan.
11        Q    Has he since repaid?
12   A    He has.
13        Q    Now we're going to go to the
14   creditors section. Let's start on page 16 of 40.
15   Let me know when you have that page in front of
16   you.
17   A    I have it.
18        Q    This is: Schedule E, Creditors
19   Holdings, Unsecured Priority Claims.
20   A    Got it.
21        Q    First we have the Internal Revenue
22   Service.
23            Again, this is the Federal Internal
24   Revenue Service?
25   A    Right.

1         Q    And the claim is 17,210?
2    A    I think I told you 9,000, but this would
3    be more accurate.
4         Q    Okay. This refreshes your
5    recollection that --
6    A    Yes, it does, yes.
7         Q    Is this the 17,000 that you
8    negotiated a payment plan for?
9    A    Yes.
10        Q    Have you made any payments since
11   the date of this document?
12   A    No.
13        Q    Next, below that, you list $31,000
14   owed to the Wisconsin Department of Revenue.
15   A    Yes.
16        Q    Now, that's their claim. Was that
17   --
18        A    That was their initial claim, which I told
19   you I think was 70 or 60. It was 31, and now,
20   they claim like 240.
21        Q    Thousand?
22   A    Yeah, for nothing more than penalty and
23   interest.
24        Q    Okay. So, your earlier testimony
25   that it was 70-something thousand, this refreshes

1    your recollection that it was only 31,000?
2    A    I'm sorry, no. No, no, no. No. This was
3    income tax due to them, which I believe I paid.
4         Q    Okay. And to be clear, there are
5    two entries here for the Wisconsin Department of
6    Revenue. The first one is income tax, and that's
7    31,000; and the second Wisconsin Department of
8    Revenue entry is for the sales tax?
9    A    Yes.
10        Q    So, just to be clear, the income
11   tax that they claim was due, the 31,000, did you
12   dispute that?
13   A    No, I don't believe I did, and I believe
14   I've since negotiated and paid it.
15        Q    Negotiated and paid.
16            And then below that is the sales
17   tax they say is owed for RB Hospitality Group,
18   LLC?
19   A    Ryan Braun restaurant.
20        Q    And that's still in dispute?
21   A    Yes.
22        Q    Okay. Turning now to page 18 of
23   40. We won't go through all the creditors'
24   claims. We're just going to focus on some of the
25   bigger ones in the interest of time.

1         Is that okay?
2    A    Yes.
3         Q    If I skip over one that you want to
4    bring to my attention, feel free, but I just want
5    to ask a few questions about the bigger ones.
6             At the bottom, second from the
7    bottom, Fairview Ridge Partnerships claims you
8    owe them 766,000.
9             Is this the same amount that was
10   referred to in the OLR Complaint?
11   A    OLR, yes.
12        Q    Below that, in the bottom entry,
13   First Business Bank claims a personal guaranty,
14   $6.5 million.
15            What is that?
16   A    That's for the loans on the Fairview Ridge
17   properties that I guaranteed.
18        Q    Are those loans still due?
19   A    There's still mortgages on the properties.
20   I guess my personal guaranty is still on it, but
21   I don't own anything, so I would have some
22   defenses if something went wrong.
23        Q    To the best of your knowledge, are
24   those loan payments still being made?
25   A    Yes.

Page 194

1    Q    In a timely fashion?
2    A    Yes, but they were always made in a timely
3    fashion, for the most part.  It may have been --
4    and those were not insignificant, $60,000 a month
5    for years.
6    Q    Next page is 19 of 40.
7         Do you have that in front of you?
8    A    Yes.
9    Q    We have the two top entries, same
10   creditor, Frank Liquor Company.
11   A    Yes.
12   Q    Two personal guaranties; one for
13   $3.5 million and one for $800,000.
14   A    Correct.
15   Q    What are those?
16   A    Those were mortgages on -- the first one,
17   the 3.5, mortgage on the property owned by
18   Fairview Ridge II -- I take it back, III,
19   Fairview Ridge III.
20        The 800 is the mortgage on Fairview
21   Ridge II.
22   Q    And these are personal guaranties
23   you made in case these loans went unpaid?
24   A    Yes.
25   Q    And these loans are still owed?

Page 195

1    A    To the best of my knowledge, they're still
2    owed.
3    Q    Are loan payments being made in a
4    timely fashion to the best of your knowledge?
5    A    I don't know.  Frank Liquor Company now
6    owns the shares of those two LLCs.  So, I don't
7    know if the Doctrine of Merger comes in here or
8    whether they wrote them off or whether they paid
9    them off.  I don't really know.
10   Q    Have you ever been asked to make a
11   payment pursuant to this personal guaranty?
12   A    No.
13   Q    Turning to page 20 of 40.
14        Do you have that page in front of
15   you?
16   A    I do.
17   Q    We have two creditors we talked
18   about before, Jeff Brown and Kenneth Ronan of
19   Lavalle, Brown & Ronan.
20        Here in 2013, you list that you owe
21   each of them $34,000.
22   A    Yeah, and I think that's wrong.  I think I
23   owed them combined 34,000.  I think I actually
24   owed them 17,500 each -- no, 17 each.  Yeah, 17
25   each, of which I made some payments, credits, to.

Page 196

1    Q    And as I recall your testimony
2    before, you also have taken additional loans
3    since 2013.
4    A    Just from Jeff.
5    Q    So, the current amount actually
6    owed to Jeff?
7    A    60- or 70,000, something like that.
8    Q    Turning to page 22, do you have
9    that page in front of you?
10   A    Yes.
11   Q    One of the creditors is Peter W.
12   Sweeney.
13   A    Yes.
14   Q    And who is Peter W. Sweeney?
15   A    My cousin.
16   Q    And you made a loan to him?
17   A    He made a loan to me.
18   Q    Oh, he made a loan to you.
19        When did he loan you this money?
20   A    2009.
21   Q    And have you repaid the loan?
22   A    I have not.  I've made some partial
23   payments towards, but I have not paid it in full.
24   Q    Is there interest occurring on this
25   loan?

Page 197

1    A    Yes.
2    Q    What is the interest rate?
3    A    13 percent.
4    Q    Per year?
5    A    Yes.
6    Q    And is that accruing each month?
7    A    It is, each day.
8    Q    Do you know the current amount due,
9    including capitalized interest?
10   A    Not off the top of my head, but I can
11   figure it out, if you give me a minute, some --
12   an approximate.
13        It's $19,000 a year in interest on
14   the initial principle, and this is 2013 -- let's
15   just say $20,000 a year so my math can be simple.
16   13 -- so, July of '14, July of '15, 2016, it
17   would be about 280.
18   Q    Why did you borrow $218,000 from
19   your cousin Peter?
20   A    Because I had a client that owed me
21   400,000 and couldn't pay for about nine months,
22   and I was in need of operating capital in my
23   life.  Actually, only borrowed 142,000, and then,
24   the client, of course, didn't pay.
25   Q    And then, finally, on page 23, we

Albanese & Associates

1    have, again, the Wisconsin Department of Revenue.
2    They claim they're owed another $38,849 as you
3    reported here.
4           Is this a different tax bill than
5    the other two we had discussed?
6    A    I don't know, and let's take a look,
7    because this is 2012 taxes, but it says "sales
8    tax," so it might just be the principle -- it
9    just might be the interest and penalties for the
10   year 2012. I'm not really sure.
11        Q    Okay.
12   A    They were the least of my worries at the
13   time.
14        Q    So, what happened in your
15   bankruptcy, you and your wife, Pamela; what
16   happened?
17   A    A very -- what I think is a very strange
18   thing. One of the reasons you go for 11 is
19   there's a reason to stay alive.
20        Q    Go for 11?
21   A    Chapter 11. Is there's a reason to stay
22   alive, particularly, to simplify it, though, the
23   key asset I had was Fairview Ridge, the
24   138-square-foot property I owned, beautiful,
25   beautiful building.

1           We had -- at the time of my
2    bankruptcy, it was being occupied by a company
3    called Parts Now. They had a ten-year lease,
4    which is how we made all those payments all those
5    years, millions of dollars of timely payments.
6           They -- I, to get into many of the
7    deals I got into, borrowed money from State Bank
8    of Cross Plains, which collateralized those loans
9    of about $1.2 million with the shares of stock in
10   my Fairview entities and my home, and I had tons
11   of equity in each.
12          We -- thus the purpose to go to the
13   Bankruptcy Court and say, stop the bank from
14   taking the security for the 1.6, because all this
15   stuff is worth, once you -- once you take all the
16   loans and everything and pay it back -- sell
17   everything and pay it back, there's like $3
18   million in credit -- or in equity, and if I pay
19   off the one, two, or three, whatever it was, then
20   I have a couple things. I have an $800,000 home
21   all paid off, and I have a couple million dollars
22   in my pocket.
23          We got to -- the first thing the
24   bank does is they want to leave to continue to
25   foreclose from the automatic stay that's imposed

1    when you file.
2           The judge heard everything I just
3    told you from our attorney and said, I grant the
4    leave for the automatic stay, which we had a
5    choice of appealing or trying to work with the
6    bank.
7           We decided to try to -- we let the
8    appeal deadline pass, and we tried to work with
9    the bank, because the -- what bank in their right
10   mind would not be comfortable with the -- with
11   the system we just talked about, and the bank
12   never took another position. The bank says,
13   yeah, yeah, yeah, yeah, yeah, yeah, yeah, no.
14          So, the reason we went for the
15   bankruptcy was done, because 11 wasn't -- the
16   help that the Chapter 11 was supposed to give us
17   simply wasn't given to us.
18          So, our attorney said, well, as
19   long as you're here, you might as well convert to
20   a 7 and get everything discharged.
21        Q    By converting to a 7, you mean
22   Chapter 7?
23   A    Chapter 7, I'm sorry, yes. And I said,
24   well, you know, most of the people on there, the
25   tax people don't go away with a 7, and the rest

1    of the people, I pretty much intend to pay. I
2    said, why don't we just drop it?
3           Well, we had a trustee -- you have
4    a trustee that's appointed for your 11, and then
5    there's a trustee that works for the Justice
6    Department, which is really the trustee for every
7    bankruptcy that gets filed in that district.
8    This woman was brutal.
9           General Motors, when they filed
10   bankruptcy, had one eight-hour 341 creditors
11   hearing. Most people have a two- or three-hour.
12        Q    341?
13   A    Creditors hearing, it's called. I had
14   seven of them.
15          This woman was convinced that Pam
16   and I had millions stashed somewhere, convinced,
17   and even made statements like, you made $500,000
18   that year, where is it?
19          And I had to say to her and her
20   ignorance, well, the people you work for, the
21   Federal Government, took about half, and
22   $250,000, when you've got kids and they go to
23   Catholic schools, ain't a lot of money, and she
24   was ruthless.
25          So, we said to our attorney, we

Page 202

1    don't even want the 7, we don't care about the
2    discharges. We'll take on the creditors. We'll
3    work something out.
4         And so, she called the trustee and
5    said, they're just going to drop this, and she
6    said, oh, no, they're not going to fight any
7    voluntary dismissal.
8         So, we go in front of the judge on
9    some scheduling matter, and he says, I see you've
10   only paid half of your Chapter 11 fees, which are
11   like $2,000, you've only paid 1,000.
12        And I said, Your Honor, that's
13   because we aren't getting the 11, it's converted
14   to a 7. We didn't even get half of our money's
15   worth.
16        And he said, well, I tell you what,
17   you pay those in the next month, or I'm going to
18   dismiss your 7.
19        To which we said, we pick you
20   dismiss our 7, and they did.
21        But there we were with the bank who
22   was just not being reasonable at all. They
23   kicked us out of our home in a very, very
24   aggressive police action.
25    Q    You mean foreclosure?

Page 203

1    A    Yep. Hands on guns, whole bunch of
2    strange stuff, which I know those guys. They
3    don't do it. I talked to the sheriff. He denied
4    what I saw. Some -- as people have said,
5    Sweeney, you pissed in someone's hat.
6         The bank, in the meantime, on the
7    promise of Frank Liquor, my partner, Parts Now,
8    remember I was telling you, had a kickout date,
9    and they elected to kick out.
10        Now, Frank Liquor is pissing their
11   pants, because they're the only viable guaranty
12   of a $9 million loan, and we're not going to have
13   a tenant in a 104,000-square-foot building, and I
14   said -- told Frank, I can find a tenant, but I've
15   got to stop most of what I'm doing in the
16   practice of law, one of the reasons I left
17   Sweeney & Sweeney, and find a tenant.
18        I mean, this stuff -- you don't
19   find a tenant for 104,000 mixed-use building
20   every day, and you certainly don't find a good
21   one, and I took almost the whole year -- in fact,
22   it was a whole year, January 1st, 2012 to January
23   15th, 2013, and I landed a publicly-traded
24   company with a 10-year lease who has a market
25   value of $1.3 billion. I signed them up, making

Page 204

1    the value of that building, the equity in it, go
2    from about 3 or 4 million to about 9 or 10
3    million, if you know how cap rates work.
4         So, I saved the day, and he had
5    promised me a consulting fee of about 6 percent
6    of the total ten-year lease.
7         Well, he stiffed me on that. He
8    stiffed me on my overall management fees for the
9    ten years, and I got a call one day from the
10   State Bank of Cross Plains and said -- it's
11   really funny how they take stock back too,
12   because they have possession of it. That's what
13   perfects a security interest in stock.
14        So, you don't know what they're
15   doing with it, and I thought they probably had
16   some duty to tell you what they're doing with if.
17   They don't. They were right, they -- but that --
18   those shares were worth, in my opinion, about $3
19   and a half million.
20        And my partners went dark on me.
21   They wouldn't allow me to get any documents so I
22   could bring people in. The Bankruptcy Court
23   isn't going to help me, I'll just bring in
24   private investors. There's a lot of people who
25   will pay 1.5 million to get a share of a 3.5

Page 205

1    million deal. They went dark on me. The bank
2    goes dark on me. The bank's attorneys go dark on
3    me.
4         The bank attorney finally calls me
5    one day, and I think they're calling me, eight
6    messages I left for them, and said, by the way,
7    we sold your Fairview Ridge stock yesterday.
8         I said, you did? How much?
9         $600,000.
10        I said, you guys are out of your
11   mind. Do you know it's worth more than that?
12        That's what my client was willing
13   to accept. What am I going to do? Of course, I
14   know it's worth more.
15        So, out of curiosity, who did you
16   sell it to?
17        Your partners, Frank Liquor
18   Company.
19        Thus the contingent lawsuits.
20    Q    Thank you for that explanation.
21   Just a couple more questions here.
22    A    Yeah.
23    Q    And then we'll wrap up.
24        How did you come to rent the house
25   at 2590 Richardson Street?

Page 206

1    A    A friend of ours owned it, they had it for
2    sale.  They would have loved to rent it, but no
3    one would rent it, because it was for sale, and
4    they weren't willing to take it off the market,
5    and we were willing to move in there and allow
6    them to continue to market it, which is why we're
7    on the street.
8         Q    Is this Brian Nolan [ph] and
9    Maria Nolan?
10   A    Yes.
11        Q    And they let you live there
12   rent-free?
13   A    No, we paid some rent from time to time.
14   I'm not sure they were made whole.
15        Q    What?
16   A    I'm not sure they were made whole, meaning
17   I don't think what we paid them was market or
18   anything, but they did it more as a favor.
19   They'd rather have some money rather than none,
20   and we needed a place to stay.
21        Q    Have you ever lived at Longford
22   Terrace in Madison?
23   A    I'm trying to think.  I don't think so.
24        Q    Have you ever owned a condo?
25   A    No.

Page 207

1         Q    Has --
2    A    At Longford Terrace?  Can I see that?
3         Q    Has Pam?
4    A    I don't think so.
5         Q    Okay.
6    A    Because I know that address; I just can't
7    think of where it is.
8         Q    5631 Longford Terrace?  It could be
9    a different Sweeney.  I was just curious.
10   A    No, I --
11        Q    No recollection of that address?
12   A    I didn't put it in here, if I did.
13        Q    Okay.  Just two last objections
14   here -- or documents, sorry.
15        (Exhibit Number 33 was marked.)
16   BY MR. STRAITE:
17        Q    This is 33.  This document says:
18   Objection of Patrick S. Sweeney to Proposed
19   Settlement and Notice of Intent Not to Appear at
20   Fairness Hearing.  This was filed in the
21   Hollister and Abercrombie & Fitch case.  It is
22   stamped filed March 7, 2016.  The same date
23   appears in the PACER stamp at the top.
24        Mr. Sweeney, do you have this
25   document in front of you?

Page 208

1    A    Yes.
2         Q    Does this document look familiar?
3    A    Yes.
4         Q    And turning to page 4, is that your
5    signature?
6    A    Yes.
7         Q    What was the basis of your
8    objection here?
9    A    I don't recall offhand, but looking at it,
10   it's the Holy Trinity, as I described it.  It's
11   attorneys' fees, efficiency of the Class
12   administrative and the catchall.
13        Q    When you say "the catchall," that
14   means?
15   A    Any other objection that anyone else
16   filed.
17        Q    Right.  And this is the Abercrombie
18   & Fitch case that you disclosed on page 1 of
19   Exhibit 3?
20   A    Yes.
21        Q    Okay.  How did this case resolve?
22   A    It's in appeal, and, frankly, there is
23   a -- what I will call a prisoner appellant.  He's
24   not really in prison, but he's behaving like it.
25   He absurdly filed pleadings or motions or just

Page 209

1    gripes that go on and on and on, and I think
2    driving Class counsel to drink.
3         Q    Is your objection on appeal?
4    A    I have not appealed my objection.
5         Q    Did you withdraw your objection?
6    A    You know, I don't know if I did or didn't.
7    I have settled this matter.
8         Q    How much did you settle it for?
9    A    Is this the 25?  I think this might be the
10   25.
11        Q    Okay.  Maybe I can refresh your
12   recollection.  The next document, 34.
13        (Exhibit Number 34 was marked.)
14        THE WITNESS:  I'm looking for the
15   amount.
16   BY MR. STRAITE:
17        Q    This is our last document, Number
18   34.  It's titled:  Agreement Re Withdrawal of
19   Objection.  It bears the PACER stamp of Docket
20   Number 142 filed in Case Number 14-cv-61978.  I
21   believe these are Judge Cohn's, C-O-H-N, initials
22   in the Southern District of Florida, although
23   this document has the date of March 18th, 2016.
24        Do you have this document in front
25   of you?

Page 210

```
 1      A    I do.
 2      Q    It's Number 34.  Does this document
 3  look familiar?
 4      A    It does.
 5      Q    Who drafted this document?
 6      A    Class counsel.
 7      Q    Did you draft any of it?
 8      A    Certainly didn't draft it, whether I had
 9  comments on it or not, I don't recall.  That's
10  funny, it got filed without anyone's signature
11  but mine.
12      Q    Do you know who filed this?
13      A    One of the Class counsels, and this is not
14  the 25 one.
15      Q    Okay.  Do you see the PACER stamp
16  at the top?
17      A    Correct, yes, I do.
18      Q    The Case Number is 14-cv-61978?
19      A    Correct.
20      Q    And then the bottom of the first
21  paragraph on page 1, it identifies this case as
22  Case Number 14-cv-23120?
23      A    I do see that.
24      Q    Do you remember filing this
25  document in a different case?
```

Page 211

```
 1      A    I don't.  I don't think I would have been
 2  the one to file it.
 3      Q    On page 1, you see the recitals?
 4      A    Yes.
 5      Q    Do you see Recital Number 1.5 on
 6  page 1?
 7      A    Yes.
 8      Q    "Whereas the following review of
 9  the objection response, further meet and confer
10  with Class counsel regarding the merits of the
11  objection and additional review of the settlement
12  and the documents filed in support thereof, the
13  objectors are satisfied, believe and contend that
14  the objection is without merit and, therefore,
15  agree to withdraw the objection, while being
16  reimbursed for attorneys' time and costs
17  associated with lodging the objection."
18           Did I read that correctly?
19      A    You did.
20      Q    And do you agree this objection had
21  no merit?
22      A    I did think it had merit, but this was
23  what was sent to me, drafted, and I'm fine with
24  signing that.
25      Q    Okay.  And page 7 --
```

Page 212

```
 1      A    Of this document?
 2      Q    Yes.  Is that your signature?
 3      A    Yes.
 4      Q    So, you think your objection did
 5  have merit?
 6      A    I always think my objections have merit.
 7      Q    But even after you met with counsel
 8  and saw the objection response, you still think
 9  it has merit today?
10      A    I think so, yeah.
11      Q    Could you please turn to page 5.
12      A    Yes.
13      Q    General Provisions, which is
14  Section 4.
15           Do you have that in front of you?
16      A    I do.
17      Q    4.1 says:  In entering into this
18  agreement, objectors acknowledge that after
19  further review of the settlement documents, the
20  objection response and meet and confer with Class
21  counsel that the objection is without merit.
22      A    I agreed to allow that, yeah.
23      Q    Okay.  So, you recall that
24  provision being in there?
25      A    Yes.
```

Page 213

```
 1           MR. STRAITE:  I have nothing
 2  further at this time.
 3           Robert, are you still on the phone?
 4           MR. PETRAGLIA:  I am.
 5           MR. STRAITE:  Does Yahoo have any
 6  questions for the witness?
 7           MR. PETRAGLIA:  We do not have any
 8  questions at this time.
 9           THE WITNESS:  I have one final
10  comment.
11           MR. STRAITE:  You have that right.
12           THE WITNESS:  I have a blanket
13  objection as to any question or document
14  not regarding the case that we're here for
15  on the basis of relevancy.
16           Having said that, I answered those
17  questions.
18           MR. STRAITE:  I think that's it.
19  Thank you, Robert, and thank you,
20  Mr. Sweeney.
21           THE WITNESS:  See you, Robert.
22           MR. PETRAGLIA:  Thank you.
23           (Break taken.)
24           MR. STRAITE:  We are back on the
25  record.  Robert is not on the phone.  One
```

Page 214

1  clerical point we're putting on the
2  record. Mr. Sweeney, you understand
3  you're still under oath?
4      THE WITNESS:  Yes.
5      MR. STRAITE:  You understand it's
6  the same oath you took this morning?
7      THE WITNESS:  Correct.
8      MR. STRAITE:  The witness is
9  requesting reimbursement of travel
10 expenses consistent with federal law.  We
11 have no objection.  We have agreed to
12 provide $20 in cash now as an advance on
13 any amounts due, and we will provide the
14 rest via check to the address preferred by
15 the witness.
16     What address would you like?
17     THE WITNESS:  In care of
18 Kerry Ann Sweeney, 1223 20th Street,
19 Apartment 101, Santa Monica, California
20 94040.
21     MR. STRAITE:  I can certainly send
22 the check to that address in care of
23 Kerry Ann.  I don't know what the rules
24 are with regard to making the check
25 payable to her.

Page 215

1      THE WITNESS:  No, you don't have to
2  make it payable to --
3      MR. STRAITE:  Payable to you.
4      THE WITNESS:  Yeah.
5      MR. STRAITE:  We're done, thank
6  you.
7      (At 3:14 p.m., the deposition was
8  recessed.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 216

1        C E R T I F I C A T E
2
3      I, Alexis A. Jensen, RPR, CRR, Certified
4  Shorthand Reporter, do hereby certify that prior
5  to the commencement of the examination,
6  PATRICK SHANE SWEENEY, ESQ. was duly sworn by me
7  to testify to the truth, the whole truth, and
8  nothing but the truth.
9      I DO FURTHER CERTIFY that the foregoing
10 is a true and accurate transcript of the
11 deposition of said witness who was first duly
12 sworn by me on the date and place hereinbefore
13 set forth.
14     I FURTHER CERTIFY that I am neither
15 attorney nor counsel for, nor related to or
16 employed by, any of the parties to the action in
17 which this deposition was taken, and further that
18 I am not a relative or employee of any attorney
19 or counsel employed in this action, nor am I
20 financially interested in this case.
21
22     _____
23        Alexis A. Jensen, RPR, CRR
            Notary Public
24        My Commission Expires 01/31/20
    Dated: _____
25

Page 217

1      INSTRUCTIONS TO WITNESS
2
3      Read your deposition over carefully.  It
4  is your right to read your deposition and make
5  changes in form or substance.  You should assign
6  a reason in the appropriate column on the errata
7  sheet for any change made.
8      After making any change in form or
9  substance, and which have been noted on the
10 following errata sheet, along with the reason for
11 any change, sign your name on the errata sheet
12 and date it.
13     Then sign your deposition at the end of
14 your testimony in the space provided.  You are
15 signing it subject to the changes you have made
16 in the errata sheet, which will be attached to
17 the deposition before filing.  You must sign it
18 in front of a witness.  The witness need not be a
19 notary public.  Any competent adult may witness
20 your signature.
21     Return the original errata sheet to the
22 court reporter promptly!  Court rules require
23 filing within 30 days after you receive the
24 deposition.
25

55 (Pages 214 to 217)